1  Michael F. Ram, SBN #104805
   mram@robinskaplan.com
2  Susan S. Brown, SBN #287986
   sbrown@robinskaplan.com
3  ROBINS KAPLAN LLP
   2440 West El Camino Real, Suite 100
4  Mountain View, California 94040
   Telephone:  (650) 784-4040
5  Facsimile:  (650) 784-4041

6

7  [Additional Counsel Listed On Signature Page]

8  *Attorneys for Plaintiffs and Proposed Class*

9              **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11 LEE WALTERS and ANDREW PARSONS,
   individually and on behalf of all others similarly      Case No. 3:16-cv-05387-VC
12 situated,
                                                           **SECOND AMENDED CLASS**
13             Plaintiffs,                                 **ACTION COMPLAINT FOR:**

14 v.                                                      **1) Breach of Implied Contract**

15 KIMPTON HOTEL & RESTAURANT                              **2) Violation of the California Unfair**
   GROUP, LLC                                              **Competition Law, Business &**
16                                                         **Professions Code § 17200**, *et seq.*

17             Defendant.                                  **3) Negligence**

18

19                                                         <u>**JURY TRIAL DEMAND**</u>

20

21        Plaintiffs Lee Walters and Andrew Parsons bring this Amended Class Action Complaint

22 against Kimpton Hotel & Restaurant Group, LLC, on behalf of themselves and all others

23 similarly situated, and allege, upon personal knowledge as to their own actions and their

24 counsel's investigations, and upon information and belief as to all other matters, as follows:

25

26

27

CLASS ACTION COMPLAINT - 1

### NATURE OF THE ACTION

1.      Plaintiffs bring this class action against Kimpton Hotel & Restaurant Group, LLC ("Kimpton" or "Defendant") for its failure to secure and safeguard its customers' credit and debit card numbers and other payment card data ("PCD"), personally identifiable information ("PII") such as the cardholders' names, mailing addresses, and other personal information, which Kimpton collected at the time of check-in to one of its hotels, or use at one its retail operations within its hotels (collectively, "Private Information"), and for failing to provide timely, accurate, and adequate notice to Plaintiffs and other Class members that their Private Information had been stolen, and failing precisely to specify what types of information were stolen. When consumers use their payment cards at Kimpton, Kimpton electronically collects and stores this information, making it a treasure trove of useful information attractive to hackers who can use the information to profit and cause damage, as was done here, to consumers.

2.      Beginning in or around February 16, 2016 and perhaps even earlier and continuing through July 7, 2016, hackers utilizing malware accessed the computer systems at Kimpton hotels in numerous locations throughout the United States, including California, and stole copies of Kimpton customers' Private Information (the "Data Breach"). While copied, Plaintiffs' and consumers' information remains in the possession of Kimpton.  On July 26, 2016, Kimpton announced it may have sustained a data breach.

3.      On August 31, 2016, Kimpton acknowledged that it discovered malicious software designed to steal credit card data on computers that operate the payment processing systems for Kimpton hotels and restaurants. https://www.kimptonhotels.com/promos/payment-card-notification. Kimpton released additional information stating that the at-risk window began on February 16, 2016 through July 7, 2016, and that the malware was designed to collect payment card data—cardholder name, card number, expiration date and internal verification code—from cards used in connection with activities at the hotels. The information collected included PCD

(payment card data). In this same press release, Kimpton acknowledged its obligation to safeguard its customers' information: "Kimpton Hotels & Restaurants values the relationship we have with our guests and understands the importance of protecting personal information. We are notifying you of an incident that may involve your payment card information." Kimpton released very few details, and it did not explain why it had delayed notification of the public regarding the Data Breach.

4. On September 9, 2016, Kimpton sent letters to customers who had visited its properties during the affected period and who had used their payment cards to make purchases for goods and services. Plaintiffs received such a letter. A true and correct copy of the letter is attached.

5. Kimpton could have prevented this Data Breach. The malicious software used in the Data Breach was more than likely a variant of "BlackPOS," the identical malware strain that hackers used in data breaches at many other hotel chains, including Hilton, Starwood, Mandarin Oriental, White Lodging (on two occasions), and the Trump Collection. While many retailers, banks, and card companies responded to recent breaches by adopting technology that helps makes transactions more secure, Kimpton acknowledged twice in its press releases discussing the Data Breach that Kimpton did not do so until it was too late. Although Kimpton claims it has now strengthen its existing security measures, https://www.kimptonhotels.com/promos/payment-card-notification, the quality of the measures taken remains suspect and the need for judicial intervention and consumer and independent oversight is mandated by the circumstances described here.

6. Kimpton disregarded Plaintiffs' and Class members' rights by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its data systems were protected, failing to take available steps to prevent and stop the breach from ever happening, and failing to disclose to its customers the material facts that it did not have

CLASS ACTION COMPLAINT - 3

1   adequate computer systems and security practices to safeguard customers' Private Information.

2   On information and belief, Plaintiffs' and Class members' Private Information was improperly

3   handled and stored, was unencrypted, and was not kept in accordance with applicable, required,

4   and appropriate cyber-security protocols, policies, and procedures. As a result, Plaintiffs' and

5   Class members' Private Information was compromised and stolen. However, as this same

6   information remains stored in Kimpton's computer systems, Plaintiffs and class members have

7   an interest in ensuring that their information is safe, and they should be entitled to seek injunctive

8   and other equitable relief, including independent oversight of Kimpton's security systems.

9                                                **PARTIES**

10          7.      Plaintiff Lee Walters is an individual and resident of California.

11          8.      Plaintiff Andrew Parsons is an individual and resident of Georgia.

12          9.      Kimpton Hotels & Restaurants, LLC is a California corporation with its principle

13   place of business in San Francisco.  Kimpton primarily derives its revenues from hotel and

14   restaurant operations.

15                                  **JURISDICTION AND VENUE**

16          10.     This Court has jurisdiction over this action under the Class Action Fairness Act,

17   28 U.S.C. § 1332(d). The aggregated claims of the individual class members exceed

18   $5,000,000.00, exclusive of interest and costs, and this is a class action in which more than two-

19   thirds of the proposed plaintiff class, on the one hand, and Kimpton, on the other, are citizens of

20   different states.

21          11.     This Court has jurisdiction over Kimpton as it maintains its corporate

22   headquarters in this District and for the following reasons: Kimpton makes decisions regarding

23   overall corporate governance and management with regards to the hotels that it owns or manages,

24   including the security measures to protect its customers' Private Information, in this District; it

25   is authorized to conduct business throughout the United States, including California; it owns and

26

27

operates many hotels throughout California  and the United States; and it advertises in a variety of media throughout the United  States, including California. Via its business operations throughout the United States, Kimpton intentionally avails itself of the markets within this state to render the exercise of jurisdiction by this Court just and proper.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) (1) because a substantial part of the events and omissions giving rise to this action occurred in this District and because Kimpton is headquartered in this District.

## **FACTUAL BACKGROUND**

### **A.  Plaintiffs' Individual Facts**

13.     On December 28, 2015, and on May 29, 2016, Plaintiff Lee Walters used his payment card when checking into two different Kimpton Hotels located in California.  In April, 2016, he sustained a breach of the payment card used to book his stay on December 28, 2015 when he discovered that card had been used to purchase tickets on line to Disneyland. At the time of this purchase, which he neither authorized nor made, the credit card used was in his possession and control. As a result of this fraudulent charge, Plaintiff Walters replaced his payment card at his bank.

14.     When Plaintiff Walters booked and paid for his stay on May 29, 2016, at another Kimpton he used a second payment card. While he has not noticed any fraudulent activity on this card, he takes time out of his life to monitor his credit through an identity theft protection service to ensure that the information taken in the data breach at Kimpton Hotels has not been used to steal his identity or otherwise cause damage to his credit and finances. He also has taken time out of his day to review and address the alerts that he receives from the identity theft protection service to determine why he received the alerts and to take whatever action is necessary to deal with the alerts, a practice which will continue into the future. As a result of this breach, he will continue to secure and maintain identity theft protection on a continuing basis to monitor his

credit and finances.

15.     In early June, 2016, Plaintiff Andy Parsons used his American Express card to pay for his stay at The George Hotel in Washington, D.C., which is a Kimpton hotel.  Shortly after Plaintiff Parsons used his American Express card at the Kimpton hotel, a representative from the American Express Fraud Prevention Team contacted Plaintiff Parsons and informed him that his credit card had been compromised.  He was informed that the card was compromised in connection with his stay at the Kimpton hotel.  As a result, American Express canceled his card and ordered a replacement card.  Approximately one week later, Plaintiff Parsons received the replacement American Express card.  During the time Plaintiff Parsons was without his American Express card, he was unable to earn valuable American Express points and utilize other benefits of the card.  Plaintiff Parsons pays an annual fee for the use of his American Express card, and as a result, he paid for the card for a period for which its use was unavailable to him.

16.     Mr. Parsons had to use a different credit card after his card was cancelled and before the replacement card arrived; this was problematic for Mr. Parsons because he segregates his personal and professional purchases for taxes purposes.  As a result, he had to spend additional time reviewing his purchases and identifying the purpose of each transaction.

17.     In response to the notification that his card had been compromised, Plaintiff Parsons spent time communicating with American Express about his compromised account.  He also spent several hours updating his automatic bill pay settings to reflect his new American Express card number.

18.     Because Plaintiff Parsons was informed that his card was compromised as a result of a breach at a Kimpton hotel, he also contacted Kimpton and inquired whether Kimpton would provide credit monitoring services.  Because he was already notified that his American Express card was compromised, he was concerned about further identity theft related to the Kimpton data breach.  The Kimpton representative informed him that Kimpton would not provide credit

monitoring for consumers impacted by the Data Breach.

 **Kimpton and Its Private Information Collection Practices**

19.     Kimpton primarily derives its revenues from hotel and restaurant operations.

**B. Consumers Rely On Kimpton's Private Information Security Practices**

20.     Kimpton maintains a privacy policy available on its website:

Kimpton Hotel & Restaurant Group and its affiliates, including Six Continents Hotels, Inc., an InterContinental Hotels Group company, use your personal information in order to fulfill our commitment to providing an unparalleled guest service experience. As part of that undertaking, we are committed to safeguarding the privacy of the personal information that we gather.

As one of our guests, you understand and agree that we collect, use and disclose your personal information in accordance with this Privacy Policy for Guests (this "Policy").

Types of Personal Information We Collect

The term "personal information" in this Policy refers to information which does or is capable of identifying you as an individual. The types of personal information that we process (which may vary by jurisdiction based on applicable law) include:

· your name, gender, home and work contact details, business title, date and place of birth, nationality and passport and visa information;

· guest stay information, including the hotels where you have stayed, date of arrival and departure, goods and services purchased, special requests made, observations about your service preferences (including room and holiday preferences), telephone numbers dialed and faxes and telephone messages received;

· your credit card details, Kimpton Karma Rewards member information, online

user account details, profile or password details and any frequent flyer or travel partner program affiliation;

· any information necessary to fulfill special requests (e.g., health conditions that require specific accommodation, purchase of goods and services);

· information you provide regarding your marketing preferences or in the course of participating in surveys, contests or promotional offers;

· information collected through the use of closed circuit television systems, card key and other security systems; and

· contact and other relevant details concerning the employees of corporate accounts and vendors and other individuals with whom we do business (e.g., travel agents or meeting and event planners).

· geolocation information for our mobile internet and iPhone app users, upon your consent

Most of the personal information we process is information that you or someone acting on your behalf knowingly provides to us. However, in some instances, we process personal information that we are able to infer about you based on other information you provide to us or on our interactions with you, or personal information about you that we receive from a third party.

How We Use Information

Demographic and profile data is collected at our site, and we use this data in two main ways:

First, we analyze visitor information in aggregate, which means that we collect information about thousands of site visits and analyze it as a whole. This kind of study involves looking for trends among many visitors to our site, rather than analyzing information about any individual visitor. Examples include researching

which parts of the site are accessed most frequently or determining which products are most attractive to our users.

Second, we may use specific information you provide to help us customize our communications with you and improve our service to you when you visit any Kimpton property, to conduct market research, customer satisfaction and quality assurance surveys and to direct marketing and sales promotions. For instance, if you inform us of a room or service preference, we will attempt to satisfy that request when you visit us in the future and may send you promotions relating to that preference.

We use third parties to build and manage these communication and preference systems, and our arrangements with these third parties prohibit them from disclosing your personal information.

Specifically, subject to applicable laws, we may collect, use and disclose relevant portions of your personal information in order to:

· provide and charge for the hotel accommodation and other goods and services you purchase;

· provide you with a better, more personalized level of service;

· administer the Kimpton Karma rewards program;

· fulfill contractual obligations to you, anyone involved in the process of making your travel arrangements (e.g., travel agents, group travel organizers or your employer) and vendors (e.g., credit card companies, airline operators and other loyalty programs);

· conduct market research, customer satisfaction and quality assurance surveys, direct marketing and sales promotions;

· respond to requests for information and services;

· provide for the safety and security of staff, guests and other visitors;

· administer general record keeping; and

· meet legal and regulatory requirements

Sharing of Personal Information

We reveal Personally Identifiable Information about you to unaffiliated third parties if:

· you request or authorize it;

· the information is provided to help complete a transaction for you;

· the information is provided to comply with the law, applicable regulations, court orders or subpoenas, to enforce our Terms of Use or other agreements, or to protect our rights, property or safety or the rights, property or safety of our users or others (e.g., to a consumer reporting agency for fraud protection etc.);

· the disclosure is done as part of a changeover in management of a hotel or restaurant from Kimpton to a third party;

· the information is provided to our agents, outside vendors or service providers to perform functions on our behalf (e.g., analyzing data, providing marketing assistance, providing customer service, processing orders, etc.); or

· to others as described in this Privacy Policy.

21.     Kimpton stores massive amounts of PII and PCD on its servers and utilizes this information to maximize its profits through predictive marketing and other marketing techniques.

22.     Consumers place value in data privacy and security, and they consider it when making decisions on where to stay for travel. Plaintiffs would not have stayed at the Kimpton hotels nor would they have used their debit card and credit card to pay for Kimpton stays had they known that Kimpton does not take all necessary precautions to secure the personal and financial data given to it by consumers.

23.     Kimpton failed to disclose its negligent and insufficient data security practices and consumers relied on or were misled by this omission into paying, or paying more, for accommodations at Kimpton.

**C. Stolen Private Information Is Valuable to Hackers and Thieves**

24.     It is well known and the subject of many media reports that PII data is highly coveted and a frequent target of hackers. PII data is often easily taken because it may be less protected and regulated than payment card data. In the hospitality industry, and as identified earlier, a large number of hotel chains were the targets of data breaches. Moreover, Kimpton— along with the other hotel chains that were hacked—was aware or should have been aware of the federal government's heightened interest in securing consumers' PII when staying in hotels located in the United States due to the very public litigation commenced by the Federal Trade Commission against Wyndham Worldwide Corporation founded upon that company's failure to provide reasonable cybersecurity protections for customer data. Despite this well-publicized litigation and the frequent public announcements of data breaches by retailers and hotel chains, Kimpton opted to maintain an insufficient and inadequate system to protect the PII of Plaintiffs and Class members.

25.     Legitimate organizations and the criminal underground alike recognize the value of PII. Otherwise, they wouldn't aggressively seek or pay for it. For example, in "one of 2013's largest breaches . . . not only did hackers compromise the [card holder data] of three million customers, they also took registration data from 38 million users."[1] Similarly, in the Target data breach, in addition to PCI data pertaining to 40,000 credit and debit cards, hackers stole PII pertaining to 70,000 customers.

26.     Biographical data is also highly sought after by data thieves. "Increasingly,

---

[1] Verizon 2014 PCI Compliance Report, available at http://www.nocash.info.ro/wp-content/uploads/2014/02/ Verizon_pci-report-2014.pdf (hereafter "2014 Verizon Report"), at 54 (last visited Sept. 24, 2014).

CLASS ACTION COMPLAINT - 11

criminals are using biographical data gained from multiple sources to perpetrate more and larger thefts." *Id.* PII data has been stolen and sold by the criminal underground on many occasions in the past, and the accounts of theft and unauthorized access have been the subject of many media reports. One form of identity theft, branded "synthetic identity theft," occurs when thieves create new identities by combining real and fake identifying information then use those identities to open new accounts. "This is where they'll take your Social Security number, my name and address, someone else's birthday and they will combine them into the equivalent of a bionic person," said Adam Levin, Chairman of IDT911, which helps businesses recover from identity theft. Synthetic identity theft is harder to unravel than traditional identity theft, experts said: "It's tougher than even the toughest identity theft cases to deal with because they can't necessarily peg it to any one person." In fact, the fraud might not be discovered until an account goes to collections and a collection agency researches the Social Security number.

27.     Unfortunately, and as is alleged below, despite all of this publicly available knowledge of the continued compromises of PII in the hands of third parties, such as hoteliers , Kimpton's approach at maintaining the privacy of Plaintiffs' and Class members' PII was lackadaisical, cavalier, reckless, or at the very least, negligent.

**D.  Kimpton Failed to Segregate PCD From PII**

28.     Unlike PII data, PCD is heavily regulated. The Payment Card Industry Data Security Standard ("PCI DSS") is a set of requirements designed to ensure that companies maintain consumer credit and debit card information in a secure environment.

29.     "PCI DSS provides a baseline of technical and operational requirements designed to protect cardholder data." [2]

30.     One PCI DSS requirement is to protect stored cardholder data. Cardholder data includes Primary Account Number, Cardholder Name, Expiration Date, and Service Code.

---

[2] PCI SECURITY STANDARDS COUNCIL, PAYMENT CARD INDUSTRY DATA SECURITY STANDARD VERSION 2.0 at 5 (October 2010) (hereafter PCI Version 2).

"Network segmentation of, or isolating (segmenting), the cardholder data environment from the remainder of an entity's network is not a PCI DSS requirement."[3] However, segregation is recommended because, among other reasons, "[i]t's not just cardholder data that's important; criminals are also after personally identifiable information (PII) and corporate data."[4]

31.     Illicitly obtained PII and PCD, sometimes aggregated from different data breaches, are sold on the black market, including on websites, as products at a set price.[5]

32.     Without such detailed disclosure, Plaintiffs and Class members are unable to take the necessary precautions to prevent imminent harm, such as continued misuse of their personal information.

33.     Kimpton has failed to provide a cogent picture of how the Data Breach occurred and its full effects on consumers' PII and PCD information.

34.     Hacking is often accomplished in a series of phases, including reconnaissance; scanning for vulnerabilities and enumeration of the network; gaining access; escalation of user, computer and network privileges; maintaining access; covering tracks; and placing backdoors. On information and belief, while hackers scoured Kimpton's networks to find a way to access PCD, they had access to and collected the PII stored on Kimpton's networks.

35.     Thieves already are using the Private Information stolen from Kimpton to commit actual fraud, as occurred to Plaintiffs here.

36.     The Data Breach was caused and enabled by Kimpton's knowing violation of its obligations to abide by best practices and industry standards in protecting its customers' Private Information.

37.     In this regard, more than likely the software used in the attack was a variant of

---

[3] *Id.* at 10.
[4] *See* Verizon Report at 54.
[5] *See, e.g.*, Brian Krebs, *How Much Is Your Identity Worth?*, KREBSONSECURITY.COM (Nov. 8, 2011), https://krebsonsecurity.com/2011/11/how-much-is-your-identity-worth/ (last visited January 18, 2016).

CLASS ACTION COMPLAINT - 13

"BlackPOS," a malware strain designed to siphon data from cards when they are swiped at infected point-of-sale systems. Hackers previously utilized BlackPOS in other recent cyber-attacks, including breaches at Home Depot and Target. While many retailers, banks, and card companies have responded to these recent breaches by adopting technology and security practices that help makes transactions and stored data more secure, Kimpton has acknowledged that it did not do so.

**E.  This Data Breach Will Result In Additional Identity Theft and Identify Fraud**

38.      Kimpton failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach.

39.      The ramifications of Kimpton's failure to keep Plaintiffs' and Class members' data secure are severe.

40.      The information Kimpton compromised, including Plaintiffs' identifying information and/or other financial information, is "as good as gold" to identity thieves, in the words of the Federal Trade Commission ("FTC").[6] Identity theft occurs when someone uses another's personal identifying information, such as that person's name, address, credit card number, credit card expiration date, and other information, without permission, to commit fraud or other crimes. The FTC estimates that as many as 10 million Americans have their identities stolen each year.

41.      As the FTC recognizes, once identity thieves have personal information, "they can drain your bank account [as occurred to Plaintiffs here], run up your credit cards, open new

---

[6] FTC Interactive Toolkit, Fighting Back Against Identity Theft, *available at* http://www.dcsheriff.net/community/documents/id-theft-tool-kit.pdf (last visited Sept. 24, 2014).

utility accounts, or get medical treatment on your health insurance."[7]

42.     According to Javelin Strategy and Research, "1 in 4 notification recipients became a victim of identity fraud."[8] Nearly half (46%) of consumers with a breached debit card became fraud victims within the same year.

43.     Identity thieves can use personal information such as that of Plaintiffs and Class members, which Kimpton failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund. Some of this activity may not come to light for years. The IRS paid out 43.6 billion in potentially fraudulent returns in 2012, and the IRS identified more than 2.9 million incidents of identity theft in 2013. The IRS has described identity theft as the number one tax scam for 2014.

44.     Among other forms of fraud, identity thieves may get medical services using consumers' compromised personal information or commit any number of other frauds, such as obtaining a job, procuring housing, or even giving false information to police during an arrest.

45.     It is incorrect to assume that reimbursing a consumer for a financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving

---

[7] FTC, Signs of Identity Theft, available at <http://www.consumer.ftc.gov/articles/ 0271-signs-identity-theft> (last visited Sept. 24, 2014).

[8] See 2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters, available at <www.javelinstrategy.com/brochure/ 276> (last visited Sept. 24, 2014) (the "2013 Identity Fraud Report").

problems."[9] In fact, the BJS reported, "resolving the problems caused by identity theft [could] take more than a year for some victims." *Id*. at 11.

**F.  Annual monetary losses from identity theft are in the billions of dollars.**

46.     Javelin Strategy and Research reports that those losses increased to $21 billion in 2013.[10]

47.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII or PCD is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[11]

48.     Plaintiffs and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies.

**G.  Plaintiffs and Class Members Suffered Damages**

49.     The Data Breach was a direct and proximate result of Kimpton's failure to properly safeguard and protect Plaintiffs' and Class members' Private Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Kimpton's failure to establish and implement

---

[9]     Victims of Identity Theft, 2012 (Dec. 2013) at 10, *available at* http://www.bjs.gov/content/pub/pdf/vit12.pdf  (last visited Sept. 24, 2014).
[10] *See* 2013 Identity Fraud Report.
[11]     GAO, Report to Congressional Requesters, at p.33 (June 2007), *available at* http://www.gao.gov/new.items/d07737.pdf (emphases added) (last visited Sept. 24, 2014).

CLASS ACTION COMPLAINT - 16

1  appropriate administrative, technical, and physical safeguards to ensure the security and

2  confidentiality of Plaintiffs' and Class members' PII to protect against reasonably foreseeable

3  threats to the security or integrity of such information.

4      50.     Plaintiffs' and Class members' PII is private and sensitive in nature and was left

5  inadequately protected by Kimpton. Kimpton did not obtain Plaintiffs' and Class members'

6  consent to disclose their PII to any other person as required by applicable law and industry

7  standards.

8      51.     As a direct and proximate result of Kimpton's wrongful action and inaction and

9  the resulting Data Breach, Plaintiffs (as was addressed above)  and Class members have been

10  placed at an imminent, immediate, and continuing increased risk of harm from identity theft and

11  identity fraud, requiring them to take the time and effort to mitigate the actual and potential

12  impact of the Data Breach on their lives including, among other things, by placing "freezes" and

13  "alerts" with credit reporting agencies, contacting their financial institutions, closing or

14  modifying financial accounts, and closely reviewing and monitoring their credit reports and

15  accounts for unauthorized activity.

16      52.     Kimpton's wrongful actions and inaction directly and proximately caused the

17  theft and dissemination into the public domain of Plaintiffs' and Class members' Private

18  Information, causing them to suffer, and continue to suffer,  damages and other actual harm for

19  which they are entitled to compensation, including:

20          a.   theft of their personal and financial information;

21          b.   the imminent and certainly impending injury flowing from potential fraud and

22               identify theft posed by their credit/debit card and personal information being

23               placed in the hands of criminals and already misused via the sale of Plaintiffs'

24               and Class members' information on the Internet card black market;

25          c.   the untimely and inadequate notification of the Data Breach;

26

27

d.   the improper disclosure of their Private Information;

e.   loss of privacy;

f.   ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g.   ascertainable losses in the form of deprivation of the value of their PII and PCD, for which there is a well-established national and international market;

h.   overpayments to Kimpton for products and services purchased during the Data Breach in that a portion of the price paid for such products and services by Plaintiffs and Class members to Kimpton was for the costs of reasonable and adequate safeguards and security measures that would protect customers' Private Information, which Kimpton did not implement and, as a result, Plaintiffs and Class members did not receive what they paid for and were overcharged by Kimpton;

i.   the loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts; and

j.   deprivation of rights they possess under the California Unfair Competition Law (Cal. Bus. & Prof. Code §17200);

k.   Plaintiffs' economic injuries are also described in Paragraphs 13-18.

53.   While the Private Information of Plaintiffs and members of the Class has been stolen, the same or a copy of the Private Information continues to be held by Kimpton. Plaintiffs and members of the Class have an undeniable interest in insuring that this information is secure, remains secure, and is not subject to further theft.

## **CLASS ACTION ALLEGATIONS**

54.     Plaintiffs seek relief in their individual capacities and as representatives of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b) (2), (b) (3), and (c) (4), Plaintiffs seek certification of a Nationwide class and a California class. The national class is initially defined as follows: all persons residing in the United States whose personal and/or financial information was disclosed in the Data Breach affecting Kimpton in 2015 (the "Nationwide Class").

55.     The California Class is initially defined as follows: all persons residing in California whose personal and/or financial information was disclosed in the Data Breach affecting Kimpton in 2016 (the "California Class").

56.     Excluded from each of the above Classes are Kimpton, including any entity in which Kimpton has a controlling interest, is a parent or subsidiary, or which is controlled by Kimpton, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Kimpton. Also excluded are the judges and court personnel in this case and any members of their immediate families.

57.     Numerosity. Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that the joinder of all members is impractical. While the exact number of Class members is unknown to Plaintiffs at this time, Kimpton has acknowledged that debit and credit cards were affected by the breach at many of its hotels in the United States, including the ones where Plaintiffs stayed. Moreover, Kimpton maintains records of the names and addresses of all Class members

58.     Commonality. Fed. R. Civ. P. 23(a) (2) and (b) (3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

          a.   Whether Kimpton violated the California's Deceptive and Unfair Trade Practices Act by failing to implement reasonable security procedures and

1            practices;

2          b. Whether Kimpton violated law by failing to promptly notify class members

3             their personal information had been compromised;

4          c. Whether class members may obtain injunctive relief against Kimpton under

5             California's privacy laws  to require that it safeguard or destroy, rather than

6             retain, the Private Information of Plaintiffs and Class members;

7          d. Which security procedures and which data-breach notification procedure

8             should Kimpton be required to implement as part of any injunctive relief

9             ordered by the Court;

10        e. Whether Kimpton has an implied contractual obligation to use reasonable

11           security measures;

12        f. Whether Kimpton has complied with any implied contractual obligation to use

13           reasonable security measures;

14        g. What security measures, if any, must be implemented by Kimpton to comply

15           with its implied contractual obligations;

16        h. Whether Kimpton violated California's privacy laws  in connection with the

17           actions described herein; and

18        i. What the nature of the relief should be, including equitable relief, to which

19           Plaintiffs and the Class members are entitled.

20      59. All members of the proposed Classes are readily ascertainable. Kimpton has

21 access to addresses and other contact information for millions of members of the Classes, which

22 can be used for providing notice to many Class members.

23      60. Typicality. Fed. R. Civ. P. 23(a) (3). Plaintiffs' claims are typical of those of other

24 Class members because Plaintiffs' information, like that of every other class member, was

25 maintained by, disclosed, taken and/or misused by Kimpton.

26

27

61.     Adequacy of Representation. Fed. R. Civ. P. 23(a) (4). Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions, including privacy litigation.

62.     Superiority of Class Action. Fed. R. Civ. P. 23(b) (3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

63.     Damages for any individual class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Kimpton's violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.  Class certification is also appropriate under Fed. R. Civ. P. 23(a), (b)(2) and (c)(4)because Kimpton has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests herein.  Such particular issues include, but are not limited to:

     a.   Whether Kimpton failed to timely notify the public of the Breach;

     b.   Whether Kimpton owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Customer Data;

     c.   Whether Kimpton's security measures were reasonable in light of measures recommended by data security experts;

     d.   Whether Kimpton's failure to adequately comply with industry standards and/or

to institute protective measures beyond industry standards amounted to negligence;

e. Whether Kimpton failed to take commercially reasonable setps to safeguard the Customer Data of Plaintiffs and the Class members; and,

f. Whether adherence to measures recommended by data security experts would have reasonably prevented the Data Breach.

**COUNT ONE**
**Breach of Implied Contract**
(On Behalf of Plaintiffs and the Nationwide Class)

64.     Plaintiffs incorporate the substantive allegations contained in Paragraphs 1 through 63 as if fully set forth herein.

65.     Kimpton solicited and invited Plaintiffs and Class Members to stay at its hotels and make purchases using their credit or debit cards. Plaintiffs and Class members accepted Kimpton's offers and used their credit or debit cards to purchase, stay, and make purchases at Kimpton hotels during the period of the Data Breach.

66.     When Plaintiffs and Class Members made and paid for purchases of Kimpton services and products in connection with their stays at Kimpton properties, they provided their PII and PCD, including but not limited to the PII and PCD contained on the face of, and embedded in the magnetic strip of, their debit and credit cards. In so doing, Plaintiffs and Class Members entered into implied contracts with Kimpton pursuant to which Kimpton agreed to safeguard and protect such information and to timely and accurately notify Plaintiffs and Class Members if their data had been breached and compromised.

67.     Each purchase at a Kimpton hotel made by Plaintiffs and Class Members using their credit or debit card was made pursuant to the mutually agreed-upon implied contract with Kimpton under which Kimpton agreed to safeguard and protect Plaintiffs' and Class Members' PII and PCD, including all information contained in the magnetic stripe of Plaintiffs' and Class

1    Members' credit or debit cards, and to timely and accurately notify them if such information was

2    compromised or stolen.

3        68.    Plaintiffs and Class Members would not have provided and entrusted their PII and

4    PCD, including all information contained in the magnetic stripes of their credit and debit cards,

5    to Kimpton to stay at its hotels and make purchases in the absence of the implied contract between

6    them and Kimpton.

7        69.    Plaintiffs and Class Members fully performed their obligations under the implied

8    contracts with Kimpton.

9        70.    Kimpton breached the implied contracts it made with Plaintiffs and Class

10   Members by failing to safeguard and protect the PII and PCD of Plaintiffs and Class Members

11   and by failing to provide timely and accurate notice to them that their PII and PCD was

12   compromised in and as a result of the Data Breach.

13       71.    As a direct and proximate result of Kimpton's breaches of the implied contracts

14   between Kimpton and Plaintiffs and Class Members, Plaintiffs and Class Members sustained

15   actual losses and damages as described in detail above.

16
17                                   **COUNT TWO**
                                       **Negligence**
18                      (On Behalf of Plaintiffs and the Nationwide Class)

19       72.    Plaintiffs incorporate the substantive allegations contained in Paragraphs 1

20   through 63 as if fully set forth herein.

21       73.    Upon accepting and storing Plaintiffs' and Class Members' Private Information

22   in their respective computer database systems, Kimpton undertook and owed a duty to Plaintiffs

23   and Class Members to exercise reasonable care to secure and safeguard that information and to

24   utilize commercially reasonable methods to do so. Kimpton knew, acknowledged, and agreed the

25   Private Information was private and confidential and would be protected as private and

26
27

CLASS ACTION COMPLAINT - 23

confidential.

74.     The law imposes an affirmative duty on Kimpton to timely disclose the unauthorized access and theft of the Private Information to Plaintiffs and the Class so that Plaintiffs and Class Members could take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Private Information.

75.     Kimpton breached its duty to notify Plaintiffs and Class Members of the unauthorized access by failing to notify Plaintiffs and Class Members of the breach until September 2016. To date, Kimpton has not provided sufficient information to Plaintiffs and Class Members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Plaintiffs and the Class.

76.     Kimpton also breached its duty to Plaintiffs and the Class Members to adequately protect and safeguard this information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Private Information. Furthering its dilatory practices, Kimpton failed to provide adequate supervision and oversight of the Private Information with which it is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a third party to gather Plaintiffs' and Class Members' Private Information, misuse the Private Information, and intentionally disclose it to others without consent.

77.     Through Kimpton's acts and omissions described in this Complaint, including Kimpton's failure to provide adequate security and its failure to protect Plaintiffs' and Class Members' Private Information from being foreseeably captured, accessed, disseminated, stolen, and misused, Kimpton unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiffs' and Class Members' Private Information during the time it was within Kimpton's possession or control.

78.     Further, through its failure to provide timely and clear notification of the Data Breach to consumers, Kimpton prevented Plaintiffs and Class Members from taking meaningful, proactive steps to secure their financial data and bank accounts.

79.     Upon information and belief, Kimpton improperly and inadequately safeguarded the Private Information of Plaintiffs and Class Members in deviation from standard industry rules, regulations, and practices at the time of the Data Breach.

80.     Kimpton's failure to take proper security measures to protect Plaintiffs' and Class Members' sensitive Private Information as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiffs' and Class Members' Private Information.

81.     Kimpton's conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the Private Information; failing to conduct regular security audits; failing to provide adequate and appropriate supervision of persons having access to Plaintiffs' and Class Members' Private Information; and failing to provide Plaintiffs and Class Members with timely and sufficient notice that their sensitive Private Information had been compromised.

82.     Neither Plaintiffs nor the other Class Members contributed to the Data Breach and subsequent misuse of their Private Information as described in this Complaint.

83.     As a direct and proximate cause of Kimpton's conduct, Plaintiffs and the Class suffered damages including, but not limited to: nominal damages, damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the Private Information of Plaintiffs and Class Members and/or filing false tax returns; and damages from identity theft, which may take months, if not years, to discover and detect, given the far-reaching, adverse, and detrimental consequences of identity theft and loss

of privacy. The nature of other forms of economic damage and injury may take years to detect and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

**COUNT THREE**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200 – Unlawful Business Practices**
(On Behalf of Plaintiffs and the Nationwide Class, Or In The Alternative, On Behalf of the California Class)

84.    Plaintiffs incorporate the substantive allegations contained in Paragraphs 1 through 63 as if fully set forth herein.

85.    Kimpton has violated Cal. Bus. and Prof. Code §17200 et seq. by engaging in unlawful, unfair or fraudulent business acts and practices and unfair, deceptive, untrue or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code §17200 with respect to the hotel services provided to the California Class.

86.    Kimpton engaged in unlawful acts and practices with respect to the hotel services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and California Class Members' Private Information with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and California Class Members' Private Information in an unsecure electronic environment in violation of California's data breach statute, Cal. Civ. Code § 1798.81.5, which requires Kimpton to take reasonable methods of safeguarding the Private Information of Plaintiffs and the California Class Members.

87.    In addition, Kimpton engaged in unlawful acts and practices with respect to the sale of hotel services by failing to disclose the Data Breach to California Class Members in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82. To date, Kimpton has still not provided such information to Plaintiffs and the California Class

Members.

88.     As a direct and proximate result of Kimpton's unlawful practices and acts, Plaintiffs and the California Class Members were injured and lost money or property, including but not limited to the price received by Kimpton for the hotel services, the loss of their legally protected interest in the confidentiality and privacy of their Private Information, nominal damages and additional losses described above.

89.     Kimpton knew or should have known that its computer systems and data security practices were inadequate to safeguard California Class Members' Private Information and that the risk of a data breach or theft was highly likely. Kimpton's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of members of the California Class.

90.     California Class Members seek relief under Cal. Bus. & Prof. Code § 17200, et. seq., including, but not limited to, restitution to Plaintiffs and California Class Members of money or property that Kimpton may have acquired by means of its unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Kimpton because of its unlawful and unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

**COUNT FOUR**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §17200 – Unfair Business Practices**
(On Behalf of Plaintiffs and the Nationwide Class, Or In The Alternative, On Behalf of the California Class)

91.     Plaintiffs incorporate the substantive allegations contained in Paragraphs 1 through 63 as if fully set forth herein.

92.     Kimpton engaged in unfair acts and practices with respect to the hotel services by establishing the sub-standard security practices and procedures described herein; by soliciting

and collecting Plaintiffs' and California Class Members' Private Information with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and California Class Members' Private Information in an unsecure electronic environment. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and California Class Members.   They were likely to deceive the public into believing their Private Information was securely stored, when it was not.  The harm these practices caused to Plaintiffs and the California Class Members outweighed their utility, if any.

93.     Kimpton engaged in unfair acts and practices with respect to the provision of hotel services by failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect California Class Members' Private Information from further unauthorized disclosure, release, data breaches, and theft. These unfair acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiffs and California Class Members.  They were likely to deceive the public into believing their Private Information was securely stored, when it was not.  The harm these practices caused to Plaintiffs and the California Class Members outweighed their utility, if any.

94.     As a direct and proximate result of Kimpton's acts of unfair practices and acts, Plaintiffs and the California Class Members were injured and lost money or property, including but not limited to the price received by Kimpton for the hotel services, the loss of their legally protected interest in the confidentiality and privacy of their Private Information, nominal damages and additional losses described above.

95.     Kimpton knew or should have known that its computer systems and data security practices were inadequate to safeguard California Class members' Private Information and that the risk of a data breach or theft was highly likely. Kimpton's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and

reckless with respect to the rights of members of the California Class.

96.     California Class members seek relief under Cal. Bus. & Prof. Code § 17200, et. seq., including, but not limited to, restitution to Plaintiffs and California Class Members of money or property that the Kimpton may have acquired by means of its unfair business practices, restitutionary disgorgement of all profits accruing to Kimpton because of its unfair business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civ. Proc. §1021.5), and injunctive or other equitable relief.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class members proposed in this Amended Complaint, respectfully requests that the Court enter judgment in her favor and against Kimpton as follows:

    a. For an Order certifying the Nationwide Class and California Class as defined herein, and appointing Plaintiffs and their Counsel to represent the Nationwide Class and California Class;

    b. For equitable relief enjoining Kimpton from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs and Class members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to the Plaintiffs and Class members;

    c. For equitable relief compelling Kimpton to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity to Class members the type of PII and PCD compromised.

    d. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Kimpton's wrongful conduct;

    e. For an award of actual damages and compensatory damages, in an amount to

1    be determined;

2       f.   For an award of costs of suit and attorneys' fees, as allowable by law; and

3       g.   Such other and further relief as this court may deem just and proper.

4                              **JURY TRIAL DEMAND**

5    Plaintiffs demand a jury trial on all issues so triable.

6  Dated: August 18, 2017

7                                   Respectfully submitted,

8                                   **MORGAN & MORGAN COMPLEX
                                    LITIGATION GROUP**

9
                              By:    */s/ John A. Yanchunis*
10                                  John A. Yanchunis *(admitted pro hac vice)*
                                    Florida Bar No. 324681
11                                  jyanchunis@ForThePeople.com
                                    Marisa Glassman *(admitted pro hac vice)*
12                                  Florida Bar No. 111991
                                    mglassman@ ForThePeople.com
13                                  MORGAN & MORGAN
14                                  COMPLEX LITIGATION GROUP
                                    201 N. Franklin Street, 7th Floor
15                                  Tampa, Florida 33602
                                    Telephone: (813) 223-5505
16                                  Facsimile: (813) 223-5402

17
                                    Michael F. Ram, SBN #104805
18                                  Email: MRam@RobinsKaplan.com
                                    Susan Brown, SBN #287986
19                                  Email: SBrown@RobinsKaplan.com
20                                  ROBINS KAPLAN, LLP
                                    2440 W. El Camino Real, Suite 100
21                                  Mountain View, California 94040
                                    Telephone: (650) 784-4040
22                                  Facsimile: (650) 784-4041

23                                  *Attorneys for Plaintiffs and Proposed Class and
24                                  California Sub-Class*

25

26

27

CLASS ACTION COMPLAINT - 30