ROBINS KAPLAN LLP
Michael F. Ram, SBN #104805
mram@robinskaplan.com
Susan S. Brown, SBN #287986
sbrown@robinskaplan.com
2440 West El Camino Real, Suite 100
Mountain View, California 94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis (admitted *pro hac vice*)
jyanchunis@ForThePeople.com
Marisa Glassman (admitted *pro hac vice*)
mglassman@ForThePeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

ROCK LAW LLP
Matt Malone, SBN #221545
101 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone:  (415) 433-4949
Facsimile:  (415) 433-7311

*Attorneys for Plaintiff and Proposed Class*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PARSONS, individually and on behalf of all others similarly situated,<br><br>             Plaintiff,<br><br>v.<br><br>KIMPTON HOTEL & RESTAURANT GROUP, LLC<br><br>             Defendant. | Case No. 3:16-cv-05387-VC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNOPPOSED MOTION FOR PRELIMINARY APPROVAL**<br><br>Date: July 12, 2018<br>Time: 10:00 a.m.<br>Judge: Hon. Vince Chhabria<br>Place: Courtroom 4, 17th Floor |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. SUMMARY OF THE LITIGATION ......................................................................... 1

III. INFORMATION ABOUT THE SETTLEMENT ...................................................... 3

IV. THE TERMS OF THE SETTLEMENT AGREEMENT .......................................... 3

    A. The Settlement Class ........................................................................................ 3

    B. The Settlement Benefits .................................................................................. 4

        1. Monetary Remedies ............................................................................. 4

        2. Injunctive Relief ................................................................................... 5

    C. Proposed Notice Plan ...................................................................................... 6

    D. Attorneys' Fees, Costs, and Expenses ........................................................... 7

    E. Service Awards ................................................................................................ 7

    F. Release of Claims ............................................................................................ 8

V. ARGUMENT ............................................................................................................... 8

    A. The Proposed Settlement Class Should Be Certified ...................................... 8

        1. The Class Meets the Requirements of Rule 23(a) ............................... 8

        2. The Class Meets the Requirements of Rule 23(b)(3) .......................... 9

    B. The Court Should Grant Preliminary Approval ............................................ 13

        1. The Standard for Preliminary Approval ............................................ 13

            a. The Strength of Plaintiff's Case ............................................ 15

            b. The Risk, Expense, Complexity, and Likely Duration of Further Litigation ............................................................... 15

            c. The Risk of Maintaining Class Action Status throughout Trial ............. 16

            d. The Amount Offered In Settlement ....................................... 16

            e. The Extent of Discovery Completed and the Stage of the Proceedings ........................................................................ 17

            f. The Experience and Views of Counsel .................................. 18

            g. The Presence of a Governmental Participant ........................ 18

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

h.   The Reaction of Class Members to the Proposed Settlement ................ 18

i.   Whether the Settlement is a Product of Collusion among the Parties ........................................................................................... 19

C.   The Court Should Approve the Proposed Settlement Notices and Authorize Their Dissemination ........................................................................................... 19

D.   The Court Should Appoint Plaintiff's Counsel as Class Counsel ............................ 20

E.   The Court Should Schedule a Fairness Hearing and Approve the Proposed Preliminary Approval Order ........................................................................................... 21

VI.  CONCLUSION ........................................................................................... 21

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)....................................................................................8, 13

*American Airlines v. Wolens*,
513 U.S. 219 (1995)...........................................................................................12

*Boyd v. Bechtel Corp.*,
485 F. Supp. 610 (N.D. Cal. 1979) ..................................................................18

*Chavez v. Blue Sky Natural Beverage Co.*,
268 F.R.D. 365 (N.D. Cal. 2010).....................................................................11

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004)............................................................................14

*Cotter v. Lyft, Inc.*,
193 F. Supp. 3d 1030 (N.D. Cal. 2016) ...........................................................14

*Duhaime v. John Hancock Mut. Life. Ins. Co.*,
177 F.R.D. 54 (D. Mass. 1997).........................................................................14

*Eddings v. DS Services of America, Inc.*,
No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016).............14

*Forcellati v. Hyland's, Inc.*,
876 F. Supp. 2d 1155 (C.D. Cal. 2012) ...........................................................11

*Garner v. State Farm Mut. Auto. Ins. Co.*,
No. CV 08 1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010).......................8

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998)..........................................................8, 9, 10, 11, 12

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010)..............................................................................8

*Hunt v. VEP Healthcare, Inc.*,
No. 16-cv- 04790-VC, 2017 WL 3608297 (N.D. Cal., Aug. 22, 2017) ..........14

*In re Bluetooth Headset Products Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011).............................................................................14

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*,
2010 WL 3931096 (N.D. Cal. Oc 6, 2010) ......................................................12

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
   2009 WL 5184352 (W.D. Ky. Dec. 22, 2009)..................................................................13

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
   2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) ..................................................................15

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*,
   No. 1:14-MD-02583-TWT, ECF No. 181-2 (March 7, 2016), 2016 WL
   6902351 (N.D. Ga. Aug. 23, 2016).......................................................................13, 16, 18

*In re Hyundai & Kia Fuel Econ. Litig.*,
   881 F.3d 679 (9th Cir. 2018)..............................................................9, 10, 11, 12, 13

*In re Linkedin User Privacy Litig.*,
   309 F.R.D. 573 (N.D. Cal. 2015) .....................................................................................13

*In re Target Corp. Customer Data Sec. Breach Litig.*,
   No. MDL 14-2522-PAM, ECF No. 358-1 (March 18, 2015), 2017 WL 2178306
   (D. Minn. May 17, 2017), *appeal pending,* Case No. 15-3912 (8th Cir.)..........................17, 18

*In re Yahoo Mail Litig.*,
   No. 13-CV-4980, 2016 WL 4474612 (N.D. Cal. Aug. 25, 2016).........................................7

*Just Film, Inc. v. Buono*,
   847 F.3d 1108 (9th Cir. 2017)...................................................................9, 10, 12, 13

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998).....................................................................................15, 17

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012).............................................................................................10

*Mullane v. Central Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950)...........................................................................................................19

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) .......................................................................................14

*O'Connor v. Uber Techs., Inc.*,
   201 F. Supp. 3d 1110 (N.D. Cal. 2016) ..............................................................................14

*Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco*,
   688 F.2d. 615 (9th Cir. 1982)..............................................................................................14

*Remijas v. The Neiman Marcus Group, LLC*,
   No. 14-cv-1735, ECF No. 145 (March 17, 2017) ................................................................17

*Smith v. Triad of Alabama, LLC*,
   2017 WL 1044692 (M.D. Ala. Mar. 17, 2017) ...................................................................16

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003)......................................................................................9

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ...........................................................................9, 10, 12, 13

*Vaquero v. Ashley Furn.*,
    824 F.3d 1150 (9th Cir. 2016) ................................................................................13

*Viceral v. Mistras Grp., Inc.*,
    2016 WL 5907869 (N.D. Cal. Oct. 11, 2016) ........................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..................................................................................................9

**Statutes**

28 U.S.C. § 1715 ...............................................................................................................18

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................8, 20

Fed. R. Civ. P. 23(a) ....................................................................................................8, 9

Fed. R. Civ. P. 23(a)(1) ....................................................................................................8

Fed. R. Civ. P. 23(b)(1) ....................................................................................................9

Fed. R. Civ. P. 23(b)(2) ....................................................................................................9

Fed. R. Civ. P. 23(b)(3) ................................................................................................9, 11

Fed. R. Civ. P. 23(e) .......................................................................................................13

Fed. R. Civ. P. 23(g)(1)(A)(i-iv) ....................................................................................21

Fed. R. Civ. P. 23(g)(1)(B) ............................................................................................20

**Other Authorities**

*Manual for Complex Litigation,* Fourth, § 21.61 (2004) ................................................13

*Manual for Complex Litigation*, Fourth, § 21.632 (2004) ................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    <center>**MEMORANDUM OF POINTS AND AUTHORITIES**</center>

2    **I.    INTRODUCTION**

3    On August 31, 2016, Kimpton Hotel & Restaurant Group, LLC publicly acknowledged

4    that it had been the target of a Security Incident[1] and that payment card information related to its

5    consumers was potentially compromised.   The parties have reached a proposed settlement that, if

6    approved by the Court, will resolve Plaintiff's and Class members' claims against Kimpton

7    arising from the Security Incident at issue in this litigation.   After nearly eighteen months of

8    litigation, Plaintiff Andrew Parsons moves for preliminary approval of the Settlement he has

9    reached with Kimpton.

10   The proposed Settlement, reached after negotiations with the assistance of an experienced

11   mediator, Bruce A. Friedman of JAMS, requires Kimpton to reimburse Settlement Class

12   Members for, among other things:  unreimbursed bank and payment card fees; time spent dealing

13   with replacement card issues or in reversing fraudulent charges; fraudulent charges on a payment

14   card; costs of credit reports; and costs of credit monitoring.   Kimpton has also agreed to

15   implement several measures to improve its data security.   The Agreement offers complete

16   recovery and is an excellent result for the members of the class.

17   For the reasons stated below, Plaintiff respectfully requests that the Court grant an order

18   (1) preliminarily approving the proposed settlement; (2) provisionally certifying the Settlement

19   Class; (3) appointing Andrew Parsons as Class Representative; (4) appointing John Yanchunis as

20   Lead Class Counsel, and Marisa Glassman, Michael Ram and Matt Malone as Class Counsel; and

21   (5) approving the proposed Notice Program and authorizing its dissemination to the Class; (6)

22   appointing Epiq Systems, Inc. to serve as the Claims Administrator; (7) appointing Bruce A.

23   Friedman as the Claims Referee, and (8) setting a schedule for the final approval process

24   including Class Counsel's motion for approval of attorneys' fees, costs and expenses.

25   **II.    SUMMARY OF THE LITIGATION**

26   This class action case was filed against Kimpton in September 2016 following a malware

27   _____

28   [1] Unless otherwise defined, capitalized terms have the same meaning attributed to them in the Settlement Agreement ("SA"), attached to this brief as Exhibit 1.

<center>1</center>

incident potentially affecting payment card transactions at 61 Kimpton hotels and restaurants between February and July 2016. (Compl., ECF 1 ¶ 2.) Plaintiff Lee Walters asserted five claims in his original complaint: negligence, breach of implied contract, and three claims under California's Unfair Competition Law (unfair conduct, unlawful conduct, and fraudulent conduct). (*Id.* ¶¶ 57-95.) Mr. Walters filed an amended complaint in January 2017 asserting the same claims. (Am. Compl., ECF 34.) Following Kimpton's motion to dismiss, the Court dismissed the UCL fraud prong claim and allowed the other four claims to go forward. (Order, ECF 44.)

With the parties' consent, the Court bifurcated pre-trial proceedings into individual liability and damages and class certification phases, and ordered the parties to proceed first with discovery and summary judgment on liability and damages as to the named plaintiff only. (Order, ECF 47.) Early in discovery, Andrew Parsons was added as a plaintiff. (Second Am. Compl., ECF 61.) Mr. Parsons alleges that he used his payment card at a Kimpton hotel in Washington, D.C. during the at-risk window for the malware incident. (*Id.* ¶¶ 13-18.) In January 2018, the original plaintiff, Mr. Walters, was voluntarily dismissed. (Stipulation, ECF 74.)

The parties completed fact discovery on February 16, 2018. (*See* Order, ECF 67.) The parties have engaged in voluminous document and ESI discovery and have exchanged substantial written discovery, including interrogatories and requests for admission. Kimpton has taken the deposition of Mr. Parsons. Plaintiff has taken the depositions of Kimpton's Rule 30(b)(6) representative, Kimpton's four data security witnesses, and Kimpton's Director of Communications.

The parties have also engaged in substantial third-party discovery. Plaintiff issued subpoenas to the Better Business Bureau, Mandiant (forensics firm), SecureWorks (forensics firm), Sunera (computer security firm), Rapid7 (computer security firm), and certain employees of Kimpton's parent company, IHG. In connection with these subpoenas, Plaintiff has taken the depositions of Mandiant, Sunera, and two IHG witnesses.

Plaintiff's counsel also retained a cybersecurity expert to assist Plaintiff's counsel to identify the cause of the breach and to determine the preventive measures necessary to protect information of consumers in the future. This expert telephonically attended several of the

depositions and reviewed documents produced by Kimpton.   In addition, Plaintiff's counsel retained a damages expert to assist counsel in determining the type and nature of the damages which could be sustained by a class member.

**III.   INFORMATION ABOUT THE SETTLEMENT**

While engaging in discovery, the parties also began a discussion of the potential resolution of the litigation. Specifically, on November 9, 2017, Plaintiff sent Kimpton a letter outlining the material terms of a proposed settlement. Declaration of John Yanchunis ("Yanchunis Decl.") (Attached as Exhibit 2), ¶ 28. On February 5, 2018, Kimpton responded to Plaintiff's proposal and outlined its position on the basic parameters of a settlement. Yanchunis Decl., Ex. 2 ¶ 28.

In February 2018, the parties retained Bruce A. Friedman, a highly experienced mediator, to assist the parties in continuing the negotiations.  Yanchunis Decl., Ex. 2 ¶ 29.  The parties briefed their respective positions on the facts, claims, defenses and assessments of the risk of litigation.  The parties also submitted a draft settlement term sheet that was prepared by Plaintiff and that was then used at the mediation. Yanchunis Decl., Ex. 2 ¶ 29.

On March 12, 2018, the parties had a full-day mediation session with Mr. Friedman at JAMS in San Francisco. Yanchunis Decl., Ex. 2 ¶ 30. The negotiations were hard-fought throughout and the settlement process was conducted at arm's length. Yanchunis Decl., Ex. 2 ¶ 30.   Through the negotiations, Mr. Friedman was able to assist the parties in reaching an agreement on the substantive terms of the Settlement.  Yanchunis Decl., Ex. 2 ¶ 30.  The parties executed a term sheet the same day.  Yanchunis Decl., Ex. 2 ¶ 30.  The subject of attorneys' fees, costs and expenses, subject to  Court approval, was negotiated only after substantive terms of the Settlement were agreed upon by the parties.  Yanchunis Decl., Ex. 2 ¶ 30.

**IV.   THE TERMS OF THE SETTLEMENT AGREEMENT**

**A.  The Settlement Class**

The proposed Settlement Class is defined as:

> All residents of the United States whose Personal Information was compromised as a result of the malware attack publicly announced by Kimpton on August 31, 2016.

1  SA, Ex. 1 ¶ 1.26.

2  **B.   The Settlement Benefits**

3  **1.   Monetary Remedies**

4  Under the Settlement, subject to its terms and conditions and subject to Court approval,

5  Settlement Class Members are eligible to receive reimbursement of up to $250 (in total) for the

6  following categories of out-pocket expenses resulting from the Security Incident:

7  (i) unreimbursed bank fees;
   (ii) unreimbursed card reissuance fees;

8  (iii) unreimbursed overdraft fees;
   (iv) unreimbursed charges related to unavailability of funds;

9  (v) unreimbursed late fees;
   (vi) unreimbursed over-limit fees;

10  (vii) long distance telephone charges;

11  (viii) cell minutes (if charged by minute), Internet usage charges (if
    charged by the minute or by the amount of data usage and incurred solely
    as a result of the Security Incident), and text messages (if charged by the

12  message and incurred solely as a result of the Security Incident);
    (ix) unreimbursed charges from banks or credit card companies;

13  (x) postage;
    (xi) interest on payday loans due to card cancelation or due to over-limit

14  situation;
    (xii) up to three hours of documented lost time spent dealing with

15  replacement card issues or in reversing fraudulent charges or otherwise
    dealing with the Security Incident (calculated at the rate of $15.00 per

16  hour), but only if at least one full hour was spent, and only if the time can
    be documented with reasonable specificity by answering questions on the

17  Claim Form;
    (xiii) an additional $15 payment for each credit or debit card on which

18  document fraudulent charges were incurred that were later reimbursed, to
    compensate the claimant for lost time associated with seeking

19  reimbursement for the fraud, but no documentation will be required for
    this benefit;

20  (xiv) costs of credit report(s) purchased by Settlement Class Members
    between February 1, 2016 and the Claims Deadline (with an affirmative

21  statement by the Settlement Class Member that it was purchased
    primarily because of the Security Incident); and

22  (xv) costs of credit monitoring and identity theft protection (not to exceed
    $80.00) purchased by Settlement Class Members between February 1,

23  2016 and the Claims Deadline (with an affirmative statement by the
    Settlement Class Member that it was purchased primarily because of the

24  Security Incident and not for other purposes, and with proof of purchase).

25  SA, Ex. 1 ¶ 2.1.

26  Class Members who had other extraordinary unreimbursed out-of-pocket monetary losses

27  as a result of the Security Incident, including alleged unreimbursed fraudulent charges, are

28  eligible to make a claim for reimbursement of up to $10,000.00.  SA, Ex. 1 ¶ 2.2.  The aggregate

- 4 -

1    amount of claims reimbursement for which Kimpton shall be responsible to pay is capped at

2    $600,000.  If the total valid claims exceed the $600,000 cap, each individual amount shall be

3    reduced pro rata so that the aggregate claims reimbursement is exactly $600,000.  SA, Ex. 1 ¶

4    2.4.

5                    **2.      Injunctive Relief**

6            In addition to the monetary compensation provided to class members by the Settlement

7    Agreement, Kimpton has also agreed to adopt and implement, at a minimum, the following data

8    security measures for three years from the execution of the Settlement Agreement:

9            1) Information Security Position.  Kimpton will designate a position that
             is specifically responsible for overseeing information security compliance
10           at Kimpton Hotel & Restaurant Group, LLC.
             2)  Annual PCI DSS Audits & Penetration Testing.  Kimpton will hire a
11           third-party Qualified Security Assessor to conduct an annual assessment
             of Kimpton's compliance with PCI DSS and hire a penetration testing
12           company to conduct an annual penetration test of Kimpton Hotel &
             Restaurant Group, LLC's cardholder data environment.  Qualified
13           Security Assessor means an independent security organization that has
             been qualified by the PCI Security Standards Council to assess an entity's
14           adherence to PCI DSS.  Penetration test means a manual process that
             complies with the standards set forth by PCI DSS for penetration testing.
15           3)  Annual Security Awareness Program.  Kimpton will provide annual
             security awareness training for its employees, which will include
16           education and training regarding payment card data security and payment
             card data security best practices.
17           4)  Payment Card Acceptance Technology.  With respect to all consumer
             card present payment transactions where a physical payment card is used
18           at a Kimpton hotel front desk or restaurant, Kimpton will: (1) implement
             a solution that encrypts payment card data when it is read by the card
19           acceptance device and routes the authorization message out to the
             payment card networks without the authorization message data being
20           unencrypted on devices owned and managed by Kimpton ("Encryption
             Solution"); and (2) install card acceptance devices and payment
21           applications that support acceptance of EMV enabled payment cards (the
             "EMV Solution").  Kimpton will implement the Encryption Solution and
22           EMV Solution by June 31, 2019 for card present transactions that occur at
             the front desk of its hotels.  Kimpton will implement the Encryption
23           Solution and EMV Solution for card present transaction that occur in its
             restaurants by January 2020.
24           5) Senior Leadership reporting.  Kimpton will report to its executive team
             about its cybersecurity efforts.

25

26   SA, Ex. 1 ¶¶ 3.1-3.5.

27          Thus, through both the opportunity to receive direct monetary payments from Kimpton in

28   amounts up to $250.00, and up to $10,000.00 for the  extraordinary loss, and from continuing

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    enhancements to Kimpton's information security posture, Settlement Class Members benefit by

2    the proposed Settlement Agreement in a meaningful way.

3        **C.    Proposed Notice Plan**

4        Pursuant to the Settlement Agreement, the parties propose Epiq Systems, Inc. ("Epiq") to

5    be appointed as Notice Specialist and Claims Administrator.  Epiq is a nationally recognized class

6    action notice and administration firm that has designed a class notice plan for this case, which the

7    parties and Epiq believe is an effective plan.  With respect to notice, there are two groups of

8    Settlement Class Members:   those for whom Kimpton has email addresses and/or physical

9    addresses, and those for whom Kimpton does not have such information.

10       Subject to Court approval, this Notice Plan involves direct notice to the approximately

11   150,000 Settlement Class Members for whom physical addresses or email addresses are available.

12   For the remaining Settlement Class Members, notice will be provided by publication.   This

13   publication notice will take two forms:  first, an advertisement in *People Magazine*, which has a

14   circulation of 3.4 million individuals.  Second, the publication notice will also be made via online

15   Internet banners through Facebook, the Google Display Network, and the Yahoo! Ad Network.

16   A declaration from Epiq with additional details about the publication plan is attached as Exhibit F

17   to the Settlement Agreement.

18       Finally, the Claims Administrator will also establish a settlement website in the form

19   agreed to by the parties and the Court.  In addition to the notices, the website will include

20   information about the Settlement, related case documents, and the Settlement Agreement.  Class

21   Members will be able to submit claims electronically.

22       Notice of the Settlement will be given to the Settlement Class no later than thirty days

23   from the date of the Court's Preliminary Approval Order.  Pursuant to the Notice Plan, there will

24   be two forms of notice, a long form and a summary notice, which are attached as Exhibits B and

25   C to the Settlement Agreement.  The Class notice informs Class Members of the nature of the

26   action, the litigation background, the terms of the agreement (including the definition of the

27   Settlement Class), the relief provided by the Settlement Agreement, Class Counsel's request for

28   fees and expenses and the scope of the release and the binding nature of the Settlement on Class

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Members.  It also describes the procedure for objecting to the Settlement; advises Class Members that they have the right to opt out of the Settlement and describes the consequences for opting out; and states the date and time of the final approval hearing, advising that the date may change and how to check the website.

Kimpton has agreed to pay all costs associated with providing Class notice and administering the Settlement benefits.  Such payment will be in addition to and not affect the amount of Class Settlement consideration available to Class Members.  SA, Ex. 1 ¶ 4.2.

### D.    Attorneys' Fees, Costs, and Expenses

Kimpton has agreed that Class Counsel is entitled to seek an award of reasonable attorneys' fees, costs and expenses for prosecuting this action and will not object to Class Counsel's petition for fees and expenses not to exceed $800,000 inclusive of expenses.  Notably, the parties did not negotiate this agreement or any other issue with respect to attorneys' fees, costs and expenses until the mediator had informed the parties that they had reached an agreement on Class relief.  In addition, the award of fees costs and expenses does not reduce or otherwise affect the amount of compensation available to Class Members.  Class Counsel's lodestar substantially exceeds the attorneys' fee request, which will be presented to the Court in their motion for attorneys' fees, costs and expenses.  This motion will be filed at least thirty (30) days prior to the deadline for objecting to the proposed settlement. SA, Ex. 1 ¶¶ 8.1-8.2.

### E.    Service Awards

The Settlement allows Class Counsel to request and for Kimpton to pay a service award to Andrew Parsons, Plaintiff and the proposed Class Representative, in an amount not to exceed $5,000.00 as approved and ordered by the Court upon final approval of the Class Settlement.  The Class Representative's agreement to the Settlement is not conditioned in any manner on the award of a service award or its amount. Declaration of Andrew Parsons, Attached as Exhibit 3 ¶ 10.  The Class Representative has given his time and accepted his responsibilities admirably, participating actively in this litigation as required and in a manner beneficial to the Class generally.  Yanchunis Decl., Ex. 2 ¶ 41. The proposed service award is presumptively reasonable. *In re Yahoo Mail Litig.*, No. 13-CV-4980, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016)

1  ("The Ninth Circuit has established $5,000.00 as a reasonable benchmark [for service awards].").

2  It is particularly warranted given Mr. Parsons' extensive participation in the litigation, including

3  being deposed on personal financial matters. *See, e.g., Garner v. State Farm Mut. Auto. Ins. Co.*,

4  No. CV 08 1365, 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010).

5      **F.      Release of Claims**

6          Under the Settlement, each member of the Class will be deemed to have released any and

7  all claims, demands, rights, liabilities and causes of action of every nature and description

8  whatsoever, known or unknown, suspected or unsuspected, asserted or that might have been

9  asserted, by the Plaintiff or any Settlement Class Member, against Kimpton arising out of or

10 related to the facts giving rise to the subject matter of the Complaint in this case.  SA, Ex. 1 ¶ 7.1.

11 Class Members are only releasing claims based on the identical factual predicate, as required

12 under Ninth Circuit precedent. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

13 Under this precedent, "we have held that federal district courts properly released claims not

14 alleged in the underlying complaint where those claims depended on the same set of facts as the

15 claims that gave rise to the settlement." *Id.*

16 **V.     ARGUMENT**

17      **A.      The Proposed Settlement Class Should Be Certified**

18          **1.      The Class Meets the Requirements of Rule 23(a)**

19          Before assessing the parties' settlement, the Court should first confirm that the underlying

20 settlement class meets the requirements of Rule 23.  *See Amchem Prods. v. Windsor*, 521 U.S.

21 591, 620 (1997); *Manual for Complex Litigation*, Fourth, § 21.632 (2004). The prerequisites for

22 class certification under Rule 23(a) are numerosity, commonality, typicality, and adequacy—each

23 of which is satisfied here. Fed. R. Civ. P. 23(a). The proposed settlement class includes more than

24 150,000 people, and so readily satisfies the numerosity requirement. *See* Fed. R. Civ. P. 23(a)(1);

25 *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

26          The proposed class also satisfies the commonality requirement of Rule 23(a), which

27 requires that class members' claims "depend upon a common contention," of such a nature that

28 "determination of its truth or falsity will resolve an issue that is central to the validity of each

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

[claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The central question behind every claim in this litigation is whether Kimpton adequately secured its consumers' payment card information.  The answer to that question depends on common evidence that does not vary from class member to class member, and so can be fairly resolved—whether through litigation or settlement—for all class members at once.

The final requirements of Rule 23(a)—typicality and adequacy—are likewise satisfied here. The proposed Class Representative used a payment card for a stay at an affected Kimpton property during the breach period, and so he was affected by the same inadequate data security that Plaintiff alleges harmed the rest of the class. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class"). The proposed Class Representative also has no conflict with the class; has participated actively in the case, including by sitting for a deposition; and is represented by experienced attorneys. *Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir. 2003) (adequacy satisfied if plaintiffs and their counsel lack conflicts of interest and are willing to prosecute the action vigorously on behalf of the class).

### 2.   The Class Meets the Requirements of Rule 23(b)(3)

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)." *Hanlon*, 150 F.3d at 1022.  Here, the proposed class is maintainable under Rule 23(b)(3), as common questions predominate over any questions affecting only individual members and class resolution is superior to other available methods for a fair resolution of the controversy.  *Id.* Plaintiff's liability case depends, first and foremost, on whether Kimpton used reasonable data security to protect payment card data.  That question can be resolved using the same evidence for all class members, and thus is the precise type of predominant question that makes a class-wide adjudication worthwhile.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) …'").

The Ninth Circuit's analysis in *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 691

1    (9th Cir. 2018) reiterates that a court considering a nationwide class "must consider the impact of

2    potentially varying state laws," but, following long-standing Ninth Circuit precedent,

3    "'[v]ariations in state law do not necessarily preclude a 23(b)(3) action.'" (*quoting Hanlon*, 150

4    F.3d at 1022); *see also Just Film*, , 847 F.3d at 1122.  The Court confirmed that the predominance

5    standard that applies in the context of a multi-state class action is the same as in any other case,

6    asking whether "'the common, aggregation-enabling, issues in the case are more prevalent or

7    important than the non-common, aggregation-defeating, individual issues.'"  *Id.* at 702 (*quoting*

8    *Tyson Foods,* 136 S.Ct. at 1045).   The district court in *Hyundai* "granted class certification

9    without ever addressing variations in state law."  *Id.* at 700. In so doing, the Ninth Circuit held

10   that the court committed two legal errors. First, the court "fail[ed] to apply California choice of

11   law rules," including examining variations in state law, to determine whether one state's law

12   could apply nationwide. *Id.* at 701.   Second, it failed to analyze *at all* whether applicable state

13   laws materially differed or to consider those differences for purposes of predominance.  *Id.*

14        *Hyundai's* conclusions were a product of the thornier legal and factual issues presented:

15   an automotive case involving misrepresentation claims involving both new and secondary

16   purchasers. The *Hyundai* court concluded: "the record does not support the presumption that used

17   car owners were exposed to and relied on misleading advertising, [so] the district court had an

18   obligation to define the relevant class 'in such a way as to include only members who were

19   exposed to advertising that is alleged to be materially misleading.'" *Id.* at 705 (quoting *Mazza v.*

20   *Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012).  It explained that "factual differences

21   regarding used car owners' exposure to the misleading statements translate into significant legal

22   differences regarding the viability of these class members' claims."  *Id.*[2]

_____

[2] This case involves a single cybersecurity incident that impacted *all* Class members whose data
was stolen in connection with using a payment card at Kimpton properties, giving rise to claims
under state law that *all* share the same common nucleus of facts and law pertaining to the duty of
care and whether Kimpton violated it.  In contrast, in *Hyundai*, defendants had previously
identified material differences across states that the trial court tentatively held undermined class
certification, and the Ninth Circuit was concerned that liability might turn on issues affecting
individual class members differently, including different exposure to advertising.  *Id.* at 695-96,
702.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    The *Hyundai* analysis supports certification here, because no similar choice-of-law

2    problems or "factual differences…regarding exposure" to misrepresentations present themselves.

3    First, a choice-of-law analysis supports application of California law nationwide.   Moreover,

4    there are no factual predominance concerns, especially in the settlement context, given that the

5    Class's damages arose from a data breach and not from, for example, multiple separate

6    misrepresentations.  Instead, much like *Hanlon's* class members who all had "the same problem –

7    an allegedly defective rear latchgate…" (*Hanlon,* 150 F.3d at 1021), the class members here all

8    suffered the same loss of personal information in the data breach.

9        First, California law applies to Plaintiff's and Class members' claims.  Courts have found

10   that California substantive law can apply nationwide to nonresident plaintiffs in similar situations.

11   Under California's choice of law analysis, where a defendant is headquartered and some

12   misconduct originates in defendant's home state, this is sufficient to establish "significant

13   contact" for due process purposes.  *See, e.g.*, *Forcellati v. Hyland's, Inc*., 876 F. Supp. 2d 1155,

14   1160 (C.D. Cal. 2012) (defendants being headquartered in California was sufficient to satisfy due

15   process); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010)

16   ("Defendants are headquartered in California and their misconduct allegedly originated in

17   California.").   Therefore, a forum state, may apply its own substantive law to claims of a

18   nationwide class.  *See, e.g. id*.  Here, Kimpton is headquartered in San Francisco and decisions

19   regarding Kimpton's data security were made in San Francisco.  Accordingly, California law

20   should be applied for all Class members.

21       Second, even if California law is not applied nationwide, predominance is satisfied in this

22   case and the common legal and factual issues here outweigh any "questions affecting only

23   individual members."  F.R.C.P. 23(b)(3).  Familiar Ninth Circuit standards going back at least 20

24   years, to *Hanlon*, govern the predominance inquiry:  here, as in in *Hanlon*, "a common nucleus of

25   facts and potential legal remedies dominate this litigation."  150 F.3d at 1022.   Thus, any

26   variations in state law do not outweigh the predominance of factual and legal issues with respect

27   to the constellation of claims in this case in the settlement context.  *Id.* at 1022–23 (holding that

28   "idiosyncratic differences between state consumer protection laws are not sufficiently substantive

1   to predominate over the shared claims"). Attached as Exhibit 4 are 50-state surveys for Plaintiff's

2   two common law causes of action, each of which demonstrate the overwhelming similarities that

3   satisfy the predominance analysis.

4        This Court can address whether any variations in state law categorically impact the

5   balance of common versus individualized issues. *Hanlon*, 150 F.3d at 1022; *Just Film,* 847 F.3d

6   at 1122. First, Plaintiff asserts two common law claims: breach of implied contract and

7   negligence. The basic elements of contract law, as they apply to our facts, are the same across

8   states. *See In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig*., 2010 WL 3931096

9   (N.D. Cal. Oct. 6, 2010); *cf. American Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995)

10  ("Because contract law is not at its core 'diverse, nonuniform, and confusing,' we see no large

11  risk of nonuniform adjudication….") (citations omitted). The breach of implied contract claim

12  focuses on issues of Kimpton's privacy policy and the alleged breach of that policy, both of

13  which are subject to common proof. There are no material differences in state law with respect to

14  interpretation or breach that would require *individualized* adjudication of the facts here at issue.

15  *Just Film,* 847 F.3d at 1123.

16       Similarly, the commonalities with respect to the key facts and legal issues relevant to

17  Plaintiff's negligence claim outweigh any individualized differences. The core elements of

18  negligence – duty, breach, causation, damages – do not substantively vary from state-to-state

19  (except as to contributory/comparative negligence principles not at play in this single-defendant

20  case). *See* Exhibit 4.

21       Likewise, Plaintiff's statutory claims alleging from the security incident have common

22  legal and factual questions regarding Kimpton's duty of care and alleged violations. In the light

23  of the common factual evidence, this Court can conclude that "common, aggregation-enabling,

24  issues in the case are more prevalent or important" (*Tyson Foods*, 136 S. Ct. at 1045) even if there

25  are variations between the state statutory claims, particularly where much of that variation applies

26  statewide rather than individually. For all of these claims, variations in state law that apply

27  statewide, or to other large sub-groups of the class, do not pose individualized issues at all, and

28  raise only questions of manageability irrelevant to settlement under governing law. *Hyundai*,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   2018 WL 505343 at *12; *Amchem Prods*, 521 U.S. at 623. Likewise, *Hyundai* does not alter the

2   long-standing rule that individualized damages issues do not defeat predominance. *Tyson Foods*,

3   136 S.Ct. at 1045; *Vaquero v. Ashley Furn.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

4          Because of the common experience of every individual in this Class with respect to the

5   single event of the Kimpton data breach, the common evidence pertaining to data security and the

6   breach, and the common legal issues across the common law claims and statutory claims here at

7   issue, the proposed class is "sufficiently cohesive to warrant adjudication by representation."

8   *Amchem Prods.*, 521 U.S. at 623.

9          Certification is particularly appropriate in this context because "the proposal is that there

10  be no trial," and so manageability considerations have no impact on whether the proposed

11  settlement class should be certified. *Amchem*, 521 U.S. at 620.  There is only the predominant

12  issue of whether Kimpton properly secured the payment card data of its consumers, such that

13  Kimpton's security should be improved and class members affected by the data breach provided

14  with a remedy.

15         As a practical matter, that issue cannot be resolved through individual trials or settlement

16  negotiations: the amount at stake for individual class members is too small, the technical issues

17  involved are too complex, and the required expert testimony and document review too costly.  *See*

18  *Just Film,* 847 F.3d  at 1123.[3]

19         **B.     The Court Should Grant Preliminary Approval**

20              **1.     The Standard for Preliminary Approval**

21         Federal Rule of Civil Procedure 23(e) provides that a class action cannot be settled or

22  compromised without approval by the court.  Fed. R. Civ. P. 23(e).  Judicial approval is required

23  regardless of whether the action is certified for trial and later settled or is certified for purposes of

24  settlement. *Manual for Complex Litigation,* Fourth, § 21.61 (2004). The approval process

---

[3] A class action is not only the superior method of adjudicating consumer claims arising from this data breach, it is the *only* method practicable—just as in other data breach cases where a class wide settlement has been approved. *See, e.g., In re Linkedin User Privacy Litig.,* 309 F.R.D. 573, 585 (N.D. Cal. 2015); *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *2 (N.D. Ga. Aug. 23, 2016); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2009 WL 5184352, at *6–7 (W.D. Ky. Dec. 22, 2009).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

typically involves two steps. First, the settlement is approved preliminarily following the submission by the parties of relevant information concerning the terms of the settlement and the history of the litigation. Second, after notice of the proposed settlement is given to the class, the court conducts a final approval hearing, also known as a fairness hearing. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523 (C.D. Cal. 2004). Ultimately, to approve the proposed settlement, this Court must determine that it is fair, reasonable and adequate. *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco.,* 688 F.2d. 615, 625 (9th Cir. 1982). A presumption of fairness exists where the settlement is reached through arm's-length negotiations, sufficient investigation has taken place to allow counsel and the Court to act intelligently, and counsel is experienced in similar types of litigation. *Duhaime v. John Hancock Mut. Life. Ins. Co.*, 177 F.R.D. 54, 68 (D. Mass. 1997) (settlement is presumed fair where it is the product of arm's-length negotiations).

More recently, however, several courts in this district have criticized the notion that review of proposed class settlements at the preliminary approval stage need only involve a "quick look," or a watered-down version of final approval. *See Cotter v. Lyft, Inc.,* 193 F. Supp. 3d 1030, 1036 (N.D. Cal. 2016).[4] Accordingly, Plaintiff addresses each of the following settlement factors articulated by the Ninth Circuit (while recognizing that at least one of those factors—the reaction of class members—is not yet known) and submit that they collectively weigh in favor of judicial approval:

> (a) the strength of the plaintiff's case;
> (b) the risk, expense, complexity, and likely duration of further litigation;
> (c) the risk of maintaining class action status throughout the trial;
> (d) the amount offered in settlement;
> (e) the extent of discovery completed and the stage of the proceedings;
> (f) the experience and views of counsel;
> (g) the presence of a governmental participant;
> (h) the reaction of the class members to the proposed settlement; and
> (i) whether the settlement is a product of collusion among the parties.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004); *In re*

---

[4] *See also O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1122 (N.D. Cal. 2016); *Viceral v. Mistras Grp., Inc.*, 2016 WL 5907869, at *6 (N.D. Cal. Oct. 11, 2016).; *Hunt v. VEP Healthcare, Inc.*, No. 16-cv- 04790-VC, 2017 WL 3608297 (N.D. Cal., Aug. 22, 2017); *Eddings v. DS Services of America, Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

*Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

### a.      The Strength of Plaintiff's Case

Plaintiff believes he has a strong case for liability and damages.  Pursuant to the scheduling order in this case, at the time the parties negotiated the Settlement, Plaintiff had developed a solid factual record to move this case forward, and was preparing his motion for summary judgment on his individual claims and damages.  Plaintiff was prepared to submit evidence supporting his assertion that Kimpton had failed to take a number of industry-standard measures to secure its consumers' payment card data; ignored warning of vulnerabilities in its data security; and that Kimpton missed opportunities to detect and stop the data breach while it was underway.  Plaintiff also believes he would be able to show that he suffered damages as a result of the Kimpton data breach.  However, throughout the litigation, Kimpton has continually disputed the sufficiency of Plaintiff's allegations, and Kimpton believes that discovery against plaintiff Parsons has allowed Kimpton to develop a factual record to support many of the same basic arguments Kimpton raised on its motion to dismiss. Although Plaintiff feels strongly that he would be able to obtain a favorable ruling on his motion for summary judgment, this is not a certainty.

### b.      The Risk, Expense, Complexity, and Likely Duration of Further Litigation

Although Plaintiff is confident in the merits of his claims, the risks involved in prosecuting a class action through trial cannot be disregarded.  While most of Plaintiff's claims survived a motion to dismiss, Plaintiff would still need to prevail on cross-motions for summary judgment and then prevail on a motion for class certification.  Almost all class actions involve a high level of risk, expense, and complexity, which is one reason that judicial policy so strongly favors resolving class actions through settlement. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998).  This is not only a complex case, but it is in an especially risky field of litigation.  *See, e.g.*, *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010) (approving data breach settlement, in part, because "proceeding through the litigation process in this case is unlikely to produce the plaintiffs' desired

results"). Data breach cases continue to be among the most risky and uncertain of all class action litigation. To date, only one consumer class has been certified. Even if the Court had certified a class, Kimpton would have sought appellate review. The Court may recall that Kimpton sought an interlocutory review of this Court's order on the motion to dismiss. Through the Settlement, Plaintiff and Class members gain significant benefits without having to face further risk.

### c.   The Risk of Maintaining Class Action Status throughout Trial

Plaintiff believes he would prevail on a motion for summary judgment and then also prevail on class certification, however, there is little directly analogous precedent to rely upon. Class certification has been denied in other consumer data breach cases and it was only last year that the first litigation class was certified in a consumer data breach case. *See Smith v. Triad of Alabama, LLC*, 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017). The lack of direct precedent creates an additional risk in achieving and maintaining class action status throughout trial and even appeal. While Plaintiff feels strongly that he would be able to obtain certification outside of a settlement context and maintain certification through trial, this is not certainty. Additionally, any potential certification would be subject to later appeal and potential reversal. Moreover, the cost of trial and any appeals would be significant and would delay the resolution of this litigation without the guarantee of any relief.

### d.   The Amount Offered In Settlement

Through arm's-length negotiations between sophisticated counsel experienced in litigating complex cases and through the assistance of an experienced mediator, the parties were able to reach an agreement that compares very favorably to settlements in payment card data breach class actions that have been approved by other courts.

- The Home Depot data breach, which involved the theft of approximately 92 million consumers, consisting of 40 million consumers' payment data and 53 million consumers' email addresses settled creating a $13 million fund for consumers, paying an additional $6.5 million for internet and dark web monitoring services (which was eligible to be repaid from the fund), and $7.5 million in attorney fees. *See In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, ECF No. 181-2 (March 7, 2016) (Settlement Agreement); *id.*, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (order approving settlement).

- The Target data breach, which compromised the personal information of nearly 110 million consumers, resolved with Target establishing a settlement fund of $10 million and separately paying $6.75 million in attorney fees. *See In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522-PAM, ECF No. 358-1 (March 18, 2015) (Settlement Agreement); *id.*, 2017 WL 2178306, at *2 (D. Minn. May 17, 2017) (order approving settlement on remand from the 8th Circuit), *appeal pending* Case No. 15-3912 (8th Cir.).

- The Neiman Marcus data breach, which compromised the personal information of approximately 2,187,773 individuals who held different payment card accounts with Neiman Marcus establishing a settlement fund of $1,600,000, $400,000 of which went to costs for the Claims Administrator and $530,000 for attorneys' fees, costs and expenses. *See Remijas v. The Neiman Marcus Group, LLC*, No. 14-cv-1735, ECF No. 145 (March 17, 2017) (Memorandum in Support of Preliminary Approval).

The proposed Settlement will also reduce the risk that the payment card data that consumers continue to entrust to Kimpton will be compromised by future attacks. Kimpton will adopt a number of significant data security measures negotiated with the assistance of a cyber security expert and Lead Counsel's experience in other date breach cases, including the ones referenced above. These measures include designating an information security position, performing annual PCI DSS audits and penetration testing, implementing an annual security awareness program, and improving payment card acceptance technology.

### e. The Extent of Discovery Completed and the Stage of the Proceedings

Before entering into settlement discussions on behalf of class members, counsel should have "sufficient information to make an informed decision." *Linney*, 151 F.3d at 1239. Here, the parties completed fact discovery, which included: eleven depositions; tens of thousands of produced documents; and, multiple subpoenas for documents and depositions to non-parties. Yanchunis Decl., Ex. 2 ¶ 51. Expert discovery was also well underway when the parties reached the Settlement. Plaintiff retained a cybersecurity expert and a damages expert. Both experts reviewed information developed during discovery and had numerous conference calls with Plaintiff. Plaintiff's cybersecurity expert also attended several of the depositions in this case. Yanchunis Decl., Ex. 2 ¶ 51. Plaintiff knows the strengths and weaknesses of the Class's claims and has worked with experts to value those claims and to understand the business practice changes necessary to protect Class members' payment card data in the future. From the

1   information Plaintiff obtained in discovery, he was well-prepared to negotiate a settlement on

2   behalf of the Class.  Yanchunis Decl., Ex. 2 ¶ 51.

3       **f.      The Experience and Views of Counsel**

4          As set forth in the attached resumes and declaration, Plaintiff's counsel have considerable

5   experience in class actions and specifically data breach litigation, and have litigated to resolution

6   some of the largest data breach and privacy cases filed to date.  *See* Yanchunis Decl., Exhibit 2.

7   Class Counsel are confident, based on their extensive experience as class action litigators and

8   with other similar class actions, *e.g. In re: The Home Depot, Inc., Customer Data Security Breach*

9   *Litigation.,* Case No. 14-md-02583-TWT (N.D. Ga. 2016), *In re: Target Corporation Customer*

10  *Data Security Breach Litigation*, Case No. 14-md-02522 (D. Minn. 2015), that they have a full

11  understanding of the facts at issue, and the strengths and weaknesses of the legal allegations in the

12  complaint.   Thus, Plaintiff's counsel is qualified to evaluate the class claims, value of the

13  settlement versus moving for certification and going to trial, and the viability of possible

14  affirmative defenses.  *See Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The

15  recommendations of plaintiffs' counsel should be given a presumption of reasonableness.").

16  Plaintiff's counsel believes that the settlement is fair and reasonable in light of the complexities of

17  the case, the uncertainties of class certification and litigation, and the secured benefit to the class.

18  Yanchunis Decl., Ex. 2 ¶ 52.

19      **g.      The Presence of a Governmental Participant**

20         No governmental agency is involved in this litigation, but the Attorney General of the

21  United States and Attorneys General of each of the States will be notified of the proposed

22  settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity

23  to raise any objections or concerns they may have.

24      **h.      The Reaction of Class Members to the Proposed Settlement**

25         The class has yet to be notified of the settlement and given an opportunity to object, so it

26  is premature to assess this factor. Before the final approval hearing, the Court will receive and

27  have a chance to review all objections or other comments received from class members, along

28  with a full accounting of all opt-out requests.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

**i.      Whether the Settlement is a Product of Collusion among the Parties**

One indication of whether a settlement is fair and reasonable is whether it is the product of serious, arm's-length negotiations following serious investigation of the merits of the case. Such negotiation and investigation minimize any concerns that the Settlement might be the result of collusion among opposing parties or their counsel to undermine the interests of the class for their own benefit.

The Settlement in this case easily meets that standard.  Class Counsel undertook significant factual and legal investigation of the issues prior to filing the case and during the hard-fought litigation.  The parties engaged in extensive discovery about both the facts and law at issue.  Finally, Mediator Bruce Friedman presided over the parties' formal, arm's length and adversarial mediation.  The Settlement clearly emerges from a formal, arms-length negotiation process between the Parties.  Yanchunis Decl., Ex. 2 ¶ 53.

**C.      The Court Should Approve the Proposed Settlement Notices and Authorize Their Dissemination**

In any proceeding that is to be accorded finality, due process requires that interested parties be provided with notice reasonably calculated, under the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  That means the settlement notices must fairly apprise the class members of the terms of the proposed compromise and give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. *Id*. Additionally, the notice must be designed so as to have a reasonable chance of reaching a substantial percentage of the class members. *Id.* at 318 (explaining notice must be reasonably calculated to reach interested parties).

Here, the proposed Notice and the method of dissemination meet each of these requirements.  As explained above, the Notice Plan involves direct notice to the approximately 150,000 Settlement Class Members for whom physical addresses or email addresses are available. For the remaining Settlement Class Members, notice will be provided by publication: an

advertisement in *People Magazine*, which has a circulation of 3.4 million individuals, and online via Internet banners through Facebook, the Google Display Network, and the Yahoo! Ad Network, for a period of 31 days. *See* Ex. F to the Settlement Agreement. Copies of all the notice documents are attached to this preliminary approval motion; they are clear and concise, and directly apprise Settlement Class Members of all the information they need to know in order to make a claim.

Moreover, on the dedicated Settlement website, Class Members can review the detailed Notice, which provides clear and concise information with respect to all the relevant aspects of the litigation.[5] Thus, the Notice provides all the information necessary for Class Members to make informed decisions with respect to whether they remain in or opt out of the Settlement Class, or object to the proposed Settlement. Yanchunis Decl., Ex. 2 ¶ 36. The Notice Plan has been developed by a provider with significant experience in designing notice plans in large and national class actions similar to this one. Yanchunis Decl., Ex. 2 ¶ 36.

Accordingly, the content and method of dissemination of the proposed Notice fully comports with the requirements of due process and applicable case law. The Court should approve the proposed Notice and direct that it be distributed as agreed by the parties.

**D.    The Court Should Appoint Plaintiff's Counsel as Class Counsel**

The next step when deciding whether to preliminarily approve a settlement is to appoint Settlement Class Counsel. Indeed, under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts generally consider the following attributes: (1) the proposed class counsel's work in identifying or investigating potential claims, (2) the proposed class counsel's experience in handling class actions or other complex litigation, and the

---

[5] This includes:  (a) the class definition and statement of claims; (b) the litigation history; (c) the terms of the Settlement Agreement; (d) the binding effect of any judgment approving the Settlement on those who do not opt out; (e) the right to (and procedure for) opting out or back into the Settlement Class; (f) the right to (and procedure for) objecting to the Settlement; (g) who to contact to obtain additional information regarding the Settlement or the litigation; (h) the manner in which compensation will be provided to the Class Representatives to compensate them for their service to the Class; (g) the manner in which Class Counsel will be compensated; and (h) additional information as required and/or suggested by the Court's Procedural Guidance For Class Action Settlements.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

types of claims asserted in the case, (3) the proposed class counsel's knowledge of the applicable law, and (4) the proposed class counsel's resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

Here, proposed Class Counsel have extensive experience prosecuting class action cases, and specifically data breach cases. *See* Firm Resumes, Exhibits A-C attached to Yanchunis Dec., Ex. 2. Accordingly, the Court should appoint John Yanchunis of Morgan & Morgan Complex Litigation Group as Lead Class Counsel, and Marisa Glassman of Morgan & Morgan Complex Litigation Group, Michael Ram of Robins Kaplan LLP and Matt Malone of Rock Law LLP as Class Counsel.

> **E.     The Court Should Schedule a Fairness Hearing and Approve the Proposed Preliminary Approval Order**

Once the Court has ruled on the motion for preliminary approval, the times for providing notice, opting out of the Settlement Class, and submitting claims will begin to run. Plaintiff provided an agreed-up schedule in his Motion for Preliminary Approval.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that the Court grant this motion for preliminary approval; provisionally certify the Settlement Class; appoint Andrew Parsons as Class Representative; appoint John Yanchunis as Lead Class Counsel, and Marisa Glassman, Michael Ram and Matt Malone as Class Counsel; approve the proposed notice and authorize its dissemination to the Class; appoint Epiq Systems, Inc. to serve as the Claims Administrator; and adopt the proposed schedule for final approval.

1

Dated:  May 23, 2018

**MORGAN & MORGAN COMPLEX**

2

**LITIGATION GROUP**

3

By:  /s/ *John A. Yanchunis*

4

John A. Yanchunis *(pro hac vice)*
Florida Bar No. 324681

5

jyanchunis@ForThePeople.com
Marisa Glassman *(pro hac vice)*

6

Florida Bar No. 111991
mglassman@ForThePeople.com

7

MORGAN & MORGAN
COMPLEX LITIGATION GROUP

8

201 N. Franklin Street, 7th Floor

9

Tampa, Florida 33602
Telephone: (813) 223-5505

10

Facsimile: (813) 223-5402

11

Michael F. Ram, SBN #104805

12

Email:  MRam@RobinsKaplan.com
Susan Brown, SBN #287986

13

Email:SBrown@RobinsKaplan.com
ROBINS KAPLAN, LLP

14

2440 W. El Camino Real, Suite 100

15

Mountain View, California 94040
Telephone:  (650) 784-4040

16

Facsimile:  (650) 784-4011

17

Matt Malone, SBN #221545

18

ROCK LAW LLP
101 Montgomery Street, Suite 1800

19

San Francisco, California 94104
Telephone:     (415) 433-4949

20

Facsimile:     (415) 433-7311
Email: mjm@rocklawcal.com

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS