1   ROBINS KAPLAN LLP
    Michael F. Ram, SBN #104805
2   mram@robinskaplan.com
    Susan S. Brown, SBN #287986
3   sbrown@robinskaplan.com
    2440 West El Camino Real, Suite 100
4   Mountain View, California 94040
    Telephone:  (650) 784-4040
5   Facsimile:  (650) 784-4041

6   MORGAN & MORGAN
    COMPLEX LITIGATION GROUP
7   John A. Yanchunis (admitted *pro hac vice*)
    jyanchunis@ForThePeople.com
8   Marisa Glassman (admitted *pro hac vice*)
    mglassman@ForThePeople.com
9   201 N. Franklin Street, 7th Floor
    Tampa, Florida 33602
10  Telephone: (813) 223-5505
    Facsimile: (813) 223-5402

11
    ROCK LAW LLP
12  Matt Malone, SBN #221545
    101 Montgomery Street, Suite 1800
13  San Francisco, California 94104
    Telephone:  (415) 433-4949
14  Facsimile:  (415) 433-7311

15  *Attorneys for Plaintiff and Proposed Class*

16                 UNITED STATES DISTRICT COURT

17            FOR THE NORTHERN DISTRICT OF CALIFORNIA

18

19  ANDREW PARSONS, individually and on         Case No. 3:16-cv-05387-VC
    behalf of all others similarly situated,
20                                               **PLAINTIFF'S MEMORANDUM OF**
                      Plaintiff,                 **POINTS AND AUTHORITIES IN**
21                                               **SUPPORT OF RENEWED**
    v.                                           **UNOPPOSED MOTION FOR**
22                                               **PRELIMINARY APPROVAL**
    KIMPTON HOTEL & RESTAURANT
23  GROUP, LLC

24                    Defendant.

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................... 1

II.    SUMMARY OF THE LITIGATION ..................................................................... 3

III.   INFORMATION ABOUT THE SETTLEMENT ................................................. 4

IV.    THE TERMS OF THE SETTLEMENT AGREEMENT ...................................... 5

    A.     The Settlement Class ................................................................................ 5

    B.     The Settlement Benefits ........................................................................... 6

        1.     Monetary Remedies ...................................................................... 6

        2.     Injunctive Relief ........................................................................... 9

    C.     Proposed Notice Plan ............................................................................. 11

    D.     Claim Form and Claim Process .............................................................. 13

    E.     Attorneys' Fees, Costs, and Expenses ................................................... 14

    F.     Service Awards ....................................................................................... 15

    G.     Release of Claims ................................................................................... 16

V.     ARGUMENT ...................................................................................................... 16

    A.     The Proposed Settlement Class Should Be Certified ............................. 16

        1.     The Class Meets the Requirements of Rule 23(a) ...................... 16

        2.     The Class Meets the Requirements of Rule 23(b)(3) .................. 17

    B.     The Court Should Grant Preliminary Approval ..................................... 21

        1.     The Standard for Preliminary Approval ...................................... 21

            a.     The Strength of Plaintiff's Case ....................................... 22

            b.     The Risk, Expense, Complexity, and Likely Duration of Further Litigation ....................................................................................... 23

            c.     The Risk of Maintaining Class Action Status throughout Trial ............. 23

            d.     The Amount Offered In Settlement ....................................... 24

            e.     The Extent of Discovery Completed and the Stage of the Proceedings .. 25

            f.     The Experience and Views of Counsel ................................. 26

            g.     The Presence of a Governmental Participant ..................... 26

i

h.     The Reaction of Class Members to the Proposed Settlement ................. 26

i.     Whether the Settlement is a Product of Collusion among the Parties ..... 26

C.     The Court Should Approve the Proposed Settlement Notices and Authorize Their Dissemination ..................................................................................................... 27

D.     The Court Should Appoint Plaintiff's Counsel as Class Counsel ............................ 28

E.     The Court Should Schedule a Fairness Hearing and Approve the Proposed Preliminary Approval Order ..................................................................................... 29

VI.    CONCLUSION ................................................................................................................. 29

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Amchem Prods. v. Windsor*,
  521 U.S. 591(1997) ................................................................................ 16, 20, 21

4

*American Airlines v. Wolens*,
  513 U.S. 219 (1995) ..................................................................................... 19

5

*Boyd v. Bechtel Corp.*,
  485 F. Supp. 610 (N.D. Cal. 1979) ............................................................... 26

6

7

*Bray v. GameStop Corporation*,
  1:17-cv-01365-JEJ (D. Del.) ........................................................................ 14

8

*Churchill Vill., L.L.C. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004).......................................................................... 22

9

10

*Cotter v. Lyft, Inc.,*
  193 F. Supp. 3d 1030 (N.D. Cal. 2016) ......................................................... 21

11

*Dugas v. Starwood Hotels & Resorts Woldwide, Inc.*,
  3:16-cv-00014-GPC-BLM (S.D. Cal.)........................................................... 24

12

13

*Duhaime v. John Hancock Mut. Life. Ins. Co.*,
  177 F.R.D. 54 (D. Mass. 1997) ..................................................................... 21

14

*Eddings v. DS Services of America, Inc.*,
  No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016) ............ 21

15

16

*Garner v. State Farm Mut. Auto. Ins. Co.*,
  No. CV 08 1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010)..................... 15

17

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)................................................................... passim

18

19

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) ......................................................................... 16

20

*Hunt v. VEP Healthcare, Inc.*,
  No. 16-cv- 04790-VC, 2017 WL 3608297 (N.D. Cal., Aug. 22, 2017) .................................. 21

21

22

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ...................... 22

23

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*,
  2010 WL 3931096 (N.D. Cal. Oct. 6, 2010)................................................... 19

24

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
  2009 WL 5184352, at *6–7 (W.D. Ky. Dec. 22, 2009).......................................... 20

25

26

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
  2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010)......................................... 23

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

iii

*In re Hyundai & Kia Fuel Econ. Litig.*,
  881 F.3d 679, 707 (9th Cir. 2018) ........................................................................ 18

*In re Linkedin User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) .......................................................................... 20

*In re Mercury Interactive Corp. Securities Litigation*,
  618 F.3d 988 (9th Cir. 2010) ................................................................................. 15

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  No. MDL 14-2522-PAM, ECF No. 358-1 (March 18, 2015), 2017 WL 2178306 (D. Minn.
  May 17, 2017) (8th Cir.) .................................................................................. 24, 26

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351 (N.D. Ga. Aug.
  23, 2016) ....................................................................................... 20, 24, 26

*In re Yahoo Mail Litig.*,
  No. 13-CV-4980, 2016 WL 4474612 (N.D. Cal. Aug. 25, 2016) ............................................ 15

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .................................................................. 17, 18, 19, 20

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) ......................................................................... 23, 25

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ................................................................................. 19

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ........................................................................................... 27

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ............................................................................ 21

*O'Connor v. Uber Techs., Inc.*,
  201 F. Supp. 3d 1110 (N.D. Cal. 2016) ...................................................................... 21

*Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco.*,
  688 F.2d. 615 (9th Cir. 1982) ............................................................................... 21

*Radcliffe v. Experian Info. Solutions*,
  715 F.3d 1157 (9th Cir. 2013) ............................................................................... 15

*Remijas v. The Neiman Marcus Group, LLC*,
  No. 14-cv-1735, ECF No. 145 (March 17, 2017) ............................................................... 25

*Smith v. Triad of Alabama, LLC*,
  2017 WL 1044692 (M.D. Ala. Mar. 17, 2017) .................................................................. 23

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ................................................................................. 17

*T.A.N. v. PNI Digital Media, Inc.*,
  2:16-cv-00132-LGW-RSB (S.D. Ga.) ........................................................................... 14

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

iv

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ............................................................................................ 17, 20

*Vaquero v. Ashley Furn.*,
   824 F.3d 1150 (9th Cir. 2016) ...................................................................................... 20

*Viceral v. Mistras Grp., Inc.*,
   2016 WL 5907869 (N.D. Cal. Oct. 11, 2016) .............................................................. 21

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...................................................................................................... 17

*Whalen v. Michaels Stores, Inc.*,
   689 F. App'x 89 (2d Cir. 2017) .................................................................................... 24

**Statutes**

28 U.S.C. § 1715 .................................................................................................................. 13

Class Action Fairness Act, 28 U.S.C. § 1715 ...................................................................... 26

**Other Authorities**

*Manual for Complex Litigation,* Fourth, § 21.61 (2004) .................................................... 21

*Manual for Complex Litigation*, Fourth, § 21.632 (2004) .................................................. 16

N.D. Cal. Procedural Guidance for Class Action Settlements, §2 ....................................... 11

N.D. Cal. Procedural Guidance for Class Action Settlements, §6 ....................................... 15

**Rules**

Fed. R. Civ. P. 23(a) ........................................................................................................... 16

Fed. R. Civ. P. 23(a)(1) ....................................................................................................... 16

Fed. R. Civ. P. 23(b)(1) ....................................................................................................... 17

Fed. R. Civ. P. 23(e) ........................................................................................................... 21

Fed. R. Civ. P. 23(g)(1)(A)(i-iv) ........................................................................................ 28

Fed. R. Civ. P. 23(g)(1)(B) ................................................................................................. 28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBINS KAPLAN LLP<br>ATTORNEYS AT LAW<br>MINNEAPOLIS

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

On August 31, 2016, Kimpton Hotel & Restaurant Group, LLC publicly acknowledged that it had been the target of a Security Incident[1] and that payment card information related to its consumers was potentially compromised.  The parties have reached a proposed settlement that, if approved by the Court, will resolve Plaintiff's and Class members' claims against Kimpton arising from the Security Incident at issue in this litigation.  After nearly eighteen months of litigation, Plaintiff Andrew Parsons moves for preliminary approval of the Settlement he has reached with Kimpton.

The proposed Settlement, reached after negotiations with the assistance of an experienced mediator, Bruce A. Friedman of JAMS, requires Kimpton to reimburse Settlement Class Members for, among other things:   unreimbursed bank and payment card fees; time spent dealing with replacement card issues or in reversing fraudulent charges; fraudulent charges on a payment card; costs of credit reports; and costs of credit monitoring.  Kimpton has also agreed to implement several measures to improve its data security.  The Agreement offers substantial recovery and is an excellent result for the members of the class.

Plaintiff filed his initial motion for preliminary approval on May 23, 2018.  On July 12, 2018, this Court denied Plaintiff's motion without prejudice.  In his renewed motion, Plaintiff addresses the issues the Court raised in its Order.  Specially, as detailed in the sections below:

(1)     The parties have substantially improved the claim form to address the Court's main concern that it was unreasonable to expect a class member to fill out the form and gather all required documents to obtain the relief offered.  The parties have agreed that the documentation described in the claim form would not be required for several categories, and a narrative description of the costs incurred would suffice.  The revised claim form is attached as Exhibit A to the Settlement Agreement and a version of the claim form showing the revisions made in track changes is attached as Exhibit 6 to this brief.

---

[1] Unless otherwise defined, capitalized terms have the same meaning attributed to them in the Settlement Agreement ("SA"), attached to this brief as Exhibit 1.

(2)      The proposed Claims Administrator, Epiq Systems, Inc. ("Epiq"), has provided data on claims rates in cases with similar forms and losses, showing that the time required for even the *unmodified* claim form would not substantially compromise claim rates.  Plaintiff submits a supplemental declaration Cameron A. Azari of Epiq, attached as Exhibit 5 (Supplemental Epiq Decl.), supporting this and answering other issues raised by the Court.  *See infra* at Section III(D).

(3)      Plaintiff has identified for the Court the number of class members in this case, and has identified the claims rate and average recovery per class member in a similar payment card data breach case.  *See infra* at Sections IV(A), (B).

(4)      Plaintiff explains why the settlement amount of $600,000 and the claim process are both reasonable, particularly relative to other similar data-breach cases, and describes in further detail both the definition of and expected claims rate for extraordinary out-of-pocket monetary losses.  *See infra* at Section V(A)(2).

(5)      Plaintiff further explains the notice plan, including why notice in *People* magazine and certain websites is included and well-designed to reach class members and particularly well-suited to reach hotel guests and travelers. *See infra* at Section IV(B) and Supplemental Epiq Decl. at ¶¶ 6-7.

(6)      Plaintiff explains why this case satisfies the predominance requirement for a class action settlement.  *See infra* at Section V(A)(2).

(7)      Plaintiff explains how this settlement satisfies this Court's Civil Standing Order requirements for class action settlements and the Northern District's Class Action Settlement Guidance.  (See Doc. 97.)  *See generally infra* at Sections III, IV.

(8)      Separately, Kimpton is filing a statement to address certain issues raised by the Court regarding the scope of expected damages to consumers in cases involving payment card security incidents.

For the reasons stated below, Plaintiff respectfully requests that the Court grant an order (1) preliminarily approving the proposed settlement; (2) provisionally certifying the Settlement Class; (3) appointing Andrew Parsons as Class Representative; (4) appointing John Yanchunis as Lead Class Counsel, and Marisa Glassman, Michael Ram and Matt Malone as Class Counsel; and (5)

1   approving the proposed Notice Program and authorizing its dissemination to the Class; (6)

2   appointing Epiq Systems, Inc. to serve as the Claims Administrator; (7) appointing Bruce A.

3   Friedman as the Claims Referee, and (8) setting a schedule for the final approval process including

4   Class Counsel's motion for approval of attorneys' fees and expenses.

5   **II.   SUMMARY OF THE LITIGATION**

6       This class action case was filed against Kimpton in September 2016 following a malware

7   incident potentially affecting payment card transactions at 61 Kimpton hotels and restaurants

8   between February and July 2016.  (Compl., ECF 1 ¶ 2.)  Plaintiff Lee Walters asserted five claims

9   in his original complaint: negligence, breach of implied contract, and three claims under

10  California's Unfair Competition Law (unfair conduct, unlawful conduct, and fraudulent conduct).

11  (*Id.* ¶¶ 57-95.)  Mr. Walters filed an amended complaint in January 2017 asserting the same claims.

12  (Am. Compl., ECF 34.)  Following Kimpton's motion to dismiss, the Court dismissed the UCL

13  fraud prong claim and allowed the other four claims to go forward.  (Order, ECF 44.)

14      The Court bifurcated pre-trial proceedings into individual liability and damages and class

15  certification phases, and ordered the parties to proceed first with discovery and summary judgment

16  on liability and damages as to the named plaintiff only.  (Order, ECF 47.)  Early in discovery,

17  Andrew Parsons was added as a plaintiff.  (Second Am. Compl., ECF 61.)  Mr. Parsons alleges that

18  he used his payment card at a Kimpton hotel in Washington, D.C. during the at-risk window for

19  the malware incident.  (*Id.* ¶¶ 13-18.)  In January 2018, the original plaintiff, Mr. Walters, was

20  voluntarily dismissed.  (Stipulation, ECF 74.)

21      The parties completed fact discovery on February 16, 2018.  (*See* Order, ECF 67.)  The

22  parties engaged in voluminous document and ESI discovery and exchanged substantial written

23  discovery, including interrogatories and requests for admission.  Kimpton has taken the deposition

24  of Mr. Parsons.  Plaintiff has taken the depositions of Kimpton's Rule 30(b)(6) representative,

25  Kimpton's four data security witnesses, and Kimpton's Director of Communications.

26      The parties have also engaged in substantial third-party discovery.  Plaintiff issued

27  subpoenas to the Better Business Bureau, Mandiant (forensics firm), SecureWorks (forensics firm),

28  Sunera (computer security firm), Rapid7 (computer security firm), and certain employees of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   Kimpton's parent company, IHG. In connection with these subpoenas, Plaintiff has taken the

2   depositions of Mandiant, Sunera, and two IHG witnesses.

3   Plaintiff's counsel also retained a cybersecurity expert to assist Plaintiff's counsel to

4   identify the cause of the breach and to determine the preventive measures necessary to protect

5   information of consumers in the future. This expert telephonically attended several of the

6   depositions and reviewed documents produced by Kimpton.  In addition, Plaintiff's counsel

7   retained a damages expert to assist counsel in determining the type and nature of the damages which

8   could be sustained by a class member.

9   **III.    INFORMATION ABOUT THE SETTLEMENT**

10   While engaging in discovery, the parties also began a discussion of the potential resolution

11   of the litigation. Specifically, on November 9, 2017, Plaintiff sent Kimpton a letter outlining the

12   material terms of a proposed settlement. Declaration of John Yanchunis ("Yanchunis Decl.")

13   (Attached as Exhibit 2), ¶ 28. On February 5, 2018, Kimpton responded to Plaintiff's proposal and

14   outlined its position on the basic parameters of a settlement. Yanchunis Decl., Ex. 2 ¶ 28.

15   In February 2018, the parties retained Bruce A. Friedman, a highly experienced mediator,

16   to assist the parties in continuing the negotiations.  Yanchunis Decl., Ex. 2 ¶ 29.  The parties briefed

17   their respective positions on the facts, claims, defenses and assessments of the risk of litigation.

18   The parties also submitted a draft settlement term sheet that was prepared by Plaintiff and that was

19   then used at the mediation. Yanchunis Decl., Ex. 2 ¶ 29.

20   On March 12, 2018, the parties had a full-day mediation session with Mr. Friedman at

21   JAMS in San Francisco. Yanchunis Decl., Ex. 2 ¶ 30. The negotiations were hard-fought

22   throughout and the settlement process was conducted at arm's length. Yanchunis Decl., Ex. 2 ¶ 30.

23   Through the negotiations, Mr. Friedman was able to assist the parties in reaching an agreement on

24   the substantive terms of the Settlement.  Yanchunis Decl., Ex. 2 ¶ 30.  The parties executed a term

25   sheet the same day.  Yanchunis Decl., Ex. 2 ¶ 30.  The subject of attorneys' fees and expenses,

26   subject to Court approval, was negotiated only after the substantive terms of the Settlement were

27   agreed upon by the parties.  Yanchunis Decl., Ex. 2 ¶ 30.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

**IV.   THE TERMS OF THE SETTLEMENT AGREEMENT**

**A.  The Settlement Class**

The proposed Settlement Class is defined as:

> All residents of the United States whose Personal Information was compromised as a result of the malware attack publicly announced by Kimpton on August 31, 2016.

SA, Ex. 1 ¶ 1.26.  A litigation class has not yet been certified.  See N.D. Cal. Procedural Guidance for Class Action Settlements, Preliminary Approval 1(a).  The class definition is consistent with the class definition in Plaintiff's Second Amended Class Action Complaint ("[a]ll persons residing in the United States whose personal and/or financial information was disclosed in the Data Breach affecting Kimpton in 2015") (Doc. 61, Second Amended Class Action Complaint ¶ 54.).  The class definition was revised to accurately include the date of the public announcement of the Data Breach based on information learned in discovery.

Through discovery Plaintiff confirmed that Kimpton has name and contact information for approximately 149,200 Settlement Class Members, to whom Kimpton provided direct notice of the security incident.  The size of the remaining class is difficult to estimate with precision.  Because of the nature of payment card acceptance, Kimpton does not have an ability to match contact information to most of the payment cards potentially affected by the incident.  Visa reported it considered 297,576 unique accounts to be at-risk, MasterCard identified 146,243 unique at-risk accounts (24,259 of which had been identified as at-risk due to other earlier reported incidents ), and American Express identified 169,335 unique at-risk accounts (54,812 of which had been identified as at-risk due to other earlier reported incidents ).  These account number totals, however, are not necessarily equivalent to unique individuals because one person could have used a Visa account at the front desk and a Mastercard in a restaurant.  Thus, based on these numbers, Kimpton estimates that in total approximately 600,000 unique individuals were potentially affected by the incident, many of whom used cards that were previously identified as at-risk by other security incidents reported to the payment card networks other than the Kimpton incident.

**B.**   **The Settlement Benefits**

**1.**   **Monetary Remedies**

Under the Settlement, subject to its terms and conditions and subject to Court approval,

Settlement Class Members are eligible to receive reimbursement of up to $250 (in total) for the

following categories of out-pocket expenses resulting from the Security Incident:

> (i) unreimbursed bank fees;
> (ii) unreimbursed card reissuance fees;
> (iii) unreimbursed overdraft fees;
> (iv) unreimbursed charges related to unavailability of funds;
> (v) unreimbursed late fees;
> (vi) unreimbursed over-limit fees;
> (vii) long distance telephone charges;
> (viii) cell minutes (if charged by minute), Internet usage charges (if charged by the minute or by the amount of data usage and incurred solely as a result of the Security Incident), and text messages (if charged by the message and incurred solely as a result of the Security Incident);
> (ix) unreimbursed charges from banks or credit card companies;
> (x) postage;
> (xi) interest on payday loans due to card cancelation or due to over-limit situation;
> (xii) up to three hours of documented lost time spent dealing with replacement card issues or in reversing fraudulent charges or otherwise dealing with the Security Incident (calculated at the rate of $15.00 per hour), but only if at least one full hour was spent, and only if the time can be documented with reasonable specificity by answering questions on the Claim Form;
> (xiii) an additional $15 payment for each credit or debit card on which document fraudulent charges were incurred that were later reimbursed, to compensate the claimant for lost time associated with seeking reimbursement for the fraud, but no documentation will be required for this benefit;
> (xiv) costs of credit report(s) purchased by Settlement Class Members between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident); and
> (xv) costs of credit monitoring and identity theft protection (not to exceed $80.00) purchased by Settlement Class Members between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident and not for other purposes, and with proof of purchase).

SA, Ex. 1 ¶ 2.1.

As explained in Epiq's supplemental declaration, in a recent payment card data breach

that included similar claim categories and capped total recovery for those claim categories of

$250 per Class Member, only 6 of the approximate 1430 submitted claims that were eligible for

an award exceeded the $250 maximum.  The average claim submitted was for an amount of $49.00.  *See* Supplemental Epiq Declaration, Ex. 5, ¶ 20.

Class Members who had other extraordinary unreimbursed out-of-pocket monetary losses as a result of the Security Incident, including alleged unreimbursed fraudulent charges, are eligible to make a claim for reimbursement of up to $10,000.00.  SA, Ex. 1 ¶ 2.2.  The qualifications for a class member to recover more than $250 under the "extraordinary unreimbursed out-of-pocket monetary losses" are:  Settlement Class Members "shall also be eligible to be reimbursed for monetary out-of-pocket losses that are claimed by the Settlement Class Member to have occurred more likely than not as a result of the Security Incident, in an amount not to exceed $10,000.00 per Settlement Class Member, subject to the following conditions: (a) it is an actual, documented, and unreimbursed monetary loss; (b) was more likely than not caused by the Security Incident; (c) occurred during the time period from February 1, 2016 through and including the end of the applicable claims period (see ¶ 2.2.2, infra); (d) is not already covered by one or more of the categories in ¶ 2.1, and (e) the claimant made reasonable efforts to avoid or seek reimbursement for the loss including but not limited to exhaustion of all available credit monitoring insurance and identity theft insurance as required under ¶ 2.2.1.  Settlement Class Members with claims under this paragraph may also submit claims for benefits under ¶ 2.1."  SA, Ex. 1 ¶ 2.2.  Given the thorough and comprehensive claims categories and significant relief provided to class members in paragraph 2.1 of the Settlement Agreement, and the expected narrow number of Settlement Class Members who have other unreimbursed out-of-pocket monetary losses as a result of the Security Incident, Plaintiff anticipates a limited number of Settlement Class Members to submit a claim for extraordinary unreimbursed out-of-pocket monetary losses.  While Plaintiff does not anticipate many claims for this category, it is important that Settlement Class Members who have incurred these out-of-pocket losses have an opportunity

to recover and be reimbursed.

The aggregate amount of claims reimbursement for which Kimpton shall be responsible to pay is capped at $600,000.  If the total valid claims exceed the $600,000 cap, each individual amount shall be reduced pro rata so that the aggregate claims reimbursement is exactly $600,000. SA, Ex. 1 ¶ 2.4. Here, the Settlement includes a claims process to permit Settlement Class Members to recover for multiple categories of claims.  Due to the nature and types of harm Settlement Class Members experienced as a result of the Security Incident, Plaintiff sought a robust and comprehensive settlement that would allow Settlement Class Members to recover the maximum amount for their claims.  *See* Standing Order for Civil Cases Before Judge Vince Chhabria, §32.  As discussed in detail below, the claims process provides Settlement Class Members the opportunity to submit a claim for numerous categories that they might not otherwise consider or on their own select.  *See* SA, Exh. 1, ¶ 2.1.  *See also infra* at Sections III(C), (D).

Plaintiff negotiated the settlement with the anticipation that $600,000 should be more than adequate to provide all claimants with the full amount they are entitled to recover and this amount also compares favorably with other payment data breach cases.  The per card amount of this Settlement is approximately $1.00 per card.  This compares favorably to other payment card data breach cases where the average per card amount was significantly below $1.00 per card.  *See infra* at Section V(B)(1)(d).  Additionally, taking the example of a recent payment card data breach settlement providing substantially similar relief, the approximate claims rate was .3% and the average award amount per claim was $49.00.  Here, using those figures, $600,000 is more than adequate to cover the anticipated claims.  Unused funds are not redistributed to class members who claim their share nor do unused funds go to cy pres.  *See* Standing Order for Civil Cases Before Judge Vince Chhabria, §32; *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 8.  This is because the goal of this settlement is to provide Settlement Class

Members with unreimbursed out-of-pocket expenses and documented lost time that resulted from the Security Incident.  Plaintiff believes that the Settlement will accomplish this goal and therefore Plaintiff did not seek additional monetary relief beyond what Settlement Class Members can recover through the claims process.

The monetary relief provided under the terms of the settlement most likely exceeds the potential recovery if Plaintiff were to prevail on each of his claims.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(d).  Reimbursement for out-of-pocket losses for the fifteen categories detailed above exceeds what would otherwise be available remedies if the Settlement is not approved.  For example, under the terms of the Settlement, Class Members may recover for the cost of credit monitoring, up to $80 and purchased anytime between February 1, 2016 and the Claims Deadline.  Similarly, in addition to time spent dealing with the Security Incident, Class Members can receive an additional $15 payment for each credit or debit card that incurred fraudulent charges that were reimbursed.  Without a Settlement, these remedies would not likely be available to Class Members.  Given the size of the Class and the amount of monetary relief available to the Class, Plaintiff does not anticipate concerns about the allocation of the settlement fund among Class Members. *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(e).

### 2.     Injunctive Relief

Class benefits from this Settlement Agreement are not merely monetary; they also include injunctive relief designed to minimize the risk of future data breaches and protect consumer data going forward.  As part of the Settlement Agreement, Kimpton will adopt and implement, at a minimum, the following data security measures for three years from the execution of the Settlement Agreement:

> 1) Information Security Position.  Kimpton will designate a position that is specifically responsible for overseeing information security compliance at Kimpton Hotel & Restaurant Group, LLC.
> 2)  Annual PCI DSS Audits & Penetration Testing.  Kimpton will hire a

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1
2
3
4

third-party Qualified Security Assessor to conduct an annual assessment of Kimpton's compliance with PCI DSS and hire a penetration testing company to conduct an annual penetration test of Kimpton Hotel & Restaurant Group, LLC's cardholder data environment. Qualified Security Assessor means an independent security organization that has been qualified by the PCI Security Standards Council to assess an entity's adherence to PCI DSS. Penetration test means a manual process that complies with the standards set forth by PCI DSS for penetration testing.

5
6

3) Annual Security Awareness Program. Kimpton will provide annual security awareness training for its employees, which will include education and training regarding payment card data security and payment card data security best practices.

7
8
9
10
11
12
13

4) Payment Card Acceptance Technology. With respect to all consumer card present payment transactions where a physical payment card is used at a Kimpton hotel front desk or restaurant, Kimpton will: (1) implement a solution that encrypts payment card data when it is read by the card acceptance device and routes the authorization message out to the payment card networks without the authorization message data being unencrypted on devices owned and managed by Kimpton ("Encryption Solution"); and (2) install card acceptance devices and payment applications that support acceptance of EMV enabled payment cards (the "EMV Solution"). Kimpton will implement the Encryption Solution and EMV Solution by June 31, 2019 for card present transactions that occur at the front desk of its hotels. Kimpton will implement the Encryption Solution and EMV Solution for card present transaction that occur in its restaurants by January 2020.

14

5) Senior Leadership reporting. Kimpton will report to its executive team about its cybersecurity efforts.

15
16

SA, Ex. 1 ¶¶ 3.1-3.5.

17
18
19
20
21
22
23

        The injunctive relief provisions included in the Settlement Agreement materially enhance the value of this Settlement and represent significant improvements by Kimpton to its data security. For example, though the parties disputed whether Kimpton had been PCI-compliant (that is, compliant with the Payment Card Industry Data Security Standards [PCI-DSS]), this settlement includes regular PCI-DSS compliance auditing. And the improvements to Kimpton's payment card acceptance technology represent a significant financial investment by Kimpton and further add to the relief Class Members would receive as a result of this Settlement.

24
25
26
27

        Thus, the meaningful benefit to Class Members through this settlement is not merely monetary. By including these security enhancements in addition to monetary relief, the Settlement Agreement provides renewed confidence that Kimpton systems will prospectively protect consumer data.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

### C.     Proposed Notice Plan

Pursuant to the Settlement Agreement, the parties propose that Epiq be appointed as Notice Specialist and Claims Administrator.  Epiq is a nationally recognized class action notice and administration firm that has designed a class notice plan for this case, which the parties and Epiq believe is an effective plan.  Kimpton has agreed to pay all costs associated with providing Class notice and administering the Settlement benefits.  Such payment will be in addition to and not affect the amount of Class Settlement consideration available to Class Members.  SA, Ex. 1 ¶ 4.2. The parties estimate that the settlement administration and notice will cost approximately $377,000.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §2.  Since Kimpton is paying these costs in addition to the monetary relief provided to Class Members, this also materially enhances the value of the Settlement.

With respect to notice, there are two groups of Settlement Class Members:  those for whom Kimpton has email addresses and/or physical addresses, and those for whom Kimpton does not. Subject to Court approval, this Notice Plan involves direct notice to the approximately 150,000 Settlement Class Members for whom physical addresses or email addresses are available.  For the remaining Settlement Class Members, notice will be provided by publication.  This publication notice will take two forms:  first, an advertisement in *People Magazine*[2], which has a circulation of 3.4 million individuals.  Second, the publication notice will also be made via online Internet banners through Facebook, the Google Display Network, and the Yahoo! Ad Network.  A declaration from Epiq with additional details about the publication plan is attached as Exhibit F to the Settlement Agreement. Further details are attached in a Supplemental Declaration attached as Exhibit 5 to this motion.

Finally, the Claims Administrator will also establish a settlement website in the form agreed to by the parties and the Court.  In addition to the notices, the website will include information about the Settlement, related case documents, and the Settlement Agreement.  Class Members will be able to submit claims electronically.

---

[2] Epiq's supplemental declaration provides details as to why People Magazine was selected and how Epiq has proposed improving its online media plan to increase the number of online impressions. *See* Ex. 5, Supplemental Epiq Decl. at ¶¶ 6-7.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    Notice of the Settlement will be given to the Settlement Class no later than thirty days from

2    the date of the Court's Preliminary Approval Order.  Pursuant to the Notice Plan, there will be two

3    forms of notice, a long form and a summary notice, which are attached as Exhibits B and C to the

4    Settlement Agreement.  The Class notice informs Class Members of the nature of the action, the

5    litigation background, the terms of the agreement (including the definition of the Settlement Class),

6    the relief provided by the Settlement Agreement, Class Counsel's request for fees and expenses

7    and the scope of the release and the binding nature of the Settlement on Class Members.  It also

8    describes the procedure for objecting to the Settlement; advises Class Members that they have the

9    right to opt out of the Settlement and describes the consequences for opting out; and states the date

10   and time of the final approval hearing, advising that the date may change and how to check the

11   website.

12   The Parties have worked with Epiq to create class notice that is easily understandable and

13   includes the following:  (1) contact information for class counsel to answer questions; (2) the

14   address for a website, maintained by the claims administrator or class counsel, that has links to the

15   notice, motions for approval and for attorneys' fees and any other important documents in the case;

16   (3) instructions on how to access the case docket. The notice will state the date of the final approval

17   hearing and clearly state that the date may change without further notice to the class.  *See* N.D. Cal.

18   Procedural Guidance for Class Action Settlements, §3.  The notice is carefully written in plain

19   English and unnecessary acronyms were avoided.  *See* Standing Order for Civil Cases Before Judge

20   Vince Chhabria, §32.

21   The notice also instructs class members who wish to exclude themselves from the

22   Settlement to send a letter to the settlement administrator, setting forth their name and a statement

23   that they request exclusion from the class and do not wish to participate in the settlement. It does

24   not require extraneous information not needed to effect an exclusion.  *See* N.D. Cal. Procedural

25   Guidance for Class Action Settlements, §4.

26   Pursuant to the Northern District of California's Procedural Guidance for Class Action

27   Settlements, the notice instructs class members who wish to object to the settlement to send their

28   written objections to the Court. All objections will be scanned into the electronic case docket and

the parties will receive electronic notices of filing. The notice requires a written objection as a prerequisite to appearing in court to object to the settlement and it specifies that this requirement may be excused upon a showing of good cause. *See* Standing Order for Civil Cases Before Judge Vince Chhabria, §32. The notice also explains that "the Court will only require substantial compliance with the requirements for submitting an objection." *See* Standing Order for Civil Cases Before Judge Vince Chhabria, §32.

No governmental agency is involved in this litigation, but the Attorney General of the United States and Attorneys General of each of the States will be notified of the proposed settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity to raise any objections or concerns they may have.

### D.    Claim Form and Claim Process

The parties have substantially improved the claim form to address the Court's main concern that it was unreasonable to expect a class member to fill out the form and gather all required documents to obtain the relief offered. First, the parties have agreed that the documentation described in the claim form would not be required for several categories, and a narrative description of the costs incurred would suffice. Second, the proposed Claims Administrator, Epiq Systems, Inc., has provided data on claims rates in cases with similar forms and losses, showing that the time required for even the *unmodified* claim form would not substantially compromise claim rates.

First, to address the Court's concern about the required documentation to submit a claim, the Parties have revised the claim form to eliminate required documents for several out-of-pocket expense categories, including: bank fees; card reissuance fees; fees related to frozen or unavailable accounts; fees related to credit reports, identity theft insurance, and/or credit monitoring; and incidental telephone, internet, or postage expenses. The Revised Claim Form is attached as Exhibit A to the Settlement Agreement. A redline comparison between the original and revised claim forms is attached as Exhibit 6 to this brief. The parties expect this to significantly improve the claim

process for Settlement Class Members.  As the Court identified, by eliminating the need for a Settlement Class Member to spend the time gathering various documents to prove their expenses incurred as a result of the Security Incident, and instead only asking for a narrative description of the costs, Plaintiff expects submitting a claim to be a simpler process that may result in more Settlement Class Members filing claims.  In addition, Epiq's online claim submission process should make it a quick and simple process for Settlement Class Members to submit claims.  *See* Ex. 5, Supplemental Epiq Decl. at ¶¶ 17-18 (providing a sample online claim form used in a prior case).

Second, while the Parties have agreed to revise the claim form to improve the process for Settlement Class Members, the claim form Plaintiff submitted with his original motion for preliminary approval is substantially similar to the claim forms approved in other payment card data breach class action settlements.  *See T.A.N. v. PNI Digital Media, Inc.*, 2:16-cv-00132-LGW-RSB (S.D. Ga.), Docs. 37-1 at Ex. A (May 25, 2017) (claim form) and Doc. 40 (June 2, 2017) (Preliminary Approval Order*).  See also Bray v. GameStop Corporation*, 1:17-cv-01365-JEJ (D. Del.), Docs. 40-2 at Ex. D (July 16, 2017) (claim form) and Doc. 43 (August 1, 2018) (Preliminary Approval Order).  While there is not yet information to provide the Court on the GameStop settlement claims process, for the PNI Digital Media settlement, Epiq has provided a supplemental declaration that details how long it took claimants to input information online, the number of claims made and average award.  *See* Ex. 5, Epiq. Decl. ¶¶14-20.  In PNI, notice went to approximately 750,000 class members, with approximately 2,350 submitting claims, for a claims rate of .3%.

**E.     Attorneys' Fees, Costs, and Expenses**

Kimpton has agreed that Class Counsel is entitled to seek an award of reasonable attorneys' fees, costs and expenses for prosecuting this action and will not object to Class Counsel's petition for fees and expenses not to exceed $800,000 inclusive of expenses.  Notably, the parties did not negotiate this agreement or any other issue with respect to attorneys' fees, costs and expenses until

the mediator had informed the parties that they had reached an agreement on Class relief. In addition, the award of fees costs and expenses does not reduce or otherwise affect the amount of compensation available to Class Members. Class Counsel's lodestar substantially exceeds the attorneys' fee request, which will be presented to the Court in their motion for attorneys' fees, costs and expenses. This motion will be filed at least thirty (30) days prior to the deadline for objecting to the proposed settlement. SA, Ex. 1 ¶¶ 8.1-8.2. *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §6 ("When proposing dates for notice, objections, motions for attorneys' fees and final approval, the parties must ensure that the motion for attorneys' fees is filed at least fourteen days before the deadline for objecting to the settlement. *See In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010)."). *See also* Standing Order for Civil Cases Before Judge Vince Chhabria, §32.

### F.     Service Awards

The Settlement allows Class Counsel to request and for Kimpton to pay a service award to Andrew Parsons, Plaintiff and the proposed Class Representative, in an amount not to exceed $5,000.00 as approved and ordered by the Court upon final approval of the Class Settlement. The Class Representative's agreement to the Settlement is not conditioned in any manner on the award of a service award or its amount. Declaration of Andrew Parsons, Attached as Exhibit 3 ¶ 10. The Class Representative has given his time and accepted his responsibilities admirably, participating actively in this litigation as required and in a manner beneficial to the Class generally. Yanchunis Decl., Ex. 2 ¶ 41. The proposed service award is presumptively reasonable. *In re Yahoo Mail Litig.*, No. 13-CV-4980, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016) ("The Ninth Circuit has established $5,000.00 as a reasonable benchmark [for service awards]."). It is particularly warranted given Mr. Parsons' extensive participation in the litigation, including being deposed on personal financial matters. *See, e.g., Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365, 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010). Here, there are no conditions placed on the incentive award nor does the amount of the award undermine the adequacy of the class representative. *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §7 (citing *See, e.g., Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. 2013).)

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

### G.    Release of Claims

Under the Settlement, each member of the Class will be deemed to have released any and all claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, suspected or unsuspected, asserted or that might have been asserted, by the Plaintiff or any Settlement Class Member, against Kimpton arising out of or related to the facts giving rise to the subject matter of the Complaint in this case.  SA, Ex. 1 ¶ 7.1.  Class Members are only releasing claims based on the identical factual predicate, as required under Ninth Circuit precedent. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).  *See also* Standing Order for Civil Cases Before Judge Vince Chhabria, §32).  Under this precedent, "we have held that federal district courts properly released claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement." *Hesse, supra.*  There are not any differences between the claims to be released and the claims set out in the operative complaint.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(c).[3]

## V.    ARGUMENT

### A.    The Proposed Settlement Class Should Be Certified

#### 1.    The Class Meets the Requirements of Rule 23(a)

Before assessing the parties' settlement, the Court should first confirm that the underlying settlement class meets the requirements of Rule 23.  *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *Manual for Complex Litigation*, Fourth, § 21.632 (2004). The prerequisites for class certification under Rule 23(a) are numerosity, commonality, typicality, and adequacy—each of which is satisfied here. Fed. R. Civ. P. 23(a). The proposed settlement class includes more than 150,000 people, and so readily satisfies the numerosity requirement. *See* Fed. R. Civ. P. 23(a)(1); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

The proposed class also satisfies the commonality requirement of Rule 23(a), which requires that class members' claims "depend upon a common contention," of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim]

---

[3] The Parties are not requesting that this Court enjoin current or future litigation in other courts based on conduct covered by the release.  *See* Standing Order for Civil Cases Before Judge Vince Chhabria, §32.

in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The central question behind every claim in this litigation is whether Kimpton adequately secured its consumers' payment card information. The answer to that question depends on common evidence that does not vary from class member to class member, and so can be fairly resolved—whether through litigation or settlement—for all class members at once.

The final requirements of Rule 23(a)—typicality and adequacy—are likewise satisfied here. The proposed Class Representative used a payment card for a stay at an affected Kimpton property during the breach period, and so he was affected by the same inadequate data security that Plaintiff alleges harmed the rest of the class. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class"). The proposed Class Representative also has no conflict with the class; has participated actively in the case, including by sitting for a deposition; and is represented by experienced attorneys. *Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir. 2003) (adequacy satisfied if plaintiffs and their counsel lack conflicts of interest and are willing to prosecute the action vigorously on behalf of the class).

## 2. The Class Meets the Requirements of Rule 23(b)(3)

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (1997). Here, the proposed class is maintainable under Rule 23(b)(3), as common questions predominate over any questions affecting only individual members and class resolution is superior to other available methods for a fair resolution of the controversy. *Id.* Plaintiff's liability case depends, first and foremost, on whether Kimpton used reasonable data security to protect payment card data. That question can be resolved using the same evidence for all class members, and thus is the precise type of predominant question that makes a class-wide adjudication worthwhile. *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class

- 17 -

and can be said to predominate, the action may be considered proper under Rule 23(b)(3) …'"). This case involves a single cybersecurity incident that impacted *all* Class members whose data was stolen in connection with using a payment card at Kimpton properties, giving rise to claims under state law that *all* share the same common nucleus of facts and law pertaining to the duty of care and whether Kimpton violated it.

The Court, in its June 12, 2018 Order, had originally asked for a more detailed explanation of how the proposed class satisfies the predominance requirements as set forth in *In re Hyundai & Kia Fuel Econ. Litig.,* 881 F.3d 679, 707 (9th Cir. 2018). The Ninth Circuit has since granted *en banc* review and that case can no longer be cited as authority. *In re Hyundai And Kia Fuel Econ. Litig.*, No. 15-56014, 2018 WL 3597310, at *1 (9th Cir. July 27, 2018). Nonetheless, this Court has an independent obligation to assess predominance and this case satisfies the Rule.

Predominance is satisfied in this case and the common legal and factual issues here outweigh any "questions affecting only individual members." F.R.C.P. 23(b)(3). Familiar Ninth Circuit standards going back at least 20 years, to *Hanlon*, govern the predominance inquiry: here, as in in *Hanlon*, "a common nucleus of facts and potential legal remedies dominate this litigation." 150 F.3d at 1022. Thus, any variations in state law do not outweigh the predominance of factual and legal issues with respect to the constellation of claims in this case in the settlement context. *Id.* at 1022–23 (holding that "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims"). Attached as Exhibit 4 are 50-state surveys for Plaintiff's two common law causes of action, each of which demonstrate the overwhelming similarities that satisfy the predominance analysis.

"Variations in state law do not necessarily preclude a 23(b)(3) action.'" *Hanlon*, 150 F.3d at 1022. Here, there are no material differences as to Plaintiff's common-law negligence or breach of implied contract claims. *Hanlon*, 150 F.3d at 1022; *Just Film,* 847 F.3d at 1122. The basic

elements of contract law, as they apply to our facts, are the same across states. *See In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*, 2010 WL 3931096 (N.D. Cal. Oct. 6, 2010); *cf. American Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("Because contract law is not at its core 'diverse, nonuniform, and confusing,' we see no large risk of nonuniform adjudication….") (citations omitted). The breach of implied contract claim focuses on issues of Kimpton's privacy policy and the alleged breach of that policy, both of which are subject to common proof. There are no material differences in state law with respect to interpretation or breach that would require *individualized* adjudication of the facts here at issue. *Just Film,* 847 F.3d at 1123.

Similarly, the commonalities with respect to the key facts and legal issues relevant to Plaintiff's negligence claim outweigh any individualized differences. The core elements of negligence – duty, breach, causation, damages – do not substantively vary from state-to-state (except as to contributory/comparative negligence principles not at play in this single-defendant case). *See* Exhibit 4. In sum, these claims are so similar across states that they do not defeat predominance.

True, this case includes an unfair competition claim under California Business & Professions Code section 17200, the precise kind of consumer protection statute that would result in application of multiple state laws under, e.g., *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589-90 (9th Cir. 2012). But let us presume that the consumer protection laws of multiple states apply because of this single claim. That fact still does not defeat predominance.

Here, as in in *Hanlon*, "a common nucleus of facts and potential legal remedies dominate this litigation." 150 F.3d at 1022. Class members here do not occupy different factual positions that might create conflicts in the legal viability of their claims. Much like *Hanlon's* class members who all had "the same problem – an allegedly defective rear latchgate…" (*Hanlon,* 150 F.3d at 1021), the class members here all suffered the same loss of personal information from the same single cybersecurity incident which compromised payment-card data. That theft gives rise to claims under state law that *all* share the same common nucleus of facts and law pertaining to the

duty of care and whether Kimpton violated it. It's the same injury, from the same origin, based on the same facts. Any variations in state law do not outweigh the predominance of common factual and legal issues in this case. *See Hanlon,* at 1022–23 (holding that "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims").

In light of the common factual evidence, this Court can conclude that "common, aggregation-enabling, issues in the case are more prevalent or important" (*Tyson Foods*, 136 S. Ct. at 1045) even if there are variations between the state statutory claims, particularly where much of that variation applies statewide rather than individually. For all of these claims, variations in state law that apply statewide, or to other large sub-groups of the class, do not pose individualized issues at all, and raise only questions of manageability irrelevant to settlement under governing law. *Amchem Prods*, 521 U.S. at 623. Likewise, there is a long-standing rule that individualized damages issues do not defeat predominance. *Tyson Foods*, 136 S.Ct. at 1045; *Vaquero v. Ashley Furn.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

Finally, since "the proposal is that there be no trial," manageability considerations have no impact on whether the proposed settlement class should be certified. *Amchem*, 521 U.S. at 620. There is only the predominant issue of whether Kimpton properly secured the payment card data of its consumers, such that Kimpton's security should be improved and class members affected by the data breach provided with a remedy. As a practical matter, that issue cannot be resolved through individual trials or settlement negotiations: the amount at stake for individual class members is too small, the technical issues involved are too complex, and the required expert testimony and document review too costly. *See Just Film,* 847 F.3d at 1123.[4]

In sum, because of the common experience of every individual in this Class with respect to the single event of the Kimpton data breach, the common evidence pertaining to data security and

---

[4] A class action is not only the superior method of adjudicating consumer claims arising from this data breach, it is the *only* method practicable—just as in other data breach cases where a class wide settlement has been approved. *See, e.g., In re Linkedin User Privacy Litig.,* 309 F.R.D. 573, 585 (N.D. Cal. 2015); *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *2 (N.D. Ga. Aug. 23, 2016); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2009 WL 5184352, at *6–7 (W.D. Ky. Dec. 22, 2009).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

the breach, and the common legal issues across the common law and statutory claims, the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623.

### B.   The Court Should Grant Preliminary Approval

#### 1.   The Standard for Preliminary Approval

Federal Rule of Civil Procedure 23(e) provides that a class action cannot be settled or compromised without approval by the court. Fed. R. Civ. P. 23(e).  Judicial approval is required regardless of whether the action is certified for trial and later settled or is certified for purposes of settlement. *Manual for Complex Litigation,* Fourth, § 21.61 (2004). The approval process typically involves two steps.  First, the settlement is approved preliminarily following the submission by the parties of relevant information concerning the terms of the settlement and the history of the litigation. Second, after notice of the proposed settlement is given to the class, the court conducts a final approval hearing, also known as a fairness hearing.  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523 (C.D. Cal. 2004).  Ultimately, to approve the proposed settlement, this Court must determine that it is fair, reasonable and adequate.  *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco.,* 688 F.2d. 615, 625 (9th Cir. 1982).  A presumption of fairness exists where the settlement is reached through arm's-length negotiations, sufficient investigation has taken place to allow counsel and the Court to act intelligently, and counsel is experienced in similar types of litigation.  *Duhaime v. John Hancock Mut. Life. Ins. Co.*, 177 F.R.D. 54, 68 (D. Mass. 1997) (settlement is presumed fair where it is the product of arm's-length negotiations).

More recently, however, several courts in this district have criticized the notion that review of proposed class settlements at the preliminary approval stage need only involve a "quick look," or a watered-down version of final approval.  *See Cotter v. Lyft, Inc.,* 193 F. Supp. 3d 1030, 1036 (N.D. Cal. 2016).[5]  Accordingly, Plaintiff addresses each of the following settlement factors

---

[5] See Standing Order For Civil Cases Before Judge Vince Chhabria, §32.  *See also O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1122 (N.D. Cal. 2016); *Viceral v. Mistras Grp., Inc.,* 2016 WL 5907869, at *6 (N.D. Cal. Oct. 11, 2016).; *Hunt v. VEP Healthcare, Inc.*, No. 16-cv- 04790-VC, 2017 WL 3608297 (N.D. Cal., Aug. 22, 2017); *Eddings v. DS Services of America, Inc.*, No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

articulated by the Ninth Circuit (while recognizing that at least one of those factors—the reaction of class members—is not yet known) and submit that they collectively weigh in favor of judicial approval:

> (a) the strength of the plaintiff's case;
> (b) the risk, expense, complexity, and likely duration of further litigation;
> (c) the risk of maintaining class action status throughout the trial;
> (d) the amount offered in settlement;
> (e) the extent of discovery completed and the stage of the proceedings;
> (f) the experience and views of counsel;
> (g) the presence of a governmental participant;
> (h) the reaction of the class members to the proposed settlement; and
> (i) whether the settlement is a product of collusion among the parties.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004); *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

### a.     The Strength of Plaintiff's Case

Plaintiff believes he has a good case for liability and damages.  Pursuant to the scheduling order in this case, at the time the parties negotiated the Settlement, Plaintiff had developed a solid factual record to move this case forward, and was preparing his motion for summary judgment on his individual claims and damages.  Plaintiff was prepared to submit evidence supporting his assertion that Kimpton had failed to take a number of industry-standard measures to secure its consumers' payment card data; ignored warning of vulnerabilities in its data security; and that Kimpton missed opportunities to detect and stop the data breach while it was underway.  Plaintiff also believes he would be able to show that he suffered damages as a result of the Kimpton data breach.  However, throughout the litigation, Kimpton has continually disputed the sufficiency of Plaintiff's allegations, and Kimpton believes that discovery against Plaintiff Parsons has allowed Kimpton to develop a factual record to support many of the same basic arguments Kimpton raised on its motion to dismiss. Although Plaintiff feels that he would be able to obtain a favorable ruling on his motion for summary judgment, this is not a certainty.  Moreover, as discussed above, the proposed settlement provides for monetary benefits that likely exceeds what class members would likely be able to recover if Plaintiff were to establish class-wide liability.  And, the level of effort that each class member must undertake to claim those settlement benefits is likely significantly less than if he or she were forced to prove and claim causation and damages in a contested proceeding.

1

2

**b.**      **The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

3

Although Plaintiff is confident in the merits of his claims, the risks involved in prosecuting

4

a class action through trial cannot be disregarded.   While most of Plaintiff's claims survived a

5

motion to dismiss, Plaintiff would still need to prevail on cross-motions for summary judgment and

6

then prevail on a motion for class certification.   Almost all class actions involve a high level of risk,

7

expense, and complexity, which is one reason that judicial policy so strongly favors resolving class

8

actions through settlement. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998).

9

This is not only a complex case, but it is in an especially risky field of litigation.  *See, e.g.*, *In re*

10

*Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *6 (W.D. Ky.

11

Aug. 23, 2010) (approving data breach settlement, in part, because "proceeding through the

12

litigation process in this case is unlikely to produce the plaintiffs' desired results").   Data breach

13

cases continue to be among the most risky and uncertain of all class action litigation and

14

certification is rare.   Even if the Court had certified a class, Kimpton would have sought appellate

15

review. The Court may recall that Kimpton sought an interlocutory review of this Court's order on

16

the motion to dismiss. Through the Settlement, Plaintiff and Class members gain significant

17

benefits without having to face further risk.

18

**c.**      **The Risk of Maintaining Class Action Status throughout Trial**

19

Plaintiff believes he would prevail on a motion for summary judgment and then also prevail

20

on class certification. But, there is little directly analogous precedent to rely upon.

21

Class certification has been denied in other consumer data breach cases and it was only last year

22

that the first litigation class was certified in a consumer data breach case.  *See Smith v. Triad of*

23

*Alabama, LLC,* 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017).  The lack of direct precedent

24

creates an additional risk in achieving and maintaining class action status throughout trial and even

25

appeal.   While Plaintiff feels that he would be able to obtain certification outside of a settlement

26

context and maintain certification through trial, this is not certainty.   Additionally, any potential

27

certification would be subject to later appeal and potential reversal.  Also, the cost of trial and any

28

appeals would be significant and would delay the resolution of this litigation without the guarantee

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

of any relief.

### d.     The Amount Offered In Settlement

Through arm's-length negotiations between sophisticated counsel experienced in litigating complex cases and through the assistance of an experienced mediator, the parties were able to reach an agreement that compares very favorably to settlements in payment card data breach class actions that have been approved by other courts.  As discussed above, payment card data breach class action cases are particularly risky and challenging and the outcome of this settlement should be considered not only as favorable compared to other payment card data breach class action settlements, but as particularly favorable given that multiple other payment card data breach cases against hotel or restaurant chains have resulted in no recovery for the plaintiff or Class Members.  *See, e.g.*, *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 3:16-cv-00014-GPC-BLM (S.D. Cal.), Doc. 56 (order dismissing payment card data breach case) (July 11, 2017); *Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89 (2d Cir. 2017) (order affirming dismissal of payment card data breach case).

- The Home Depot data breach, which involved the theft of approximately 92 million consumers, consisting of 40 million consumers' payment data and 53 million consumers' email addresses settled creating a $13 million fund for consumers, paying an additional $6.5 million for internet and dark web monitoring services (which was eligible to be repaid from the fund), and $7.5 million in attorney fees. For the 40 million payment cards at issue, the settlement equates to approximately .33 cents per card.  *See In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, ECF No. 181-2 (March 7, 2016) (Settlement Agreement); *id.*, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (order approving settlement).

- The Target data breach, which compromised the personal information of nearly 110 million consumers, resolved with Target establishing a settlement fund of $10 million and separately paying $6.75 million in attorney fees. This amounts to approximately .09 cents per card.  *See In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522-PAM, ECF No. 358-1 (March 18, 2015) (Settlement Agreement); *id.*, 2017 WL 2178306, at *2 (D. Minn. May 17, 2017) (order approving settlement on remand from the 8th Circuit), *appeal pending* Case No. 15-3912 (8th Cir.).

- The Neiman Marcus data breach, which compromised the personal information of approximately 2,187,773 individuals who held different payment card accounts with Neiman Marcus establishing a settlement fund of $1,600,000, $400,000 of which went to costs for the Claims Administrator and $530,000 for attorneys' fees, costs

and expenses.  This equates to approximately .31 cents per card.  *See Remijas v. The Neiman Marcus Group, LLC*, No. 14-cv-1735, ECF No. 145 (March 17, 2017) (Memorandum in Support of Preliminary Approval).

Here, the $1.00 per card recovery compares well against other payment card data breach settlements.  Also, as discussed above, the Settlement amount is also a good result when considering the claims rate and average award amount in a similar recent payment card case.  *See supra* at Section IV (D) (discussing PNI Digital Media).

The proposed Settlement will also reduce the risk that the payment card data that consumers continue to entrust to Kimpton will be compromised by future attacks.   Kimpton will adopt a number of significant data security measures negotiated with the assistance of a cyber security expert and Lead Counsel's experience in other date breach cases, including the ones referenced above. These measures include designating an information security position, performing annual PCI DSS audits and penetration testing, implementing an annual security awareness program, and improving payment card acceptance technology.

e.    **The Extent of Discovery Completed and the Stage of the Proceedings**

Before entering into settlement discussions on behalf of class members, counsel should have "sufficient information to make an informed decision." *Linney*, 151 F.3d at 1239.  Here, the parties completed fact discovery, which included: eleven depositions; tens of thousands of produced documents; and, multiple subpoenas for documents and depositions to non-parties. Yanchunis Decl., Ex. 2 ¶ 51. Expert discovery was also well underway when the parties reached the Settlement.  Plaintiff retained a cybersecurity expert and a damages expert.  Both experts reviewed information developed during discovery and had numerous conference calls with Plaintiff.  Plaintiff's cybersecurity expert also attended several of the depositions in this case. Yanchunis Decl., Ex. 2 ¶ 51.  Plaintiff knows the strengths and weaknesses of the Class's claims and has worked with experts to value those claims and to understand the business practice changes necessary to protect Class members' payment card data in the future.  From the information Plaintiff obtained in discovery, he was well-prepared to negotiate a settlement on behalf of the Class. Yanchunis Decl., Ex. 2 ¶ 51.

1

#### f.      The Experience and Views of Counsel

As set forth in the attached resumes and declaration, Plaintiff's counsel have considerable experience in class actions and specifically data breach litigation, and have litigated to resolution some of the largest data breach and privacy cases filed to date.  *See* Yanchunis Decl., Exhibit 2. Class Counsel are confident, based on their extensive experience as class action litigators and with other similar class actions, *e.g. In re: The Home Depot, Inc., Customer Data Security Breach Litigation.,* Case No. 14-md-02583-TWT (N.D. Ga. 2016), *In re: Target Corporation Customer Data Security Breach Litigation*, Case No. 14-md-02522 (D. Minn. 2015), that they have a full understanding of the facts at issue, and the strengths and weaknesses of the legal allegations in the complaint.  Thus, Plaintiff's counsel is qualified to evaluate the class claims, value of the settlement versus moving for certification and going to trial, and the viability of possible affirmative defenses. *See Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The recommendations of plaintiffs' counsel should be given a presumption of reasonableness.").  Plaintiff's counsel believes that the settlement is fair and reasonable in light of the complexities of the case, the uncertainties of class certification and litigation, and the secured benefit to the class.  Yanchunis Decl., Ex. 2 ¶ 52.

#### g.      The Presence of a Governmental Participant

No governmental agency is involved in this litigation, but the Attorney General of the United States and Attorneys General of each of the States will be notified of the proposed settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity to raise any objections or concerns they may have.

#### h.      The Reaction of Class Members to the Proposed Settlement

The class has yet to be notified of the settlement and given an opportunity to object, so it is premature to assess this factor. Before the final approval hearing, the Court will receive and have a chance to review all objections or other comments received from class members, along with a full accounting of all opt-out requests.

#### i.      Whether the Settlement is a Product of Collusion among the Parties

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

One indication of whether a settlement is fair and reasonable is whether it is the product of serious, arm's-length negotiations following serious investigation of the merits of the case. Such negotiation and investigation minimize any concerns that the Settlement might be the result of collusion among opposing parties or their counsel to undermine the interests of the class for their own benefit.

The Settlement in this case easily meets that standard. Class Counsel undertook significant factual and legal investigation of the issues prior to filing the case and during the hard-fought litigation. The parties engaged in extensive discovery about both the facts and law at issue. Finally, Mediator Bruce Friedman presided over the parties' formal, arm's length and adversarial mediation. The Settlement clearly emerges from a formal, arms-length negotiation process between the Parties. Yanchunis Decl., Ex. 2 ¶ 53.

### C.    The Court Should Approve the Proposed Settlement Notices and Authorize Their Dissemination

In any proceeding that is to be accorded finality, due process requires that interested parties be provided with notice reasonably calculated, under the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). That means the settlement notices must fairly apprise the class members of the terms of the proposed compromise and give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. *Id*. Additionally, the notice must be designed so as to have a reasonable chance of reaching a substantial percentage of the class members. *Id.* at 318 (explaining notice must be reasonably calculated to reach interested parties).

Here, the proposed Notice and the method of dissemination meet each of these requirements. As explained above, the Notice Plan involves direct notice to the approximately 150,000 Settlement Class Members for whom physical addresses or email addresses are available. For the remaining Settlement Class Members, notice will be provided by publication: an advertisement in *People Magazine*, which has a circulation of 3.4 million individuals, and online via Internet banners through Facebook, the Google Display Network, and the Yahoo! Ad Network,

for a period of 31 days.  *See* Ex. F to the Settlement Agreement.  Copies of all the notice documents are attached to this preliminary approval motion; they are clear and concise, and directly apprise Settlement Class Members of all the information they need to know in order to make a claim.

Moreover, on the dedicated Settlement website, Class Members can review the detailed Notice, which provides clear and concise information with respect to all the relevant aspects of the litigation.[6]  Thus, the Notice provides all the information necessary for Class Members to make informed decisions with respect to whether they remain in or opt out of the Settlement Class, or object to the proposed Settlement.  Yanchunis Decl., Ex. 2 ¶ 36.  The Notice Plan has been developed by a provider with significant experience in designing notice plans in large and national class actions similar to this one.  Yanchunis Decl., Ex. 2 ¶ 36.

Accordingly, the content and method of dissemination of the proposed Notice fully comports with the requirements of due process and applicable case law.  The Court should approve the proposed Notice and direct that it be distributed as agreed by the parties.

### D.    The Court Should Appoint Plaintiff's Counsel as Class Counsel

The next step when deciding whether to preliminarily approve a settlement is to appoint Settlement Class Counsel. Indeed, under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts generally consider the following attributes: (1) the proposed class counsel's work in identifying or investigating potential claims, (2) the proposed class counsel's experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) the proposed class counsel's knowledge of the applicable law, and (4) the proposed class counsel's resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

---

[6] This includes:  (a) the class definition and statement of claims; (b) the litigation history; (c) the terms of the Settlement Agreement; (d) the binding effect of any judgment approving the Settlement on those who do not opt out; (e) the right to (and procedure for) opting out or back into the Settlement Class; (f) the right to (and procedure for) objecting to the Settlement; (g) who to contact to obtain additional information regarding the Settlement or the litigation; (h) the manner in which compensation will be provided to the Class Representatives to compensate them for their service to the Class; (g) the manner in which Class Counsel will be compensated; and (h) additional information as required and/or suggested by the Court's Procedural Guidance For Class Action Settlements.

Here, proposed Class Counsel have extensive experience prosecuting class action cases, and specifically data breach cases. *See* Firm Resumes, Exhibits A-C attached to Yanchunis Dec., Ex. 2. Accordingly, the Court should appoint John Yanchunis of Morgan & Morgan Complex Litigation Group as Lead Class Counsel, and Marisa Glassman of Morgan & Morgan Complex Litigation Group, Michael Ram of Robins Kaplan LLP and Matt Malone of Rock Law LLP as Class Counsel.

### E.   The Court Should Schedule a Fairness Hearing and Approve the Proposed Preliminary Approval Order

Once the Court has ruled on the motion for preliminary approval, the times for providing notice, opting out of the Settlement Class, and submitting claims will begin to run. Plaintiff provided an agreed-up schedule in his Motion for Preliminary Approval.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully request that the Court grant this motion for preliminary approval; provisionally certify the Settlement Class; appoint Andrew Parsons as Class Representative; appoint John Yanchunis as Lead Class Counsel, and Marisa Glassman, Michael Ram and Matt Malone as Class Counsel; approve the proposed notice and authorize its dissemination to the Class; appoint Epiq Systems, Inc. to serve as the Claims Administrator; and adopt the proposed schedule for final approval.

Dated:  August 9, 2018

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**

By:  /s/ *John A. Yanchunis*
John A. Yanchunis *(pro hac vice)*
Florida Bar No. 324681
jyanchunis@ForThePeople.com
Marisa Glassman *(pro hac vice)*
Florida Bar No. 111991
mglassman@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

Michael F. Ram, SBN #104805
Email:  MRam@RobinsKaplan.com
Susan Brown, SBN #287986
Email:SBrown@RobinsKaplan.com
ROBINS KAPLAN, LLP
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

Matt Malone, SBN #221545
ROCK LAW LLP
101 Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone:     (415) 433-4949
Facsimile:     (415) 433-7311
Email: mjm@rocklawcal.com