ROBINS KAPLAN LLP
Michael F. Ram, SBN #104805
mram@robinskaplan.com
Susan S. Brown, SBN #287986
sbrown@robinskaplan.com
2440 West El Camino Real, Suite 100
Mountain View, California 94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis (admitted *pro hac vice*)
jyanchunis@ForThePeople.com
Marisa Glassman (admitted *pro hac vice*)
mglassman@ForThePeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

*Attorneys for Plaintiff and Proposed Class*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PARSONS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KIMPTON HOTEL & RESTAURANT GROUP, LLC<br><br>Defendant. | Case No. 3:16-cv-05387-VC<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND RENEWED UNOPPOSED MOTION FOR PRELIMINARY APPROVAL** |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    SUMMARY OF THE LITIGATION ............................................................................ 2

III.   INFORMATION ABOUT THE SETTLEMENT ......................................................... 3

IV.    THE TERMS OF THE SETTLEMENT AGREEMENT .............................................. 9

    A.     The Settlement Class ........................................................................................ 9

    B.     The Settlement Benefits ................................................................................. 10

        1.     Monetary Remedies ............................................................................. 10

        2.     Injunctive Relief .................................................................................. 14

    C.     Proposed Notice Plan ..................................................................................... 16

    D.     Claim Form and Claim Process ..................................................................... 18

    E.     Attorneys' Fees, Costs, and Expenses ........................................................... 20

    F.     Service Awards .............................................................................................. 20

    G.     Release of Claims .......................................................................................... 21

V.     ARGUMENT .............................................................................................................. 22

    A.     The Proposed Settlement Class Should Be Certified ..................................... 22

        1.     The Class Meets the Requirements of Rule 23(a) ................................ 22

        2.     The Class Meets the Requirements of Rule 23(b)(3) ........................... 23

    B.     The Court Should Grant Preliminary Approval .............................................. 26

        1.     The Standard for Preliminary Approval ............................................... 26

            a.     The Strength of Plaintiff's Case ............................................... 29

            b.     The Risk, Expense, Complexity, and Likely Duration of Further Litigation ................................................................................... 30

            c.     The Risk of Maintaining Class Action Status throughout Trial ............. 30

            d.     The Amount Offered In Settlement ......................................... 31

            e.     The Extent of Discovery Completed and the Stage of the Proceedings .. 32

            f.     The Experience and Views of Counsel ..................................... 33

            g.     The Presence of a Governmental Participant ........................... 33

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

4838-6959-8594.1

    h. The Reaction of Class Members to the Proposed Settlement.................. 33

    i. Whether the Settlement is a Product of Collusion among the Parties ..... 34

  C. The Court Should Approve the Proposed Settlement Notices and Authorize Their Dissemination ........................................................................................... 34

  D. The Court Should Appoint Plaintiff's Counsel as Class Counsel ............................ 35

  E. The Court Should Schedule a Fairness Hearing and Approve the Proposed Preliminary Approval Order ........................................................................................ 36

VI. CONCLUSION ............................................................................................................ 36

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Amchem Prods. v. Windsor,*
  521 U.S. 591(1997) ........................................................................................... 22, 26

4

*American Airlines v. Wolens,*
  513 U.S. 219 (1995) ................................................................................................... 24

5

*Boyd v. Bechtel Corp.,*
  485 F. Supp. 610 (N.D. Cal. 1979) ........................................................................... 33

*Bray v. GameStop Corporation,*
  1:17-cv-01365-JEJ (D. Del.) ..................................................................................... 19

*Churchill Vill., L.L.C. v. Gen. Elec.,*
  361 F.3d 566 (9th Cir. 2004) ..................................................................................... 29

*Cotter v. Lyft, Inc.,*
  193 F. Supp. 3d 1030 (N.D. Cal. 2016) .................................................................... 27

*Dugas v. Starwood Hotels & Resorts Woldwide, Inc.,*
  3:16-cv-00014-GPC-BLM (S.D. Cal.) ...................................................................... 31

*Duhaime v. John Hancock Mut. Life. Ins. Co.,*
  177 F.R.D. 54 (D. Mass. 1997) ................................................................................. 27

*Eddings v. DS Services of America, Inc.,*
  No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016) ........................ 27

*Garner v. State Farm Mut. Auto. Ins. Co.,*
  No. CV 08 1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ............................... 21

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ............................................................................ passim

*Hesse v. Sprint Corp.,*
  598 F.3d 581 (9th Cir. 2010) ..................................................................................... 21

*Hunt v. VEP Healthcare, Inc.,*
  No. 16-cv- 04790-VC, 2017 WL 3608297 (N.D. Cal., Aug. 22, 2017) .................... 27

*In re Bluetooth Headset Products Liab. Litig.,* 654 F.3d 935, 946 (9th Cir. 2011) ................ 28, 29

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.,*
  2010 WL 3931096 (N.D. Cal. Oct. 6, 2010) ............................................................. 24

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.,*
  2009 WL 5184352, at *6–7 (W.D. Ky. Dec. 22, 2009) ............................................. 26

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.,*
  2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010) ................................................. 30

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

*In re Hyundai & Kia Fuel Econ. Litig.*,
  881 F.3d 679, 707 (9th Cir. 2018) ................................................................... 27

*In re Linkedin User Privacy Litig.*,
  309 F.R.D. 573 (N.D. Cal. 2015) ..................................................................... 23

*In re Mercury Interactive Corp. Securities Litigation*,
  618 F.3d 988 (9th Cir. 2010) ............................................................................ 26

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  No. MDL 14-2522-PAM, ECF No. 358-1 (March 18, 2015), 2017 WL 2178306 (D. Minn.
  May 17, 2017) (8th Cir.) ............................................................................ 8, 20

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351 (N.D. Ga. Aug.
  23, 2016) ............................................................................ 13, 32, 33

*In re Yahoo Mail Litig.*,
  No. 13-CV-4980, 2016 WL 4474612 (N.D. Cal. Aug. 25, 2016) ........................... 21

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .......................................................... 22, 24, 26

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) .......................................................... 30, 32

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................................ 25

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950) ............................................................................ 34

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................... 27

*O'Connor v. Uber Techs., Inc.*,
  201 F. Supp. 3d 1110 (N.D. Cal. 2016) ........................................................... 27

*Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco.*,
  688 F.2d. 615 (9th Cir. 1982) ............................................................................ 27

*Radcliffe v. Experian Info. Solutions*,
  715 F.3d 1157 (9th Cir. 2013) ............................................................................ 21

*Remijas v. The Neiman Marcus Group, LLC*,
  No. 14-cv-1735, ECF No. 145 (March 17, 2017) ............................................. 32

*Smith v. Triad of Alabama, LLC*,
  2017 WL 1044692 (M.D. Ala. Mar. 17, 2017) ................................................. 30

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................ 22

*T.A.N. v. PNI Digital Media, Inc.*,
  2:16-cv-00132-LGW-RSB (S.D. Ga.) ............................................................... 19

*Tyson Foods, Inc. v. Bouaphakeo*,
 136 S. Ct. 1036 (2016) ........................................................................... 23, 25, 26

*Vaquero v. Ashley Furn.*,
 824 F.3d 1150 (9th Cir. 2016) ...................................................................... 26

*Viceral v. Mistras Grp., Inc.*,
 2016 WL 5907869 (N.D. Cal. Oct. 11, 2016) .............................................. 27

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011) ...................................................................................... 22

*Whalen v. Michaels Stores, Inc.*,
 689 F. App'x 89 (2d Cir. 2017) ..................................................................... 31

**Statutes**

Class Action Fairness Act, 28 U.S.C. § 1715 ....................................................... 18, 33

**Other Authorities**

*Manual for Complex Litigation,* Fourth, § 21.61 (2004) ......................................... 22

*Manual for Complex Litigation*, Fourth, § 21.632 (2004) ....................................... 26

N.D. Cal. Procedural Guidance for Class Action Settlements ............................... *passim*

**Rules**

Fed. R. Civ. P. 23(a) ............................................................................................ 22

Fed. R. Civ. P. 23(b) ...................................................................................... *passim*

Fed. R. Civ. P. 23(e) ................................................................................ 26, 2, 28

Fed. R. Civ. P. 23(g)(1) ....................................................................................... 36

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff filed his initial motion for preliminary approval on May 23, 2018.  On July 12, 2018, this Court denied Plaintiff's motion without prejudice.  On August 9, 2018, Plaintiff filed his renewed motion to address the issues the Court raised in the July 12, 2018 Order.   On September 6, 2018, the Court held a hearing on Plaintiff's renewed motion for preliminary approval.  At the hearing, the Court facilitated an in-depth discussion, providing the parties with the Court's view of the initially proposed settlement while also allowing counsel to present argument as to why the parties believed the initially proposed settlement was fair, reasonable and adequate.  On September 13, 2018, this Court entered an Order denying the renewed motion for preliminary approval, advising the parties of its concerns with the proposed settlement, and directing the parties to address them in a supplemental submission.  With the Court's suggestions and guidance in mind, the parties began additional negotiations to modify the settlement to address the Court's concerns.   After extensive discussions, the parties were able to reach an amended settlement addressing the Court's concerns.

Plaintiff files this second renewed motion for preliminary approval to address this Court's September 13 Order.  Specifically, Plaintiff addresses the following three areas:

First, the parties have agreed to increase the number of hours for which an injured class member may seek reimbursement from three to five.  The parties have also agreed to increase the hourly rate for compensation from $15 to $25.

Second, Plaintiff has revised the notice documents to clarify that documentation is not required to support expenses and that incurred expenses may simply be described in order to be reimbursed.  The notice documents are now clearer.

Third, in this renewed motion, Plaintiff will address the attorney's fees and expenses

provision included in the settlement agreement.

Plaintiff hereby renews his motion for preliminary approval of the settlement.   For the reasons stated below, Plaintiff respectfully requests that the Court grant an order (1) preliminarily approving the proposed amended settlement; (2) provisionally certifying the Settlement Class; (3) appointing Andrew Parsons as Class Representative; (4) appointing John Yanchunis as Lead Class Counsel, and Marisa Glassman and Michael Ram as Class Counsel; and (5) approving the proposed Notice Program and authorizing its dissemination to the Class; (6) appointing Epiq Systems, Inc. to serve as the Claims Administrator; (7) appointing Bruce A. Friedman as the Claims Referee, and (8) setting a schedule for the final approval process including Class Counsel's motion for approval of attorneys' fees and expenses. Plaintiff incorporates by reference the Motion for Preliminary Approval (ECF  89.) and the Amended Motion for Preliminary Approval (ECF 98.) previously filed.  This Second Amended Motion for Preliminary Approval is based on this Memorandum of Points and Authorities and all its attachments (including the Amended Settlement Agreement); Proposed Order Granting Preliminary Approval of Class Settlement; and all records, pleadings and papers filed in this action.

## II.    SUMMARY OF THE LITIGATION

Plaintiff's counsel filed this case in September 2016 following a malware incident potentially affecting payment card transactions at 61 Kimpton hotels and restaurants between February and July 2016.  (Compl., ECF 1 ¶ 2.)  Plaintiff Lee Walters asserted five claims in his original complaint: negligence, breach of implied contract, and three claims under California's Unfair Competition Law (unfair conduct, unlawful conduct, and fraudulent conduct).  (*Id.* ¶¶ 57-95.)  Mr. Walters filed an amended complaint in January 2017 asserting the same claims.  (Am. Compl., ECF 34.)  Following Kimpton's motion to dismiss, the Court dismissed the UCL fraud prong claim and allowed the other four claims to go forward.  (Order, ECF 44.)

The Court bifurcated pre-trial proceedings into individual liability and damages and class

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

certification phases, and ordered the parties to proceed first with discovery and summary judgment on liability and damages as to the named plaintiff only.  (Order, ECF 47.)  Early in discovery, Andrew Parsons joined as a plaintiff.  (Second Am. Compl., ECF 61.)  Mr. Parsons alleges that he used his payment card at a Kimpton hotel in Washington, D.C. during the at-risk window for the malware incident.  (*Id.* ¶¶ 13-18.)  In January 2018, the original plaintiff, Mr. Walters, was voluntarily dismissed.  (Stipulation, ECF 74.)

The parties completed fact discovery on February 16, 2018.  (*See* Order, ECF 67.)  The parties engaged in voluminous document and ESI discovery and exchanged substantial written discovery, including interrogatories and requests for admission.   Kimpton has taken the deposition of Mr. Parsons. Plaintiff has taken the depositions of Kimpton's Rule 30(b) (6) representative, Kimpton's four data security witnesses, and Kimpton's Director of Communications.

The parties have also engaged in substantial third-party discovery. Plaintiff issued subpoenas to the Better Business Bureau, Mandiant (forensics firm), SecureWorks (forensics firm), Sunera (computer security firm), Rapid7 (computer security firm), and certain employees of Kimpton's parent company, IHG. Plaintiff deposed Mandiant, Sunera, and two IHG witnesses. Because of an examination of the documents produced by Kimpton and the depositions of its employees and the third parties which Kimpton brought in to conduct assessments of its information security environment, Plaintiff's counsel became well versed in the circumstances surrounding the data breach and the reasons the breach occurred.

Plaintiff's counsel also retained a cybersecurity expert to assist Plaintiff's counsel to identify the cause of the breach and to determine the preventive measures necessary to protect information of consumers in the future. This expert telephonically attended several of the depositions and reviewed documents produced by Kimpton.   In addition, Plaintiff's counsel retained a damages expert to assist counsel in determining the type and nature of the damages that the breach could cause.

## III.   REVISED TERMS OF SETTLEMENT

Plaintiff filed his initial motion for preliminary approval on May 23, 2018.  On July 12,

2018, this Court denied Plaintiff's motion without prejudice.  On August 9, 2018, Plaintiff filed his first renewed motion to address issues the Court raised. In Plaintiff's prior renewed motion for preliminary approval, he addressed the following items detailed in the sections below:

(1)     The parties substantially improved the claim form to address the Court's main concern that it was unreasonable to expect a class member to fill out the form and gather all required documents to obtain the relief offered.  The parties have agreed that the documentation described in the claim form would not be required for several categories, and a narrative description of the costs incurred would suffice.

(2)     The proposed Claims Administrator, Epiq Systems, Inc. ("Epiq"), provided data on claims rates in cases with similar forms and losses, showing that the time required for even the *unmodified* claim form would not substantially compromise claim rates.

(3)     Plaintiff identified for the Court the number of class members in this case, and identified the claims rate and average recovery per class member in a similar payment card data breach case.

(4)     Plaintiff explained why the settlement amount of $600,000 and the claim process are both reasonable, particularly relative to other similar data-breach cases, and described in further detail both the definition of and expected claims rate for extraordinary out-of-pocket monetary losses.

(5)     Plaintiff further explained the notice plan, including why notice in *People* magazine and certain websites was selected and is well designed to reach class members and particularly well suited to reach hotel guests and travelers.

(6)     Plaintiff explained why this case satisfies the predominance requirement for a class action settlement.

(7)     Plaintiff explained how this settlement satisfies this Court's Civil Standing Order requirements for class action settlements and the Northern District's Class Action Settlement Guidance.

Separately, Kimpton filed a statement to address certain issues raised by the Court regarding the scope of expected damages to consumers in cases involving payment card security

incidents.

At the hearing on September 6, 2018 and in its subsequent Order, the Court raised questions regarding three issues: 1) the number of hours for which a class member may seek reimbursement for time spent dealing with the effects of the breach and the hourly rate of compensation for time spent; 2) clarification that documentation is not required to support expenses and that incurred expenses may simply be described to be reimbursed; and 3) the attorney's fees and costs provision included in the settlement agreement.

First, the amended settlement agreement increases the number of hours for which an injured class member may seek reimbursement from three to five. (*See infra* at Section IV(B)(1).) The total number of hours for which a class member may claim compensation is in line with the average time spent by consumers to rectify problems resulting from a data breach. Declaration of Michael F. Ram (Ram Decl.), Ex. 3 ¶ 5. According to *The Aftermath of a Data Breach: Consumer Settlement (April 2014)*, sponsored by Experian Data Breach Resolution and conducted and reported by Ponemon Institute, approximately 39% of consumers who have been affected by a data breach actually spent time dealing with the consequences of the breach.[1] Of those individuals, 34% noted that they were able to resolve any issues stemming from the data breach within one day.[2] These statistics support the reasonableness for this element of the settlement.

Additionally, the amended settlement agreement increases the hourly rate for compensation from $15 to $25. (*See infra* at Section IV(B)(1).) This hourly rate of compensation offered to class members is greater than the average national hourly earnings in the United States for the relevant time period, and is significantly more than double the current minimum wage for

---

[1] *The Aftermath of a Data Breach: Consumer Settlement* (April 2014), p.19, *available at*: https://www.ponemon.org/local/upload/file/Consumer%20Study%20on%20Aftermath%20of%20a%20Breach%20FINAL%202.pdf (last accessed November 25, 2018).

[2] *Id.*

the state of California. Ram Decl., Ex. 3 ¶¶ 2-4. Although the minimum hourly wage in San

Francisco is $15, the current federal minimum wage is $7.25. While some states set higher

minimum wages than the federal rate, the settlement rate of $25 is more than double any state

minimum wage[3] The compensation rate provided by the settlement agreement is also higher than

the minimum wage set by many national companies.  For instance, Amazon recently raised its

minimum wage to $15, while Walmart will be raising its rate to $11 in 2019, and Target will be

increasing its rate to $15 in 2020.[4]

Second, the notice documents have been revised to clarify that documentation is not

required to support expenses and that a description of expenses is enough for purposes of filing a

claim.  As example, the short form notice now states clearly:

> CLAIM FORM. To get a payment, you must file a Claim Form describing any
> expenses you incurred as a result of the Security Incident.  To get a Claim
> Form, visit the website or call 1-XXX-XXX-XXXX. The claim deadline is
> Month Day, 2018.

The long form notice now provides:

> There are two types of payments that are available: (1) Expense
> Reimbursement (Question 8) and (2) Extraordinary Expense Reimbursement
> (Question 9). You may submit a claim for either or both types of payments. In
> order to claim each type of payment, you must describe each expense and how
> it related to the Security Incident. You may also provide related documentation
> (receipts, bank statements, etc.) with your Claim Form if they are available.
> The Claim Form includes examples of types of expenses you may have
> incurred and how to document them.

The notice documents are now more clearly worded and consistent with the revised claim

form that was submitted with Plaintiff's first renewed motion for preliminary approval. (*See infra*

---

[3] *See*, https://www.deputy.com/blog/top-states-with-the-highest-minimum-wage (last
accessed December 10, 2018).
[4] CNBC, *Amazon raises minimum wage to $15 for all US employees*,
https://www.cnbc.com/2018/10/02/amazon-raises-minimum-wage-to-15-for-all-us-employees.html last accessed November 27, 2018).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

at Section IV(C); *see also* Exhibits B, C, and D to the Amended Settlement Agreement, Ex. 1 (SA).)

Third, the Court asked Plaintiff to address the attorney's fees and costs provision included in the settlement agreement. The parties have refined the Settlement Agreement to reflect that Class Counsel have agreed to request a total amount of up to $800,000.00 from the Court for their attorneys' fees, reasonable costs and expenses. *See* Ex. 1, SA at §8.2.  The Settlement Agreement also states that, "The amount(s) of any award of attorneys' fees, costs, and expenses, and the service award to Representative Plaintiff, are intended to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement." See Ex. 1, SA at §8.5.

After reaching agreement on benefits to Settlement Class Members, the parties separately negotiated Plaintiff's counsel's claims for attorney fees, costs, and expenses. Declaration of John Yanchunis (Yanchunis Decl.), Ex. 2 ¶ 13.  Any award of attorneys' fees, reasonable costs and expenses sums are to be paid separately from the relief obtained for the Settlement Class and do not impact the Class benefits in any way. Yanchunis Decl., Ex. 2 ¶ 23.

Plaintiff's counsel negotiated the attorneys' fees amount based upon the monetary relief provided to the Class, the expense and benefit of the injunctive relief provided by the Settlement, and the hours and expenses incurred, and expected to be incurred, by counsel through the entire course of the litigation, including through administration of the settlement.  As explained in the attached Declaration of John Yanchunis, Plaintiff's counsel's current lodestar already exceeds $1,150,000.00 and counsel will incur additional lodestar and expenses in implementing the settlement and seeing it through final approval. Yanchunis Decl., Ex. 2 ¶ 25. As the Court bifurcated the issues of liability and class certification, with liability first, coupled with the technical complexities inherent in a data breach case, significant time was spent in discovery, and

aside for class certification motion practice and the deposition of experts and any Daubert challenges, the case was close to being ready for trial. Yanchunis Decl., Ex. 2 ¶ 24. Additionally, Plaintiff's counsel have incurred more than $100,000.00 in litigation expenses, including expenses for filing and court fees, research, travel, postage, printing, and mediation. Yanchunis Decl., Ex. 2 ¶ 25. The billing rates for each firm and total hours expended to date are provided in the attached Declaration of John Yanchunis.  Counsel will supplement these numbers in their motion for attorney fees to be filed prior to the Final Approval Hearing.  This motion will be filed at least thirty (30) days prior to the deadline for objecting to the proposed settlement. SA, Ex. 1 ¶¶ 8.1-8.2.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §6 ("When proposing dates for notice, objections, motions for attorneys' fees and final approval, the parties must ensure that the motion for attorneys' fees is filed at least fourteen days before the deadline for objecting to the settlement. *See In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010)."). *See also* Standing Order for Civil Cases before Judge Vince Chhabria, §32.

In its September 13 Order, the Court cited two Ninth Circuit cases to support its holding that the Plaintiffs' anticipated $800,000 request was unjustified on the current record given the low expected participation rate in the settlement and the $600,000. Ord. 2 (citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947-49 (9th Cir. 2011); *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003)).  Both *In re Bluetooth* and *Staton*, however, involved appeals following the final approval of settlement agreements where the appellate courts were concerned about the factual findings the district court had made in connection with finally approving the fee awards. *In re Bluetooth*, 654 F.3d at 943 (district court "made (1) no explicit calculation of a reasonable lodestar amount; (2) no comparison between the settlement's attorneys' fees award and the benefit to the class or degree of success in the litigation; and (3) no comparison between the lodestar amount and a reasonable percentage award"); *Staton*, 327 F.3d at 966 ("no lodestar-based

scrutiny of the fees awarded class counsel in the settlement agreement ever took place").  At this point here the claims rate and total payout are unknown, particularly in light of the other changes the parties have made to the agreement in response to the Court's concerns.  And the parties have further refined their agreement to include the following language:  "The amount of attorneys' fees and expenses to be awarded shall be a matter of complete discretion of the Court upon consideration of the complete factual record before the Court at the final fairness hearing, provided that the amount does not exceed $800,000.00."  SA, Ex. 1 ¶ 8.2.  Thus, while the parties acknowledge and expect the Court will give close scrutiny to the final fee award, they respectfully submit their agreement on this matter is not a reason to deny preliminary approval.

## IV.    THE TERMS OF THE SETTLEMENT AGREEMENT

### A.  The Settlement Class

The proposed Settlement Class is defined as:

> All residents of the United States whose Personal Information was compromised as a result of the malware attack publicly announced by Kimpton on August 31, 2016.

SA, Ex. 1 ¶ 1.26.  A litigation class has not yet been certified.  See N.D. Cal. Procedural Guidance for Class Action Settlements, Preliminary Approval 1(a).  The class definition is consistent with the class definition in Plaintiff's Second Amended Class Action Complaint ("[a]ll persons residing in the United States whose personal and/or financial information was disclosed in the Data Breach affecting Kimpton in 2015") (ECF. 61, Second Amended Class Action Complaint ¶ 54.).  The class definition was revised to accurately include the date of the public announcement of the Data Breach based on information learned in discovery.

Through discovery Plaintiff confirmed that Kimpton has name and contact information for approximately 149,200 Settlement Class Members, to whom Kimpton provided direct notice of the security incident.  The size of the remaining class is difficult to estimate with precision.  Because of the nature of payment card acceptance, Kimpton does not have an ability to match contact information to most of the payment cards potentially affected by the

- 9 -

incident.  Visa reported it considered 297,576 unique accounts to be at-risk, MasterCard identified 146,243 unique at-risk accounts (24,259 of which had been identified as at-risk due to other earlier reported incidents), and American Express identified 169,335 unique at-risk accounts (54,812 of which had been identified as at-risk due to other earlier reported incidents).  These account number totals, however, are not necessarily equivalent to unique individuals because one person could have used a Visa account at the front desk and a Mastercard in a restaurant.  Thus, based on these numbers, Kimpton estimates that in total approximately 600,000 unique individuals were potentially affected by the incident, many of whom used cards that were previously identified as at-risk by other security incidents reported to the payment card networks other than the Kimpton incident.

### B.    The Settlement Benefits

#### 1.    Monetary Remedies

Under the Settlement, subject to its terms and conditions and subject to Court approval, Settlement Class Members are eligible to receive reimbursement of up to $250 (in total) for the following categories of out-pocket expenses resulting from the Security Incident:

> (i) unreimbursed bank fees;
> (ii) unreimbursed card reissuance fees;
> (iii) unreimbursed overdraft fees;
> (iv) unreimbursed charges related to unavailability of funds;
> (v) unreimbursed late fees;
> (vi) unreimbursed over-limit fees;
> (vii) long distance telephone charges;
> (viii) cell minutes (if charged by minute), Internet usage charges (if charged by the minute or by the amount of data usage and incurred solely as a result of the Security Incident), and text messages (if charged by the message and incurred solely as a result of the Security Incident);
> (ix) unreimbursed charges from banks or credit card companies;
> (x) postage;
> (xi) interest on payday loans due to card cancelation or due to over-limit situation;
> (xii) up to five hours of lost time spent dealing with replacement card issues or in reversing fraudulent charges or otherwise dealing with the Security Incident (calculated at the rate of $25.00 per hour), but only if at least one full hour was spent;
> (xiii) an additional $15 payment for each credit or debit card on which document fraudulent charges were incurred that were later reimbursed, to compensate the claimant for lost time associated with seeking reimbursement for the fraud, but no documentation will be required for this benefit;
> (xiv) costs of credit report(s) purchased by Settlement Class Members

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident); and

(xv) costs of credit monitoring and identity theft protection (not to exceed $80.00) purchased by Settlement Class Members between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident and not for other purposes, and with proof of purchase).

SA, Ex. 1 ¶ 2.1.

As explained in Epiq's supplemental declaration, in a recent payment card data breach that included similar claim categories and capped total recovery for those claim categories of $250 per Class Member, only 6 of the approximate 1430 submitted claims that were eligible for an award exceeded the $250 maximum.  The average claim submitted was for an amount of $49.00.  *See* Supplemental Epiq Declaration, ECF 98-14, ¶ 20.  In their amended agreement, the parties agreed to increase the number of hours for which an injured class member may seek reimbursement from three to five.  The parties have also agreed to increase the hourly rate for compensation from $15 to $25.  SA, Ex. 1 ¶ 2.1.  The settlement provides fair compensation for class members' lost time: the hourly rate of compensation offered to class members matches the average national hourly earnings in the United States for the relevant time, and exceeds the current minimum wage for the state of California. Ram Decl., Ex. 3 ¶¶ 2-4. The total number of hours for which a class member may claim compensation matches the average time required for consumers to rectify an identity theft.   Ram Decl., Ex. 3 ¶ 5.

Class Members who had other extraordinary unreimbursed out-of-pocket monetary losses because of the Security Incident, including alleged unreimbursed fraudulent charges, are eligible to make a claim for reimbursement of up to $10,000.00.  SA, Ex. 1 ¶ 2.2.  Settlement Class Members "shall also be eligible to be reimbursed for monetary out-of-pocket losses that are claimed by the Settlement Class Member to have occurred more likely than not as a result of the Security Incident, in an amount not to exceed $10,000.00 per Settlement Class Member, subject

to the following conditions: (a) it is an actual, documented, and unreimbursed monetary loss; (b) was more likely than not caused by the Security Incident; (c) occurred during the time period from February 1, 2016 through and including the end of the applicable claims period (see ¶ 2.2.2, infra); (d) is not already covered by one or more of the categories in ¶ 2.1, and (e) the claimant made reasonable efforts to avoid or seek reimbursement for the loss including but not limited to exhaustion of all available credit monitoring insurance and identity theft insurance as required under ¶ 2.2.1.  Settlement Class Members with claims under this paragraph may also submit claims for benefits under ¶ 2.1." SA, Ex. 1 ¶ 2.2.

Given the thorough and comprehensive claims categories and significant relief provided to class members in paragraph 2.1 of the Settlement Agreement, and the expected narrow number of Settlement Class Members who have other unreimbursed out-of-pocket monetary losses as a result of the Security Incident, Plaintiff anticipates a limited number of Settlement Class Members to submit a claim for extraordinary unreimbursed out-of-pocket monetary losses.  While Plaintiff does not anticipate many claims for this category, it is important that Settlement Class Members who have incurred these out-of-pocket losses have an opportunity to be reimbursed.

The aggregate amount of claims reimbursement for which Kimpton shall be responsible to pay is capped at $600,000.  If the total valid claims exceed the $600,000 cap, each individual amount shall be reduced pro rata so that the aggregate claims reimbursement is exactly $600,000. SA, Ex. 1 ¶ 2.4. Here, the Settlement includes a claims process to permit Settlement Class Members to recover for multiple categories of claims.  Due to the nature and types of harm Settlement Class Members experienced because of the Security Incident, Plaintiff sought a robust and comprehensive settlement that would allow Settlement Class Members to recover the maximum amount for their claims.  *See* Standing Order for Civil Cases before Judge Vince Chhabria, §32.  As discussed in detail below, the claims process provides Settlement Class

Members the opportunity to submit a claim for numerous categories that they might not otherwise consider or on their own select.  *See* SA, Ex. 1, ¶ 2.1.  *See also infra* at Sections III(C), (D).

Plaintiff negotiated the settlement with the anticipation that $600,000 should be more than adequate to provide all claimants with the full amount they are entitled to recover.   This amount also compares favorably with the amounts in other payment data breach settlements.   The per card amount of this Settlement is approximately $1.00.   This compares favorably to other payment card data breach cases where the average per card amount was significantly below $1.00.  *See infra* at Section V (B) (1) (d).   Additionally, taking the example of a recent payment card data breach settlement providing substantially similar relief, the approximate claims rate was .3% and the average award amount per claim was $49.00.  Here, using those figures, $600,000 is more than adequate to cover the anticipated claims.

Out-of-pocket costs claims-rates in large, consumer data breach cases consistently track at from below one percent to three percent.  *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, 15-MD-02617-LHK, 2018 WL 3872788, at *13 (N.D. Cal. Aug. 15, 2018) (noting a 1.8% claims rate for the *Anthem* class, and "claims rates of approximately 0.2% and 0.23% in the *In re Home Depot* and *In re Target* data-breach actions"); *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, ECF No. 245-1 (N.D. Ga.) (noting submission of 127,527 claims for a class of approximately 40,000,000 individuals, a rate of .31%).   These exemplar cases involved large, highly publicized consumer data breach cases, with tens of millions of class members—quite the contrast to the smaller, more intimate class involved in this case.   These claims rates provide further support that the settlement amount of $600,000 will sufficiently cover the claims of class members.

Unused funds will not be redistributed to class members who claim their share nor do unused funds go to cy pres.  *See* Standing Order for Civil Cases before Judge Vince Chhabria,

- 13 -

§32; *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 8.  This is because the goal of this settlement is to provide Settlement Class Members with unreimbursed out-of-pocket expenses and documented lost time that resulted from the Security Incident.  Plaintiff believes that the Settlement will accomplish this goal and therefore Plaintiff did not seek additional monetary relief beyond what Settlement Class Members can recover through the claims process.

The monetary relief provided under the terms of the settlement most likely exceeds the potential recovery if Plaintiff were to prevail on each of his claims.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(d).  Reimbursement for out-of-pocket losses for the fifteen categories detailed above exceeds what would otherwise be available remedies if the Settlement is not approved.  For example, under the terms of the Settlement, Class Members may recover for the cost of credit monitoring, up to $80 and purchased anytime between February 1, 2016 and the Claims Deadline.  Similarly, in addition to time spent dealing with the Security Incident, Class Members can receive an additional $15 payment for each credit or debit card that incurred fraudulent charges that were reimbursed.  Without a Settlement, these remedies would not likely be available to Class Members.  Given the size of the Class and the amount of monetary relief available to the Class, Plaintiff does not anticipate concerns about the allocation of the settlement fund among Class Members.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(e).

### 2.      Injunctive Relief

Class benefits from this Settlement Agreement are not merely monetary; they also include injunctive relief designed to minimize the risk of future data breaches and protect consumer data going forward.  As part of the Settlement Agreement, Kimpton will adopt and implement, at a minimum, the following data security measures for three years from the execution of the Settlement Agreement:

1) Information Security Position.  Kimpton will designate a position that

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

is specifically responsible for overseeing information security compliance at Kimpton Hotel & Restaurant Group, LLC.

2) Annual PCI DSS Audits & Penetration Testing.  Kimpton will hire a third-party Qualified Security Assessor to conduct an annual assessment of Kimpton's compliance with PCI DSS and hire a penetration testing company to conduct an annual penetration test of Kimpton Hotel & Restaurant Group, LLC's cardholder data environment.  Qualified Security Assessor means an independent security organization that has been qualified by the PCI Security Standards Council to assess an entity's adherence to PCI DSS.  Penetration test means a manual process that complies with the standards set forth by PCI DSS for penetration testing.

3) Annual Security Awareness Program.  Kimpton will provide annual security awareness training for its employees, which will include education and training regarding payment card data security and payment card data security best practices.

4) Payment Card Acceptance Technology.  With respect to all consumer card present payment transactions where a physical payment card is used at a Kimpton hotel front desk or restaurant, Kimpton will: (1) implement a solution that encrypts payment card data when it is read by the card acceptance device and routes the authorization message out to the payment card networks without the authorization message data being unencrypted on devices owned and managed by Kimpton ("Encryption Solution"); and (2) install card acceptance devices and payment applications that support acceptance of EMV enabled payment cards (the "EMV Solution").  Kimpton will implement the Encryption Solution and EMV Solution by June 31, 2019 for card present transactions that occur at the front desk of its hotels.  Kimpton will implement the Encryption Solution and EMV Solution for card present transaction that occur in its restaurants by January 2020.

5) Senior Leadership reporting.  Kimpton will report to its executive team about its cybersecurity efforts.

SA, Ex. 1 ¶¶ 3.1-3.5.

The injunctive relief provisions included in the Settlement Agreement materially enhance the value of this Settlement and represent significant improvements by Kimpton to its data security.  For example, though the parties disputed whether Kimpton had been PCI-compliant (that is, compliant with the Payment Card Industry Data Security Standards [PCI-DSS]), this settlement includes regular PCI-DSS compliance auditing.  The improvements to Kimpton's payment card acceptance technology represent a significant financial investment by Kimpton and further add to the relief Class Members would receive because of this Settlement.

Thus, the meaningful benefit to Class Members through this settlement is not merely monetary.  By including these security enhancements in addition to monetary relief, the Settlement Agreement provides renewed confidence that Kimpton systems will prospectively

1    protect consumer data.

2        **C.      Proposed Notice Plan**

3            Pursuant to the Settlement Agreement, the parties propose that Epiq be appointed as

4    Notice Specialist and Claims Administrator.  Epiq is a nationally recognized class action notice

5    and administration firm that has designed a class notice plan for this case, which the parties and

6    Epiq believe is an effective plan.  Kimpton has agreed to pay all costs associated with providing

7    Class notice and administering the Settlement benefits.  Such payment will be in addition to and

8    not affect the amount of Class Settlement consideration available to Class Members.  SA, Ex. 1 ¶

9    4.2.  The parties estimate that the settlement administration and notice will cost approximately

10   $377,000.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §2.  Since Kimpton

11   is paying these costs in addition to the monetary relief provided to Class Members, this also

12   materially enhances the value of the Settlement.

13           With respect to notice, there are two groups of Settlement Class Members:  those for

14   whom Kimpton has email addresses and/or physical addresses, and those for whom Kimpton does

15   not.  Subject to Court approval, this Notice Plan involves direct notice to the approximately

16   150,000 Settlement Class Members for whom physical addresses or email addresses are available.

17   For the remaining Settlement Class Members, notice will be provided by publication.  This

18   publication notice will take two forms:  first, an advertisement in *People Magazine*[5], which has a

19   circulation of 3.4 million individuals.  Second, the publication notice will also be made via online

20   Internet banners through Facebook, the Google Display Network, and the Yahoo! Ad Network.

21   A declaration from Epiq with additional details about the publication plan is attached as Exhibit F

22   to the Amended Settlement Agreement.  Further details are attached in a Supplemental

23   Declaration previously filed. (ECF 98-14.)

24           Finally, the Claims Administrator will also establish a settlement website in the form

25   agreed to by the parties and the Court.  In addition to the notices, the website will include

26   _____

27       [5] Epiq's supplemental declaration provides details as to why People Magazine was selected and how Epiq has proposed improving its online media plan to increase the number of online impressions.  *See* Supplemental Epiq Decl., ECF 98-14 at ¶¶ 6-7.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

information about the Settlement, related case documents, and the Settlement Agreement.  Class Members will be able to submit claims electronically.

Notice of the Settlement will be given to the Settlement Class no later than thirty days from the date of the Court's Preliminary Approval Order.  Pursuant to the Notice Plan, there will be two forms of notice, a long form and a summary notice, which are attached as Exhibits B and C to the Amended Settlement Agreement.  The Class notice informs Class Members of the nature of the action, the litigation background, the terms of the agreement (including the definition of the Settlement Class), the relief provided by the Settlement Agreement, Class Counsel's request for fees and expenses and the scope of the release and the binding nature of the Settlement on Class Members.  It also describes the procedure for objecting to the Settlement; advises Class Members that they have the right to opt out of the Settlement and describes the consequences for opting out; and states the date and time of the final approval hearing, advising that the date may change and how to check the website.

The Parties have worked with Epiq to create class notice that is easily understandable and includes the following:  (1) contact information for class counsel to answer questions; (2) the address for a website, maintained by the claims administrator or class counsel, that has links to the notice, motions for approval and for attorneys' fees and any other important documents in the case; (3) instructions on how to access the case docket. The notice will state the date of the final approval hearing and clearly state that the date may change without further notice to the class.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §3.  The notice is carefully written in plain English and unnecessary acronyms were avoided.  *See* Standing Order for Civil Cases before Judge Vince Chhabria, §32.  The notices have been updated to more clearly signal that documentation is not required to support expenses and that the expenses may simply be described.  The notice documents are now more clearly worded and consistent with the revised claim form that was submitted with Plaintiff's renewed motion for preliminary approval.  *See* Exhibits B, C, D, and F to the Amended Settlement Agreement.

The notice also instructs class members who wish to exclude themselves from the Settlement to send a letter to the settlement administrator, setting forth their name and a statement

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

that they request exclusion from the class and do not wish to participate in the settlement. It does not require extraneous information not needed to effect an exclusion.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §4.

Pursuant to the Northern District of California's Procedural Guidance for Class Action Settlements, the notice instructs class members who wish to object to the settlement to send their written objections to the Court. All objections will be scanned into the electronic case docket and the parties will receive electronic notices of filing. The notice requires a written objection as a prerequisite to appearing in court to object to the settlement and it specifies that this requirement may be excused upon a showing of good cause.  *See* Standing Order for Civil Cases before Judge Vince Chhabria, §32.   The notice also explains, "the Court will only require substantial compliance with the requirements for submitting an objection."  *See* Standing Order for Civil Cases before Judge Vince Chhabria, §32.

No governmental agency is involved in this litigation, but the Attorney General of the United States and Attorneys General of each of the States will be notified of the proposed settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity to raise any objections or concerns they may have.

**D.**     **Claim Form and Claim Process**

The parties have substantially improved the claim form to address the Court's main concern that it was unreasonable to expect a class member to fill out the form and gather all required documents to obtain the relief offered.   First, the parties have agreed that the documentation described in the claim form would not be required for several categories, and a narrative description of the costs incurred would suffice.   Second, the proposed Claims Administrator, Epiq Systems, Inc., has provided data on claims rates in cases with similar forms and losses, showing that the time required for even the *unmodified* claim form would not substantially compromise claim rates.

First, to address the Court's concern about the required documentation to submit a claim,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

the Parties have revised the claim form to eliminate required documents for several out-of-pocket expense categories, including: bank fees; card reissuance fees; fees related to frozen or unavailable accounts; fees related to credit reports, identity theft insurance, and/or credit monitoring; and incidental telephone, internet, or postage expenses.  The Revised Claim Form is attached as Exhibit A to the Amended Settlement Agreement.  The parties expect this to significantly improve the claim process for Settlement Class Members.  As the Court identified, by eliminating the need for a Settlement Class Member to spend the time gathering various documents to prove their expenses, and instead only asking for a narrative description of the costs, Plaintiff expects submitting a claim to be a simpler process that may result in more Settlement Class Members filing claims.  In addition, Epiq's online claim submission process should make it a quick and simple process for Settlement Class Members to submit claims.  *See* Supplemental Epiq Decl., ECF 98-14 at ¶¶ 17-18 (providing a sample online claim form used in a prior case).

Second, while the Parties have agreed to revise the claim form to improve the process for Settlement Class Members, the claim form Plaintiff submitted with his original motion for preliminary approval is substantially similar to the claim forms approved in other payment card data breach class action settlements.  *See T.A.N. v. PNI Digital Media, Inc.*, 2:16-cv-00132-LGW-RSB (S.D. Ga.), Docs. 37-1 at Ex. A (May 25, 2017) (claim form) and Doc. 40 (June 2, 2017) (Preliminary Approval Order*).  See also Bray v. GameStop Corporation*, 1:17-cv-01365-JEJ (D. Del.), Docs. 40-2 at Ex. D (July 16, 2017) (claim form) and Doc. 43 (August 1, 2018) (Preliminary Approval Order).  While there is not yet information to provide the Court on the GameStop settlement claims process, for the PNI Digital Media settlement, Epiq has provided a supplemental declaration that details how long it took claimants to input information online, the number of claims made and average award.  *See* Supplemental Epiq. Decl., ECF 98-14 ¶¶14-20.

In PNI, notice went to approximately 750,000 class members, with approximately 2,350 submitting claims, for a claims rate of .3%.

### E.    Attorneys' Fees, Costs, and Expenses

Kimpton has agreed that Class Counsel is entitled to seek an award of reasonable attorneys' fees, costs and expenses for prosecuting this action and will not object to Class Counsel's petition for fees and expenses not to exceed $800,000 inclusive of expenses.  Notably, the parties did not negotiate this agreement or any other issue with respect to attorneys' fees, costs and expenses until the mediator had informed the parties that they had reached an agreement on Class relief.  In addition, the award of fees costs and expenses does not reduce or otherwise affect the amount of compensation available to Class Members.  Class Counsel's lodestar substantially exceeds the attorneys' fee request, which will be presented to the Court in their motion for attorneys' fees, costs and expenses.  This motion will be filed at least thirty (30) days prior to the deadline for objecting to the proposed settlement. SA, Ex. 1 ¶¶ 8.1-8.2.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §6 ("When proposing dates for notice, objections, motions for attorneys' fees and final approval, the parties must ensure that the motion for attorneys' fees is filed at least fourteen days before the deadline for objecting to the settlement. *See In re Mercury Interactive Corp. Securities Litigation*, 618 F.3d 988 (9th Cir. 2010).").  *See also* Standing Order for Civil Cases before Judge Vince Chhabria, §32.

### F.    Service Awards

The Settlement allows Class Counsel to request and for Kimpton to pay a service award to Andrew Parsons, Plaintiff and the proposed Class Representative, in an amount not to exceed $5,000.00 as approved and ordered by the Court upon final approval of the Class Settlement.  The Class Representative's agreement to the Settlement is not conditioned in any manner on the award of a service award or its amount. Declaration of Andrew Parsons, ECF 98-12 ¶ 10.  The Class Representative has given his time and accepted his responsibilities admirably, participating actively in this litigation as required and in a manner beneficial to the Class generally.  Yanchunis Decl., Ex. 2 ¶ 41.  The proposed service award is presumptively reasonable. *In re Yahoo Mail*

*Litig.*, No. 13-CV-4980, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016) ("The Ninth Circuit has established $5,000.00 as a reasonable benchmark [for service awards]."). It is particularly warranted by Mr. Parsons' extensive participation in the litigation, including being deposed on personal financial matters. *See, e.g., Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365, 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010). Here, there are no conditions placed on the incentive award nor does the amount of the award undermine the adequacy of the class representative. *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §7 (citing *See, e.g., Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. 2013).)

### G.   Release of Claims

Under the Settlement, each member of the Class will be deemed to have released any and all claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, suspected or unsuspected, asserted or that might have been asserted, by the Plaintiff or any Settlement Class Member, against Kimpton arising out of or related to the facts giving rise to the subject matter of the Complaint in this case. SA, Ex. 1 ¶ 7.1. Class Members are only releasing claims based on the identical factual predicate, as required under Ninth Circuit precedent. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). *See also* Standing Order for Civil Cases before Judge Vince Chhabria, §32). Under this precedent, "we have held that federal district courts properly released claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement." *Hesse, supra.* There are not any differences between the claims to be released and the claims set out in the operative complaint. *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(c).[6]

---

[6] The Parties are not requesting that this Court enjoin current or future litigation in other courts based on conduct covered by the release. *See* Standing Order for Civil Cases Before Judge Vince Chhabria, §32.

1

2   **V.     ARGUMENT**

3       **A.     The Proposed Settlement Class Should Be Certified**

4           **1.     The Class Meets the Requirements of Rule 23(a)**

5       Before assessing the parties' settlement, the Court should first confirm that the underlying

6   settlement class meets the requirements of Rule 23.   *See Amchem Prods. v. Windsor*, 521 U.S.

7   591, 620 (1997); *Manual for Complex Litigation*, Fourth, § 21.632 (2004). The prerequisites for

8   class certification under Rule 23(a) are numerosity, commonality, typicality, and adequacy—each

9   of which is satisfied here. Fed. R. Civ. P. 23(a). The proposed settlement class includes more than

10  150,000 people, and so readily satisfies the numerosity requirement. *See* Fed. R. Civ. P. 23(a) (1);

11  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

12      The proposed class also satisfies the commonality requirement of Rule 23(a), which

13  requires that class members' claims "depend upon a common contention," of such a nature that

14  "determination of its truth or falsity will resolve an issue that is central to the validity of each

15  [claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The central

16  question behind every claim in this litigation is whether Kimpton adequately secured its

17  consumers' payment card information.   The answer to that question depends on common

18  evidence that does not vary from class member to class member, and so can be resolved—

19  whether through litigation or settlement—for all class members at once.

20      The final requirements of Rule 23(a)—typicality and adequacy—are likewise satisfied

21  here. The proposed Class Representative used a payment card for a stay at an affected Kimpton

22  property during the breach period, and so he was affected by the same inadequate data security

23  that Plaintiff alleges harmed the rest of the class. *See Just Film, Inc. v. Buono*, 847 F.3d 1108,

24  1118 (9th Cir. 2017) ("it is sufficient for typicality if the plaintiff endured a course of conduct

25  directed against the class"). The proposed Class Representative also has no conflict with the class;

26  has participated actively in the case, including by sitting for a deposition; and is represented by

27  experienced attorneys. *Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir. 2003) (adequacy

28  satisfied if Plaintiffs and their counsel lack conflicts of interest and are willing to prosecute the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

action vigorously on behalf of the class).

**2.      The Class Meets the Requirements of Rule 23(b)(3)**

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (1997).  Here, the proposed class is maintainable under Rule 23(b) (3), as common questions predominate over any questions affecting only individual members and class resolution is superior to other available methods for a fair resolution of the controversy.  *Id.*  Plaintiff's liability case depends, primarily, on whether Kimpton used reasonable data security to protect payment card data.  That question can be resolved using the same evidence for all class members, and thus is the precise type of predominant question that makes a class-wide adjudication worthwhile.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) …'"). This case involves a single cybersecurity incident that impacted *all* Class members whose data was stolen in connection with using a payment card at Kimpton properties, giving rise to claims under state law that *all* share the same common nucleus of facts and law pertaining to the duty of care and whether Kimpton violated it.

The Court, in its June 12, 2018 Order, had originally asked for a more detailed explanation of how the proposed class satisfies the predominance requirements as set forth in *In re Hyundai & Kia Fuel Econ. Litig.,* 881 F.3d 679, 707 (9th Cir. 2018).  The Ninth Circuit has since granted *en banc* review and that case can no longer be cited as authority.  *In re Hyundai And Kia Fuel Econ. Litig.*, No. 15-56014, 2018 WL 3597310, at *1 (9th Cir. July 27, 2018). Nonetheless, this Court has an independent obligation to assess predominance and this case satisfies the Rule.

Predominance is satisfied in this case and the common legal and factual issues here outweigh any "questions affecting only individual members." F.R.C.P. 23(b)(3). Familiar Ninth Circuit standards going back at least 20 years, to *Hanlon*, govern the predominance inquiry: here, as in *Hanlon*, "a common nucleus of facts and potential legal remedies dominate this litigation." 150 F.3d at 1022. Thus, any variations in state law do not outweigh the predominance of factual and legal issues with respect to the constellation of claims in this case in the settlement context. *Id.* at 1022–23 (holding that "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims"). Previously filed as ECF 98-13 are 50-state surveys for Plaintiff's two common law causes of action, each of which demonstrate the overwhelming similarities that satisfy the predominance analysis.

"Variations in state law do not necessarily preclude a 23(b)(3) action.'" *Hanlon*, 150 F.3d at 1022. Here, there are no material differences as to Plaintiff's common-law negligence or breach of implied contract claims. *Hanlon*, 150 F.3d at 1022; *Just Film,* 847 F.3d at 1122. The basic elements of contract law, as they apply to our facts, are the same across states. *See In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig.*, 2010 WL 3931096 (N.D. Cal. Oct. 6, 2010); *cf. American Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("Because contract law is not at its core 'diverse, nonuniform, and confusing,' we see no large risk of nonuniform adjudication….") (citations omitted). The breach of implied contract claim focuses on issues of Kimpton's privacy policy and the alleged breach of that policy, both of which are subject to common proof. There are no material differences in state law with respect to interpretation or breach that would require *individualized* adjudication of the facts here at issue. *Just Film,* 847 F.3d at 1123.

Similarly, the commonalities with respect to the key facts and legal issues relevant to

Plaintiff's negligence claim outweigh any individualized differences.   The core elements of negligence – duty, breach, causation, damages – do not substantively vary from state-to-state (except as to contributory/comparative negligence principles not at play in this single-defendant case).   *See* ECF 98-13.   In sum, these claims are so similar across states that they do not defeat predominance.

True, this case includes an unfair competition claim under California Business & Professions Code section 17200, the precise kind of consumer protection statute that would result in application of multiple state laws under, e.g., *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589-90 (9th Cir. 2012).   But let us presume that the consumer protection laws of multiple states apply because of this single claim.   That fact still does not defeat predominance.

Here, as in in *Hanlon*, "a common nucleus of facts and potential legal remedies dominate this litigation." 150 F.3d at 1022.   Class members here do not occupy different factual positions that might create conflicts in the legal viability of their claims.   Much like *Hanlon's* class members who all had "the same problem – an allegedly defective rear latchgate…" (*Hanlon,* 150 F.3d at 1021), the class members here all suffered the same loss of personal information from the same single cybersecurity incident, which compromised payment-card data.   That theft gives rise to claims under state law that *all* share the same common nucleus of facts and law pertaining to the duty of care and whether Kimpton violated it.   It's the same injury, from the same origin, based on the same facts. Any variations in state law do not outweigh the predominance of common factual and legal issues in this case.   *See Hanlon,* at 1022–23 (holding that "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims").

In light of the common factual evidence, this Court can conclude that "common, aggregation-enabling, issues in the case are more prevalent or important" (*Tyson Foods*, 136 S. Ct. at 1045) even if there are variations between the state statutory claims, particularly where much of that variation applies statewide rather than individually.   For all of these claims, variations in state law that apply statewide, or to other large sub-groups of the class, do not pose individualized issues at all, and raise only questions of manageability irrelevant to settlement

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

under governing law. *Amchem Prods*, 521 U.S. at 623. Likewise, there is a long-standing rule that individualized damages issues do not defeat predominance. *Tyson Foods*, 136 S.Ct. at 1045; *Vaquero v. Ashley Furn.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

Finally, since "the proposal is that there be no trial," manageability considerations have no impact on whether the proposed settlement class should be certified. *Amchem*, 521 U.S. at 620. There is only the predominant issue of whether Kimpton properly secured the payment card data of its consumers, such that Kimpton's security should be improved and class members affected by the data breach provided with a remedy. As a practical matter, that issue cannot be resolved through individual trials or settlement negotiations: the amount at stake for individual class members is too small, the technical issues involved are too complex, and the required expert testimony and document review too costly. *See Just Film,* 847 F.3d at 1123.[7]

In sum, because of the common experience of every individual in this Class with respect to the single event of the Kimpton data breach, the common evidence pertaining to data security and the breach, and the common legal issues across the common law and statutory claims, the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623.

**B.      The Court Should Grant Preliminary Approval**

**1.      The Standard for Preliminary Approval**

Federal Rule of Civil Procedure 23(e) provides that a class action cannot be settled or compromised without approval by the court. Fed. R. Civ. P. 23(e). Judicial approval is required regardless of whether the action is certified for trial and later settled or is certified for purposes of settlement. *Manual for Complex Litigation,* Fourth, § 21.61 (2004). The approval process typically involves two steps. First, the settlement is approved preliminarily following the

---

[7] A class action is not only the superior method of adjudicating consumer claims arising from this data breach, it is the *only* method practicable—just as in other data breach cases where a class wide settlement has been approved. *See, e.g., In re Linkedin User Privacy Litig.,* 309 F.R.D. 573, 585 (N.D. Cal. 2015); *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.,* 2016 WL 6902351, at *2 (N.D. Ga. Aug. 23, 2016); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2009 WL 5184352, at *6–7 (W.D. Ky. Dec. 22, 2009).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

submission by the parties of relevant information concerning the terms of the settlement and the history of the litigation. Second, after notice of the proposed settlement is given to the class, the court conducts a final approval hearing, also known as a fairness hearing. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523 (C.D. Cal. 2004). Ultimately, to approve the proposed settlement, this Court must determine that it is fair, reasonable and adequate. *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco.,* 688 F.2d. 615, 625 (9th Cir. 1982). A presumption of fairness exists where the settlement is reached through arm's-length negotiations, sufficient investigation has taken place to allow counsel and the Court to act intelligently, and counsel is experienced in similar types of litigation. *Duhaime v. John Hancock Mut. Life. Ins. Co.,* 177 F.R.D. 54, 68 (D. Mass. 1997) (settlement is presumed fair where it is the product of arm's-length negotiations).

In the past, courts have focused only on whether the proposed agreement appears to be non-collusive, is free of "obvious deficiencies," and generally falls within the range of "possible" approval. *See, e.g., In re Tableware Antitrust Litig.,* 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007). More recently, however, several courts in this district have criticized the notion that review of proposed class settlements at the preliminary approval stage need only involve a "quick look," or a watered-down version of final approval. *See Cotter v. Lyft, Inc.,* 193 F. Supp. 3d 1030, 1036 (N.D. Cal. 2016).[8]

Proposed revisions to Rule 23—effective on December 1, 2018—further confirm the need for a more detailed analysis. Under the proposed rule, notice should be given to the class, and hence, preliminary approval should only be granted, where the Court "will likely be able to" finally approve the settlement under Proposed Rule 23(e)(2) and certify the class for settlement purposes. Fed. R. Civ. P. 23 (proposed amended Rule 23(e)); *see also id.* 2018 Amendment Advisory Committee Notes. Thus, the proposed rule reflects the factors already used in this

---

[8] See Standing Order For Civil Cases Before Judge Vince Chhabria, §32. *See also O'Connor v. Uber Techs., Inc.,* 201 F. Supp. 3d 1110, 1122 (N.D. Cal. 2016); *Viceral v. Mistras Grp., Inc.,* 2016 WL 5907869, at *6 (N.D. Cal. Oct. 11, 2016).; *Hunt v. VEP Healthcare, Inc.,* No. 16-cv- 04790-VC, 2017 WL 3608297 (N.D. Cal., Aug. 22, 2017); *Eddings v. DS Services of America, Inc.,* No. 15-cv-02576-VC, 2016 WL 3390477 (N.D. Cal. May 20, 2016).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Circuit for final approval: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; (8) the reaction of the class members to the proposed settlement; and (9) whether the settlement is a product of collusion among the parties. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

"[I]n the context of a case in which the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) ("settlement approval that takes place prior to formal class certification requires a higher standard of fairness.") As the Ninth Circuit has observed, "[p]rior to formal class certification, there is an even greater potential for a breach of fiduciary duty owed the class during settlement. Accordingly, such agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *In re Bluetooth*, 654 F.3d at 946. Ultimately, "[s]trong judicial policy favors settlements." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 576, (ellipses and quotation marks omitted) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

Accordingly, Plaintiff addresses each of the following settlement factors articulated by the Ninth Circuit and by the proposed amended Rule 23(e) (while recognizing that at least one of those factors—the reaction of class members—is not yet known) and submit that they collectively weigh in favor of judicial approval:

> (a) the strength of the plaintiff's case;
> (b) the risk, expense, complexity, and likely duration of further litigation;
> (c) the risk of maintaining class action status throughout the trial;
> (d) the amount offered in settlement;
> (e) the extent of discovery completed and the stage of the proceedings;
> (f) the experience and views of counsel;
> (g) the presence of a governmental participant;

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

(h) the reaction of the class members to the proposed settlement; and

(i) whether the settlement is a product of collusion among the parties.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575-76 (9th Cir. 2004); *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

### a.       The Strength of Plaintiff's Case

Plaintiff believes he has a good case for liability.  Pursuant to the scheduling order in this case, at the time the parties negotiated the Settlement, Plaintiff had developed a solid factual record to move this case forward, and was preparing his motion for summary judgment on his individual claims and damages.  Plaintiff was prepared to submit evidence supporting his assertion that Kimpton had failed to take a number of industry-standard measures to secure its consumers' payment card data; ignored warning of vulnerabilities in its data security; and that Kimpton missed opportunities to detect and stop the data breach while it was underway.  Plaintiff also believes he would be able to show that he suffered damages as a result of the Kimpton data breach.  However, throughout the litigation, Kimpton has continually disputed the sufficiency of Plaintiff's allegations, and Kimpton believes that discovery against Plaintiff Parsons has allowed Kimpton to develop a factual record to support many of the same basic arguments Kimpton raised on its motion to dismiss. Although Plaintiff feels that he would be able to obtain a favorable ruling on his motion for summary judgment, this is not a certainty.  Moreover, as discussed above, the proposed settlement provides for monetary benefits that likely exceed what class members would likely be able to recover if Plaintiff were to establish class-wide liability. Although the last several years have seen a significant number of cases filed following data breaches and the identity theft which may follow, class wide damage models remain the subject of debate among parties to litigation and a data breach case has not yet gone to trial. Defendant here would have no doubt advanced challenges to a class wide damage model. This settlement brings certainty to the issues. Moreover, the level of effort that each class member must undertake to claim those settlement benefits is likely significantly less than if he or she were forced to prove and claim causation and damages in a contested proceeding.

1

2          **b.     The Risk, Expense, Complexity, and Likely Duration of Further Litigation**

3

4          Although Plaintiff is confident in the merits of his claims, the risks involved in

5    prosecuting a class action through trial cannot be disregarded.  While most of Plaintiff's claims

6    survived a motion to dismiss, Plaintiff would still need to prevail on cross-motions for summary

7    judgment and then prevail on a motion for class certification.  Almost all class actions involve a

8    high level of risk, expense, and complexity, which is one reason that judicial policy so strongly

9    favors resolving class actions through settlement. *Linney v. Cellular Alaska P'ship*, 151 F.3d

10   1234, 1238 (9th Cir. 1998).  This is not only a complex case, but it is in an especially risky field

11   of litigation in which a data breach class case has not yet gone to trial or undergone the rigors of

12   any subsequent appeals.  *See, e.g.*, *In re Countrywide Fin. Corp. Customer Data Sec. Breach

13   Litig.*, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010) (approving data breach settlement, in

14   part, because "proceeding through the litigation process in this case is unlikely to produce the

15   Plaintiffs' desired results").  Data breach cases continue to be among the most risky and uncertain

16   of all class action litigation and certification is still rare.  Even if the Court had certified a class,

17   Kimpton would have sought appellate review. The Court may recall that Kimpton unsuccessfully

18   sought an interlocutory review of this Court's order on the motion to dismiss. Through the

19   Settlement, Plaintiff and Class members gain significant benefits without having to face further

20   risk.

21          **c.     The Risk of Maintaining Class Action Status throughout Trial**

22          Plaintiff believes he would prevail on a motion for summary judgment and then also

23   prevail on class certification. However, there is little directly analogous precedent to rely upon.

24   Class certification has been denied in other consumer data breach cases and it was only last year

25   that the first litigation class was certified in a consumer data breach case.  *See Smith v. Triad of

26   Alabama, LLC,* 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017).  The lack of direct precedent

27   creates an additional risk in achieving and maintaining class action status throughout trial and

28   even appeal.  While Plaintiff feels that he would be able to obtain certification outside of a

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

settlement context and maintain certification through trial, this is not certainty. Additionally, any potential certification would be subject to later appeal and potential reversal. Also, the cost of trial and any appeals would be significant and would delay the resolution of this litigation without the guarantee of any relief.

### d.     The Amount Offered In Settlement

Through arm's-length negotiations between sophisticated counsel experienced in litigating complex cases and through the assistance of an experienced mediator, the parties were able to reach an agreement that compares very favorably to settlements in payment card data breach class actions that have been approved by other courts. As discussed above, payment card data breach class action cases are particularly risky and challenging and the outcome of this settlement should be considered not only as favorable compared to other payment card data breach class action settlements, but as particularly favorable given that multiple other payment card data breach cases against hotel or restaurant chains have resulted in no recovery for the plaintiff or class members. *See, e.g.*, *Dugas v. Starwood Hotels & Resorts Worldwide, Inc.*, 3:16-cv-00014-GPC-BLM (S.D. Cal.), Doc. 56 (order dismissing payment card data breach case) (July 11, 2017); *Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89 (2d Cir. 2017) (order affirming dismissal of payment card data breach case).

- The Home Depot data breach, which involved the theft of approximately 92 million consumers, consisting of 40 million consumers' payment data and 53 million consumers' email addresses settled creating a $13 million fund for consumers, paying an additional $6.5 million for internet and dark web monitoring services (which was eligible to be repaid from the fund), and $7.5 million in attorney fees. For the 40 million payment cards at issue, the settlement equates to approximately .33 cents per card. *See In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, ECF No. 181-2 (March 7, 2016) (Settlement Agreement); *id.*, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (order approving settlement).

- The Target data breach, which compromised the personal information of nearly 110 million consumers, resolved with Target establishing a settlement fund of $10 million and separately paying $6.75 million in attorney fees. This amounts to approximately .09 cents per card. *See In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522-PAM, ECF No. 358-1 (March 18, 2015)

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

(Settlement Agreement); *id.*, 2017 WL 2178306, at *2 (D. Minn. May 17, 2017) (order approving settlement on remand from the 8th Circuit), *appeal pending* Case No. 15-3912 (8th Cir.).

- The Neiman Marcus data breach, which compromised the personal information of approximately 2,187,773 individuals who held different payment card accounts with Neiman Marcus establishing a settlement fund of $1,600,000, $400,000 of which went to costs for the Claims Administrator and $530,000 for attorneys' fees, costs and expenses. This equates to approximately .31 cents per card. *See Remijas v. The Neiman Marcus Group, LLC*, No. 14-cv-1735, ECF No. 145 (March 17, 2017) (Memorandum in Support of Preliminary Approval).

Here, the $1.00 per card recovery compares well against other payment card data breach settlements. Also, as discussed above, the Settlement amount is also a good result when considering the claims rate and average award amount in a similar recent payment card case, and provides a mechanism whereby class members can obtain a recovery of their respective damages. *See supra* at Section IV (D) (discussing PNI Digital Media).

The proposed Settlement will also reduce the risk that the payment card data that consumers continue to entrust to Kimpton will be compromised by future attacks. Kimpton will adopt a number of significant data security measures negotiated with the assistance of a cyber security expert and Lead Counsel's experience in other data breach cases, including the ones referenced above. These measures include designating an information security position, performing annual PCI DSS audits and penetration testing, implementing an annual security awareness program, and improving payment card acceptance technology.

### e.     The Extent of Discovery Completed and the Stage of the Proceedings

Before entering into settlement discussions on behalf of class members, counsel should have "sufficient information to make an informed decision." *Linney*, 151 F.3d at 1239. With the exception of one deposition, the parties completed fact discovery that included eleven depositions; tens of thousands of produced documents; and, multiple subpoenas for documents and depositions to non-parties. Yanchunis Decl., Ex. 2 ¶ 51. Expert discovery was also well underway when the parties reached the Settlement. Plaintiff retained a cybersecurity expert and a damages expert. Both experts reviewed information developed during discovery and had numerous conference calls with Plaintiff. Plaintiff's cybersecurity expert also attended several of

the depositions in this case. Yanchunis Decl., Ex. 2 ¶ 51. Plaintiff knows the strengths and weaknesses of the Class's claims and has worked with experts to value those claims and to understand the business practice changes necessary to protect Class members' payment card data in the future. From the information Plaintiff obtained in discovery, he was well prepared to negotiate a settlement on behalf of the Class. Yanchunis Decl., Ex. 2 ¶ 51.

### f.     The Experience and Views of Counsel

As set forth in the attached resumes and declaration, Plaintiff's counsel have considerable experience in class actions and specifically data breach litigation, and have litigated to resolution some of the largest data breach and privacy cases filed to date. *See* Yanchunis Decl., Exhibit 2. Class Counsel are confident, based on their extensive experience as class action litigators and with other similar class actions, *e.g. In re: The Home Depot, Inc., Customer Data Security Breach Litigation., Case No. 14-md-02583-TWT (N.D. Ga. 2016), In re: Target Corporation Customer Data Security Breach Litigation*, Case No. 14-md-02522 (D. Minn. 2015), that they have a full understanding of the facts at issue, and the strengths and weaknesses of the legal allegations in the complaint. Thus, Plaintiff's counsel is qualified to evaluate the class claims, value of the settlement versus moving for certification and going to trial, and the viability of possible affirmative defenses. *See Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The recommendations of Plaintiffs' counsel should be given a presumption of reasonableness."). Plaintiff's counsel believes that the settlement is fair and reasonable in light of the complexities of the case, the uncertainties of class certification and litigation, and the secured benefit to the class. Yanchunis Decl., Ex. 2 ¶ 52.

### g.     The Presence of a Governmental Participant

No governmental agency is involved in this litigation, but the Attorney General of the United States and Attorneys General of each of the States will be notified of the proposed settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity to raise any objections or concerns they may have.

### h.     The Reaction of Class Members to the Proposed Settlement

The class has yet to be notified of the settlement and given an opportunity to object, so it

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

is premature to assess this factor. Before the final approval hearing, the Court will receive and have a chance to review all objections or other comments received from class members, along with a full accounting of all opt-out requests.

### i.   Whether the Settlement is a Product of Collusion among the Parties

One indication of whether a settlement is fair and reasonable is whether it is the product of serious, arm's-length negotiations following serious investigation of the merits of the case. Such negotiation and investigation minimize any concerns that the Settlement might be the result of collusion among opposing parties or their counsel to undermine the interests of the class for their own benefit.

The Settlement in this case easily meets that standard. Class Counsel undertook significant factual and legal investigation of the issues prior to filing the case and during the hard-fought litigation. The parties engaged in extensive discovery about both the facts and law at issue. Finally, a neutral and experienced mediator, Bruce Friedman, presided over the parties' formal, arm's length and adversarial mediation. The Settlement clearly emerges from a formal, arms-length negotiation process between the parties. Yanchunis Decl., ¶ 53.

### C.   The Court Should Approve the Proposed Settlement Notices and Authorize Their Dissemination

In any proceeding that is to be accorded finality, due process requires that interested parties be provided with notice reasonably calculated, under the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). That means the settlement notices must fairly apprise the class members of the terms of the proposed compromise and give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. *Id*. Additionally, the notice must be designed to have a reasonable chance of reaching a substantial percentage of the class members. *Id*. at 318 (explaining notice must be reasonably calculated to reach interested parties).

Here, the proposed Notice and the method of dissemination meet each of these requirements. As explained above, the Notice Plan involves direct notice to the approximately

- 34 -

150,000 Settlement Class Members for whom physical addresses or email addresses are available. For the remaining Settlement Class Members, notice will be provided by publication: an advertisement in *People Magazine*, which has a circulation of 3.4 million individuals, and online via Internet banners through Facebook, the Google Display Network, and the Yahoo! Ad Network, for a period of 31 days.  *See* Ex. F to the Settlement Agreement.  Copies of all the notice documents are attached to this preliminary approval motion; they are clear and concise, and directly apprise Settlement Class Members of all the information they need to know in order to make a claim.

Moreover, on the dedicated Settlement website, Class Members can review the detailed Notice, which provides clear and concise information with respect to all the relevant aspects of the litigation.[9]  Thus, the Notice provides all the information necessary for Class Members to make informed decisions with respect to whether they remain in or opt out of the Settlement Class, or object to the proposed Settlement.  Yanchunis Decl., Ex. 2 ¶ 36.  The Notice Plan has been developed by a notice provider with significant experience in designing notice plans in large and national class actions similar to this one.  Yanchunis Decl., Ex. 2 ¶ 36.

Accordingly, the content and method of dissemination of the proposed Notice fully comports with the requirements of due process and applicable case law.  The Court should approve the proposed Notice and direct that it be distributed as agreed by the parties.

**D.    The Court Should Appoint Plaintiff's Counsel as Class Counsel**

The next step when deciding whether to preliminarily approve a settlement is to appoint Settlement Class Counsel. Indeed, under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P.

---

[9] This includes:  (a) the class definition and statement of claims; (b) the litigation history; (c) the terms of the Settlement Agreement; (d) the binding effect of any judgment approving the Settlement on those who do not opt out; (e) the right to (and procedure for) opting out or back into the Settlement Class; (f) the right to (and procedure for) objecting to the Settlement; (g) who to contact to obtain additional information regarding the Settlement or the litigation; (h) the manner in which compensation will be provided to the Class Representatives to compensate them for their service to the Class; (g) the manner in which Class Counsel will be compensated; and (h) additional information as required and/or suggested by the Court's Procedural Guidance For Class Action Settlements.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

23(g)(1)(B). In making this determination, courts generally consider the following attributes: (1) the proposed class counsel's work in identifying or investigating potential claims, (2) the proposed class counsel's experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) the proposed class counsel's knowledge of the applicable law, and (4) the proposed class counsel's resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

Here, proposed Class Counsel have extensive experience prosecuting class action cases, and specifically data breach cases. *See* Firm Resumes, ECF 98-9, 10, 11.  Accordingly, the Court should appoint John Yanchunis of Morgan & Morgan Complex Litigation Group as Lead Class Counsel, and Marisa Glassman of Morgan & Morgan Complex Litigation Group, and Michael Ram of Robins Kaplan LLP as Class Counsel.

### E.    The Court Should Schedule a Fairness Hearing and Approve the Proposed Preliminary Approval Order

Once the Court has ruled on the motion for preliminary approval, the times for providing notice, opting out of the Settlement Class, and submitting claims will begin to run.  Plaintiff provided an agreed-up schedule in his Motion for Preliminary Approval.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this motion for preliminary approval; provisionally certify the Settlement Class; appoint Andrew Parsons as Class Representative; appoint John Yanchunis as Lead Class Counsel, and Marisa Glassman and Michael Ram as Class Counsel; approve the proposed notice and authorize its dissemination to the Class; appoint Epiq Systems, Inc. to serve as the Claims Administrator; and  adopt the proposed schedule for final approval.

Dated:  December 10, 2018

MORGAN & MORGAN COMPLEX
LITIGATION GROUP

By:  /s/ *John A. Yanchunis*
      John A. Yanchunis *(pro hac vice)*
      Florida Bar No. 324681
      jyanchunis@ForThePeople.com
      Marisa Glassman *(pro hac vice)*
      Florida Bar No. 111991
      mglassman@ForThePeople.com
      MORGAN & MORGAN
      COMPLEX LITIGATION GROUP
      201 N. Franklin Street, 7th Floor
      Tampa, Florida 33602
      Telephone: (813) 223-5505
      Facsimile: (813) 223-5402

      Michael F. Ram, SBN #104805
      Email:  MRam@RobinsKaplan.com
      Susan Brown, SBN #287986
      Email:SBrown@RobinsKaplan.com
      ROBINS KAPLAN, LLP
      2440 W. El Camino Real, Suite 100
      Mountain View, California 94040
      Telephone:  (650) 784-4040
      Facsimile:  (650) 784-4041

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS