ROBINS KAPLAN LLP
Michael F. Ram, SBN #104805
mram@robinskaplan.com
2440 West El Camino Real, Suite 100
Mountain View, California 94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
John A. Yanchunis (admitted *pro hac vice*)
jyanchunis@ForThePeople.com
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

*Attorneys for Plaintiff and Proposed Class*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW PARSONS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KIMPTON HOTEL & RESTAURANT GROUP, LLC<br><br>Defendant. | Case No. 3:16-cv-05387-VC<br><br>PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, COSTS AND EXPENSES |

1

2

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................ 6

II.  HISTORY AND BACKGROUND FACTS.......................................................... 6

III.  ANALYSIS....................................................................................................... 8

A.  As the Prevailing Party, the Plaintiff Class is Entitled to an Award of Attorneys' Fees under California Code of Civil Procedure Section 1021.5 ........................................ 8

  1.  This Action Enforced an "Important Right Affecting the Public Interest."..................... 8

  2.  A Significant Benefit Was Conferred Upon a Large Class of People ............................ 9

  3.  The Necessity and Financial Burden of Private Enforcement Make a Fee Award Appropriate ........................................................................................................... 9

B.  The Court Should Apply a Lodestar Approach Here........................................ 10

C.  A Lodestar Fee Award is Presumptively Reasonable........................................ 11

D.  Class Counsel's Lodestar ......................................................................... 13

E.  Reasonable Rates .................................................................................. 14

F.  The Requested Fee Is Reasonable in Light of the Benefit Provided to the Class............. 15

  1.  Monetary Remedies.............................................................................. 15

  2.  Injunctive Relief ................................................................................. 19

G.  The reasonableness of the Plaintiff's requested fee award is confirmed by recent case law. 21

H.  The Requested Expenses and Costs Are Fully Documented, Necessarily Incurred and Reasonable. ............................................................................................... 24

I.  Service Award......................................................................................... 25

IV.  CONCLUSION................................................................................................ 26

Case No. 3:16-cv-05387-VC

1

# TABLE OF AUTHORITIES

**Page(s)**

2

**Cases**

3

*Baggett v. Gates*

4
　　32 Cal. 3d 128 ................................................................................................................ 8

5

*Ballen v. City of Redmond*

6
　　466 F.3d 736 ................................................................................................................ 13

7

*Beasley v. Wells Fargo Bank* ................................................................................... 7, 8, 9

8

*Blum v. Stenson*
　　465 U.S. 886 ................................................................................................................ 10

9

*Bobbie Pacheco Dyer and Patricia Stallworth v. Wells Fargo Bank, N.A.,*

10
　　No. C13-2858 (N.D. Cal.) .......................................................................................... 14

11

*Camacho v. Bridgeport Fin., Inc.,*

12
　　523 F.3d 973 ................................................................................................................ 13

13

*Cunningham v. Cnty. of L.A.,*

14
　　879 F.2d 481 ................................................................................................................ 10

*Daniel Finerman and Donna Devino v. Marriott Ownership Resorts, Inc. et al.,*

15
　　No. 3:14-cv-1154-J-32 MCR (M.D. Fla.) ................................................................... 14

16

*Fischel v. Equitable Life Assur. Soc'y of U.S.,*

17
　　307 F.3d 997 ................................................................................................................ 10

18

*Fowler v Wells Fargo,*

19
　　4:17-cv-02092-HSG ............................................................................................. 12, 14

20

*Friends of "B" Street v. City of Hayward,*
　　106 Cal. App. 3d 988 ................................................................................................... 9

21

*Friends of the Trails v. Blasius,*

22
　　78 Cal. App. 4th 810 ................................................................................................... 8

23

*Garner v. State Farm Mut. Auto. Ins. Co., No.*

24
　　CV 08 1365, (2010) ..................................................................................................... 25

25

*Gonzales v. City of Maywood,*

26
　　729 F.3d 1196 .............................................................................................................. 10

27

*Graciano v. Robinson Ford Sales, Inc.,*
　　144 Cal. App. 4th 145 ....................................................................................... 21, 22, 23

*Grove v. Wells Fargo Fin., Inc.*,
    606 F.3d 577 (2010) ........................................................................... 23

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 .................................................................. 9, 10, 11, 12

*Hensley v. Eckerhart*,
    461 U.S. 424 .......................................................................................... 11

*In re Anthem, Inc. Data Breach Litig.*,
    15-MD-02617-LHK ................................................................................ 17

*In re Bluetooth Headset Prods. Liab. Litig.*
    654 F.3d 935 .......................................................................................... 22

*In re Target Corp. Customer Data Security Breach Litig.*,
    No. 14-2522 (PAM/JJK) ....................................................................... 17

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*,
    No. 1:14-MD-02583-TWT ............................................................. 17, 18

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F. 3d 1291 ........................................................................................... 9

*In re Yahoo Mail Litig.*,
    No. 13-CV-4980 (2016) ........................................................................ 24

*Ketchum v. Moses*,
    24 Cal. 4th 1122 .................................................................................... 11

*McCown v. City of Fontana*,
    565 F.3d 1097 ......................................................................................... 11

*National Info. Servs., Inc. v. TRW, Inc.*
    51 F.3d 1470 (1995) .............................................................................. 23

*Press v. Lucky Stores*,
    34 Cal.3d 311 ........................................................................................... 8

*Prison Legal News v. Schwarzenegger*
    608 F.3d 446 ........................................................................................... 13

*Radcliffe v. Experian Info. Solutions*,
    715 F.3d 1157 (2013) ............................................................................ 25

*Stanley v. Univ. of S. Cal.*
    178 F.3d 1069, (1999) ........................................................................... 23

*Staton v. Boeing Co.*
   327 F.3d 938 ............................................................................................................ 22

*Thalheimer v. City of San Diego*
   2012 U.S. Dist. LEXIS 59315 (2012)....................................................................... 23

*Vizcaino v. Microsoft Corp.*
   290 F.3d 1043 ..................................................................................................... 11, 14

*Warren v. Kia Motors America, Inc.*, 30 Cal. App. 5th 24
   (2018)......................................................................................................... 20, 21, 23

*Woodland Hills Residents Assn., Inc. v. City Council*
   23 Cal. 3d 917 .......................................................................................................... 8

**Statutes**
Automobile Sales Finance Act (ASFA, § 2981 *et seq.*) ............................................ 21
Cal. Civ. Proc. § 1021.5(c) ........................................................................................... 9
California Code of Civil Procedure Section 1021.5 ............................................. 7, 8, 9
Consumers Legal Remedies Act (CLRA,§ 1750 *et seq.*) ........................................... 21
Federal Rule of Civil Procedure 54(d)....................................................................... 23

**Other Authorities**
N.D. Cal. Procedural Guidance for Class Action Settlements, 1(d) ..................... 18, 25

Case No. 3:16-cv-05387-VC

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on June 20, 2019 at 10:00 a.m., the undersigned will appear before the Honorable Judge Vince Chhabria in Courtroom 4 of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, and shall then and there present Plaintiff's Motion for Attorneys' Fees, Costs and Expenses.

Plaintiff respectfully requests the Court to approve Class Counsel's requested attorneys' fees, costs and expenses and requested service award. This Motion is based on this Notice and Motion for Attorneys' Fees, Costs and Expenses, the Declaration of John A. Yanchunis, the Declaration of Michael F. Ram in Support of Motion For Final Approval and For Attorneys' Fees and Expenses; the Declaration of Matt J. Malone in Support of Motion For Final Approval and For Attorneys' Fees, Costs and Expenses, as well as all records and papers on file in this action, any oral argument, and any other evidence that the Court may consider in hearing this Motion.

## I.   INTRODUCTION

After years of hard-fought litigation, the parties reached a settlement that provides Plaintiff and the class with a recovery, which compares favorably to what class members could recover if successful at trial. In light of the relief they obtained, Class Counsel's request for $800,000 in attorneys' fees, costs and expenses is reasonable and appropriate. In fact, despite working on a contingency basis and risking a considerable amount of time and expense prosecuting this case, which was litigated vigorously by defendant, the amount of attorneys' fees sought by Class Counsel is substantially less than their lodestar amount. For these reasons, and those that follow, the Court should approve Class Counsel's request for fees, costs and expenses, as well as the service award for the named Plaintiff.

## II.   HISTORY AND BACKGROUND FACTS

The case history and background facts will be set out in Plaintiff's motion for final

1   approval of the proposed settlement.  Additional facts regarding Class Counsel's attorneys' fees

2   are set forth in the next few paragraphs.

3          After reaching agreement on benefits to Settlement Class Members, the parties separately

4   negotiated Plaintiff's counsel's claims for attorney fees, costs and expenses. Declaration of John

5   A. Yanchunis (Yanchunis Decl.) ¶ 10.  Any award of attorneys' fees, reasonable costs and

6   expense sums are to be paid separately from the relief obtained for the Settlement Class and do

7   not affect or reduce the Class benefits in any way. Yanchunis Decl. ¶ 11.

8          Plaintiff's counsel negotiated the attorneys' fees amount based upon the monetary relief

9   provided to the Class, the expense and benefit of the injunctive relief provided by the Settlement,

10   and the substantial hours and expenses incurred, and expected to be incurred in the future, by

11   counsel through the entire course of the litigation, including through administration of the

12   settlement. As explained in the attached Declaration of John Yanchunis, Plaintiff's counsel's

13   current lodestar already well exceeds the requested $800,000.  Yanchunis Decl. ¶ 14; Declaration

14   of Michael Ram (Ram Decl.), ¶ 13; Declaration of Matt J. Malone (Malone Decl.); ¶ 6.  (The

15   total lodestar as of the approximate date of this motion is $1,503,101.90 as set out in more detail

16   in Section D, below.)  Counsel will incur additional lodestar and expenses in implementing the

17   settlement, seeing it through final approval, and defending it on appeal should an appeal be

18   taken. Yanchunis Decl. ¶ 14.

19          As the Court bifurcated the issues of liability and class certification, with liability first,

20   and coupled with the technical complexities inherent in a data breach case, significant time was

21   spent in factual discovery, assisted by Plaintiff's expert. Aside from the filing of a class

22   certification motion, the deposition of experts and any Daubert challenges, the case was close to

23   being ready for trial at the time of settlement. Yanchunis Decl. ¶ 11.  Additionally, Plaintiff's

24   counsel have incurred more than $138,417.76 in litigation expenses, which include filing and

25   court fees, research, travel, postage, printing, fees for cyber security experts and a damage

26   expert, and for mediation. Yanchunis Decl. ¶ 16; Ram Decl. ¶ 14; Malone Decl. ¶ 7.  The billing

27   rates for each firm and total hours expended to date are provided in the attached Declarations of

John A. Yanchunis, Michael F. Ram, and Matt J. Malone.

## III.   ANALYSIS

### A.   As the Prevailing Party, the Plaintiff Class is Entitled to an Award of Attorneys' Fees under California Code of Civil Procedure Section 1021.5.

Section 1021.5 provides for an award of fees to:

> a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any.

Cal. Civ. Proc. Code § 1021.5.

Each of the above elements is satisfied here.

### 1.   This Action Enforced an "Important Right Affecting the Public Interest."

The first inquiry under section 1021.5 is whether the action enforced "an important right affecting the public interest."  California courts have recognized that consumer protection actions such as this one meet the public interest criterion.  In *Beasley v. Wells Fargo Bank,* the court affirmed an award of nearly $2 million in attorneys' fees and expenses.  235 Cal. App. 3d 1407, 1412 (1991).  The case involved Wells Fargo's assessment of fees against credit card customers who failed to make timely payments or exceeded their credit limits.  *Id.*  The court observed:

> The present action to recover excessive fee assessments on behalf of hundreds of thousands of Wells Fargo customers, on the ground the fees were not valid as liquidated damages [citation] is appropriately characterized as a consumer protection action.  [Citations.]  Such actions have long been judicially recognized to be vital to the public interest.  (*E.g., Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 808, [parallel citations omitted].)  Accordingly, there was an important public interest at stake in this action.

*Id.* at 1418. This case is likewise a "consumer protection" action.  The California Legislature has also passed laws recognizing the need to ensure the protection of consumer's privacy.  This litigation will serve the public interest and the protection of privacy by enforcing the unfair

competition law and motivating other companies to safeguard customers' data.

### 2. A Significant Benefit Was Conferred Upon a Large Class of People.

Section 1021.5 also requires that a significant benefit be conferred upon the general public. That requirement, too, is met here. "The significant benefit criterion calls for an examination whether the litigation has had a beneficial impact on the public as a whole or on a group of private parties which is sufficiently large to justify a fee award." *Beasley*, 235 Cal. App. 3d at 1417.

The cases have liberally interpreted the "significant benefit" requirement. *See*, *e.g., id.,* at 1418 ("significant benefit" requirement indisputably established "by virtue of the huge size of the class"); *Friends of the Trails v. Blasius*, 78 Cal. App. 4th 810, 834-35 (2000) (litigation vindicating access to a 240-foot stretch of an irrigation ditch conferred significant benefit upon public because "a chain is only as strong as its weakest link" and "the benefit of maintaining public access to a trail segment is, obviously, far more than the mere segment viewed in isolation"); *Press v. Lucky Stores,* 34 Cal.3d 311, 321 (1983) (even if the impact of plaintiffs' lawsuit was limited to access gained for petitioners at one store, it would still have benefitted a large class of people). Here, Plaintiff conferred a significant benefit on a large class of persons in the form of a direct monetary and non-monetary benefits designed to protect consumer privacy, plus indirect benefits for others in the form of deterrence against similar unlawful conduct.

### 3. The Necessity and Financial Burden of Private Enforcement Make a Fee Award Appropriate.

The general rule is that "the financial burden criterion of section 1021.5 is satisfied when the cost of litigation is disproportionate to the plaintiff's 'individual' stake in the matter." *Beasley*, 235 Cal. App. 3d at 1414 (*citing Baggett v. Gates,* 32 Cal. 3d 128, 142 (1982); *Woodland Hills Residents Assn., Inc. v. City Council* 23 Cal. 3d 917, 941 (1979); *Friends of "B" Street v. City of Hayward*, 106 Cal. App. 3d 988, 994 (1980)). In a class action, however, it is appropriate to consider "the estimated value of the case at the time the vital litigation decisions were being made. [Citation.]" *Id.* The court continued:

> In other words, the inquiry looks forward from the outset of counsel's vital litigation decisions, rather than backward after judgment. This is because the purpose of section 1021.5 is to encourage public interest litigation by offering the 'bounty' of a court-ordered fee [citation], and the focus of that incentive is on the point in time when vital litigation decisions are being considered.

*Id.* In general, the *Beasley* court found that a section 1021.5 fee award is "appropriate unless estimated value exceeds by a substantial margin the actual litigation costs." *Id.* at 1415. "In other words, unless the estimated value of the case was sufficient to absorb actual litigation costs and still provide an incentive to litigate, fees may be awarded under section 1021.5." *Id.*

Here, looking forward from the beginning of the case, the estimated common fund did not substantially exceed actual litigation costs. In accordance with the purpose of providing for fee awards as an incentive "to encourage public interest litigation," an award of attorneys' fees here is appropriate. Section 1021.5 supports the separate award of attorneys' fees requested here because "the fees should not in the interest of justice be paid out of the recovery, if any." Cal. Civ. Proc. § 1021.5(c).

**B.    The Court Should Apply a Lodestar Approach Here.**

The Ninth Circuit recognizes two methods for determining attorneys' fees: the percentage of the fund method and the lodestar method. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998). Where a settlement results in a "common fund," a district court has discretion to choose either method when calculating class counsel attorneys' fees. *Id.* (citing *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F. 3d 1291, 1295-96 (9th Cir. 1994)). The percentage method is appropriate where the amount of the common fund is known and the court can award a percentage of the fund—25% is a common benchmark—as reasonable attorneys' fees. *Id.* However, the lodestar method is appropriate in class actions where the relief obtained is not easily monetized, but attorneys' fees are justified by fee shifting statutes. *See Hanlon*, 150 F.3d at 1029 (attorneys' fees approved where no class member was entitled to cash recovery, making valuation of the settlement agreement more difficult).

In this case, as in *Hanlon*, an evaluation of attorneys' fees as "a straight percentage recovery" is not possible because there is "uncertainty as to the valuation of the settlement" Here

1   the settlement provides not only monetary relief , but also  significant injunctive relief designed

2   to ensure the protection of the privacy interests of the class which is not easily evaluated .

3   Significantly, the fee award sought by Class Counsel will be paid directly by Kimpton and will

4   not reduce the funds available to the Class.  Further, the costs of notice and settlement

5   administration have been borne by Kimpton.  The fee award sought by Class Counsel is entirely

6   distinct from the settlement's potential total cost to Kimpton; it is the result of arms-length

7   negotiations with the assistance of a neutral mediator, Bruce Friedman of JAMS.

8   **C.      A Lodestar Fee Award is Presumptively Reasonable.**

9           Class Counsel requests a fee award by application of the lodestar method—a calculation

10   of the value of Class Counsel's time expended to accomplish the relief obtained on behalf of the

11   nationwide Class--which provides a presumptively reasonable fee. *See Fischel v. Equitable Life*

12   *Assur. Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002) ("There is a strong presumption that the

13   lodestar figure represents a reasonable fee."); *Hanlon*, 150 F.3d at 1029 ("[C]ourts often use a

14   lodestar calculation because there is no way to gauge the net value of the settlement or any

15   percentage thereof."); *Cunningham v. Cnty. of L.A.*, 879 F.2d 481, 484 (9th Cir. 1988) (noting

16   that the lodestar method produces a "presumptively reasonable lodestar fee"). "The lodestar

17   calculation begins with the multiplication of the number of hours reasonably expended by a

18   reasonable hourly rate." *Hanlon*, 150 F.3d at 1029 (citing *Blum v. Stenson*, 465 U.S. 886, 897

19   (1984)). The reasonable hourly rate is the prevailing market rate in the geographic community,

20   taking into consideration "the experience, skill, and reputation of the attorney" in question.

21   *Gonzales v. City of Maywood*, 729 F.3d 1196, 1205 - 06 (9th Cir. 2013).

22           "The resulting figure may be adjusted upward or downward to account for several factors

23   including the quality of the representation, the benefit obtained for the class, the complexity and

24   novelty of the issues presented, and the risk of nonpayment." *Hanlon*, 150 F.3d at 1029. "The

25   reasonableness of the fee is determined primarily by reference to the level of success achieved by

26   the plaintiff[s]." *McCown v. City of Fontana*, 565 F.3d 1097, 1101-02 (9th Cir. 2009) (citing

27   *Hensley v. Eckerhart*, 461 U.S. 424, 436, 103 S. Ct. 1933 (1983)). Multipliers ranging from one

to four are frequently awarded in cases when the lodestar method is applied. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n. 6 (9th Cir. 2002); *see also Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001) (lodestar figure may be increased or decreased depending on a variety of factors, including the contingent nature of the fee award).

The California Supreme Court has explained:

> A contingent fee must be higher than a fee for the same legal services paid as they are performed.  . . .  A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases.

*Ketchum v. Moses*, 24 Cal. 4th 1122 1132 – 33 (2001) (internal quotations and citations omitted). The attorneys' fee award in this case stands up when evaluated using the factors set forth in *Vizcaino*, 290 F.3d at 1048-50:

(a)  Class Counsel's procurement of relief is a good result for a nationwide class;

(b)  Class Counsel took on considerable risk to litigate against a well-financed Defendant with facially valid defenses; and

(c)  Class Counsel devoted considerable time to the litigation and settlement.

This case was prosecuted on behalf of the Plaintiff Class by three law firms who have extensive class action experience, including significant experience with data breach cases and specific expertise with respect to the subject matter of this litigation.  In this litigation, Class Counsel overcame motions to dismiss involving numerous difficult questions of law and Kimpton's claim that it took reasonable measures to safeguard class members' data. To demonstrate the contrary, Class Counsel worked diligently through discovery and motion practice to obtain a result which reasonably compensates Kimpton customers who were damaged by the data breach.  Discovery here entailed the review of over 100,000 pages of documents and 17 depositions of fact witness and forensic experts.  Class Counsel retained highly regarded cyber security and damage experts who assisted in the development of the case. Class Counsel also negotiated against a difficult defendant to secure relief for a nationwide class. As the record before this Court demonstrates, discovery was extensive and few cases in this area exceeded the

discovery taken here.

Having attained a good result, Class Counsel have also diligently guided the details of the proposed settlement, including nationwide notice and class administration plans. Counsel spent significant time and money on this matter to the exclusion of other matters. The case was risky and complex, and undertaken on a contingent basis. Class Counsel have succeeded both in securing a remedy that compensates those who suffered monetary damages, and by forgoing the delay of trial and its inherent risks of non-recovery on behalf of the proposed nationwide settlement class.  As of approximately May 7, 2019, Class Counsel, have expended a total of 2,543.45 hours on this matter. At current hourly rates, which reflect the prevailing consumer class action rates in California, *see Fowler v Wells Fargo*, 4:17-cv-02092-HSG , Doc. 94, counsel's lodestar amounts to $1,503,101.90.

Moreover, the fee award should also take into account and reflect the future services that Class Counsel must provide. *See Hanlon*, 150 F.3d at 1029 (awarding fees which included compensation for future services). Class Counsel cannot entirely predict the amount of work to be performed post-settlement, nor the time yet to be spent obtaining final approval of the settlement in this Court and possibly on appeal. Class Counsel's award, however, is fairly considered in light of the reasonableness of the reduced lodestar Class Counsel agreed to in order to assure the settlement is effectuated in full for the benefit of class members both after and apart from the Class benefit.

### D.     Class Counsel's Lodestar

This motion seeks compensation for Class Counsel who worked diligently against strenuous opposition to secure an excellent settlement for the Class in this technically difficult case. Class Counsel's actual lodestar in prosecuting this case is much higher than the fee portion of the settlement. Class Counsel's actual lodestar is as follows:

Morgan & Morgan, LLPO: $892,907.40.  Yanchunis Decl., ¶ 14.

Robins Kaplan, LLP: $313,631.00. Ram Decl., ¶ 13

ROCK Law, LLP: $296,563.50.  Malone Decl., ¶ 6.

TOTAL $1,503,101.90

Class Counsel also incurred the following reasonable and necessary expenses in the prosecution of this action:

Morgan & Morgan: $110,283.70.  Yanchunis Decl., ¶ 16.

Robins Kaplan: $14,078.45.  Ram Decl., ¶ 13.

ROCK LAW:  $14,055.61. Malone Decl., ¶ 7.

TOTAL:  $138,417.76

Class Counsel believe that the benefit to the Class supports a reasonable $800,000 fee and expense award. This award would include incurred expenses in the amount of $138,417.76. After a subtraction of expenses, the fee award of $ 661,582.24 represents a "negative" multiplier of 0.44 based upon Class Counsel's lodestar. See Section G, below.  This request for attorneys' fees and expenses is founded on a lodestar analysis that gives due consideration to the difficulty of this case, the results that Class Counsel have achieved, and the work yet to be done.

### E.    Reasonable Rates

In addition to computing a reasonable number of hours, the district court must determine a reasonable hourly rate for the attorneys working on the case. *Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006). The prevailing market rates in the relevant community determine the reasonable hourly rate for purposes of lodestar calculation.  *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010)   "Generally, . . . the relevant community is the forum in which the District court sits." *Id.* at 454-55 (quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir 2008)). Here, Class Counsel's rates are reasonable. Yanchunis Decl., ¶ 12; Ram Decl., ¶ 6; Malone Decl., ¶ 4. They are consistent with the rates approved for these very attorneys by other courts in this district. Notably, the rates sought by Class Counsel are virtually identical to those recently approved by Judge Gilliam in *Fowler v. Wells Fargo,* No. 4:17-cv-02092-HSG (N.D. Cal.)  (Ram Dec., ¶ 6) and those approved by judges in other prior litigation.  Yanchunis Decl., ¶ 12 (referencing *Bobbie Pacheco Dyer and Patricia Stallworth v. Wells Fargo Bank, N.A.,* No. C13-2858 (N.D. Cal.); *Daniel Finerman and Donna Devino v.*

*Marriott Ownership Resorts, Inc. et al.,* No. 3:14-cv-1154-J-32 MCR (M.D. Fla.)).  Under the circumstances of this case, a "negative" or reduced multiplier of 0.44 applied to Class Counsel's lodestar shows that the fees sought are extremely reasonable. *See, e.g., Vizcaino*, 290 F.3d at 1051 (affirming a 3.65 multiplier of the lodestar).

**F.     The Requested Fee Is Reasonable in Light of the Benefit Provided to the Class**

**1.     Monetary Remedies**

Under the Settlement, subject to its terms and conditions and subject to Court approval, Settlement Class Members are eligible to receive reimbursement of up to $250 (in total) for the following categories of out-pocket expenses resulting from the Security Incident:

(i)     Unreimbursed bank fees;

(ii)    Unreimbursed card reissuance fees;

(iii)   Unreimbursed overdraft fees;

(iv)    Unreimbursed charges related to unavailability of funds;

(v)     Unreimbursed late fees;

(vi)    Unreimbursed over-limit fees;

(vii)   Long distance telephone charges;

(viii)  Cell minutes (if charged by minute), Internet usage charges (if charged by the minute or by the amount of data usage and incurred solely as a result of the Security Incident), and text messages (if charged by the message and incurred solely as a result of the Security Incident);

(ix)    Unreimbursed charges from banks or credit card companies;

(x)     Postage;

(xi)    Interest on payday loans due to card cancelation or due to over-limit situation;

(xii)   Up to five hours of lost time spent dealing with replacement card issues or in reversing fraudulent charges or otherwise dealing with the Security Incident (calculated at the rate of $25.00 per hour), but only if at least one full hour was spent;

(xiii)   An additional $15 payment for each credit or debit card on which document fraudulent charges were incurred that were later reimbursed, to compensate the claimant for lost time associated with seeking reimbursement for the fraud, but no documentation will be required for this benefit;

(xiv)   Costs of credit report(s) purchased by Settlement Class Members between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident); and

(xv)   Costs of credit monitoring and identity theft protection (not to exceed $80.00) purchased by Settlement Class Members between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident and not for other purposes, and with proof of purchase).

SA, Ex. 1 ¶ 2.1.

As explained in Epiq's supplemental declaration in support of preliminary approval, in a recent payment card data breach that included similar claim categories and capped total recovery for those claim categories of $250 per Class Member, the average claim submitted was for an amount of $49.00.  *See* Supplemental Epiq Declaration, Ex. 5, ECF 98-14, ¶ 20.

In their amended agreement, the parties agreed to increase the number of hours for which an injured class member may seek reimbursement from three to five.  The parties have also agreed to increase the hourly rate for compensation from $15 to $25.  SA, Ex. 1 ¶ 2.1.  The settlement provides fair compensation for class members' lost time: the hourly rate of compensation offered to class members matches the average national hourly earnings in the United States for the relevant time period, and exceeds the current minimum wage for the state of California.  Ram Decl., ¶ 8. The total number of hours for which a class member may claim compensation matches the average time required for consumers to rectify an identity theft.  *Id.*

Class Members who had other extraordinary unreimbursed out-of-pocket monetary losses because of the Security Incident, including alleged unreimbursed fraudulent charges, are eligible to make a claim for reimbursement of up to $10,000.00.  SA, Ex. 1 ¶ 2.2.  The qualifications for a class member to recover more than $250 under the "extraordinary unreimbursed out-of-pocket monetary losses" are:

(a) it is an actual, documented, and unreimbursed monetary loss;

(b) was more likely than not caused by the Security Incident;

(c) occurred during the time period from February 1, 2016 through and including the end of the applicable claims period (see ¶ 2.2.2, infra);

(d) is not already covered by one or more of the categories in ¶ 2.1, and

(e) the claimant made reasonable efforts to avoid or seek reimbursement for the loss including but not limited to exhaustion of all available credit monitoring insurance and identity theft insurance as required under ¶ 2.2.1.  Settlement Class Members with claims under this paragraph may also submit claims for benefits under ¶ 2.1."

SA, Ex. 1 ¶ 2.2.  .

Given the thorough and comprehensive claims categories and significant relief provided to class members in paragraph 2.1 of the Settlement Agreement, and the expected number of Settlement Class Members who have other unreimbursed out-of-pocket monetary losses as a result of the Security Incident, Plaintiff anticipates a limited number of Settlement Class Members to submit a claim for extraordinary unreimbursed out-of-pocket monetary losses. Indeed, as explained in Epiq's supplemental declaration in support of preliminary approval, in a recent payment card data breach that included similar claim categories, only 6 of the approximate 1430 submitted claims exceeded the $250 maximum.  Thus, while Plaintiff does not anticipate many claims for this category, it is important that Settlement Class Members who have incurred these out-of-pocket losses have an opportunity to recover and be reimbursed.

The aggregate amount of claims reimbursement for which Kimpton shall be responsible to pay is capped at $600,000.  If the total valid claims exceed the $600,000 cap, each individual amount shall be reduced pro rata so that the aggregate claims reimbursement is exactly $600,000. SA, Ex. 1 ¶ 2.4. Here, the Settlement includes a claims process to permit Settlement Class Members to recover for multiple categories of claims. Due to the nature and types of harm Settlement Class Members experienced as a result because of the Security Incident, Plaintiff sought a robust and comprehensive settlement that would allow Settlement Class Members to recover the maximum amount for their claims. See Standing Order for Civil Cases before Judge Vince Chhabria, §32. As discussed in detail below, the claims process provides Settlement Class Members the opportunity to submit a claim for numerous categories that they might not

Case No. 3:16-cv-05387-VC

otherwise consider or on their own select. See SA, Exh. 1, ¶ 2.1. See also infra at Sections III(C), (D).

Plaintiff negotiated the settlement with the anticipation that $600,000 should be more than adequate to provide all claimants with the full amount they are entitled to recover and this. This amount also compares favorably with the amounts in other payment data breach cases settlements because, here, the amount of this Settlement is approximately $1.00 per card. In contrast, in other payment card data breach cases the average per card amount was significantly below $1.00 per card. *See, e.g, In re the Home Depot, Inc., Customer Data Sec. Breach Litig*., No. 1:14-MD-02583-TWT, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (approving $13 million fund, maximum of $10,000 in expense reimbursement, documented time of 5 hours at $15/hour and up to 2 hours of self-certified time only if had also documented losses with class size of 40 million consumers); *In re Target Corp. Customer Data Security Breach Litig.*, No. 14-2522 (PAM/JJK), 2015 WL 7253765, at *1 (D. Minn. Nov. 17, 2015) (approving settlement that provided $10 million to pay for losses and time spent as a result of Target data breach, and injunctive relief with class size of 100 million consumers)  Additionally, taking the example of a recent payment card data breach settlement providing substantially similar relief, the approximate claims rate was .3% and the average award amount per claim was $49.00.  Here, using those figures, $600,000 is more than adequate to cover the anticipated claims.

Out-of-pocket costs claims-rates in large, consumer data breach cases consistently track at from below one percent to three percent.  *See, e.g., In re Anthem, Inc. Data Breach Litig.*, 15-MD-02617-LHK, 2018 WL 3872788, at *13 (N.D. Cal. Aug. 15, 2018) (noting a 1.8% claims rate for the Anthem class, and "claims rates of approximately 0.2% and 0.23% in the *In re Home Depot and In re Target data-breach actions*"); *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 1:14-MD-02583-TWT, ECF No. 245-1 (N.D. Ga.) (noting submission of 127,527 claims for a class of approximately 40,000,000 individuals, a rate of .31%). These exemplar cases involved large, highly publicized consumer data breach cases, with tens of millions of class members—quite the contrast to the smaller, more intimate class involved in this

case. These claims rates provide further support that the settlement amount of $600,000 will sufficiently cover the claims of class members.

Unused funds will not be redistributed to class members who claim their share nor do unused funds go to cy pres.  See Standing Order for Civil Cases before Judge Vince Chhabria, §32; See N.D. Cal. Procedural Guidance for Class Action Settlements, 8. This is because the goal of this settlement is to provide Settlement Class Members with unreimbursed out-of-pocket expenses and documented lost time that resulted from the Security Incident. Plaintiff believes that the Settlement will accomplish this goal and therefore Plaintiff did not seek additional monetary relief beyond what Settlement Class Members can recover through the claims process. The monetary relief provided under the terms of the settlement most likely exceeds the potential recovery if Plaintiff were to prevail on each of his claims.  See N.D. Cal. Procedural Guidance for Class Action Settlements, 1(d). Reimbursement for out-of-pocket losses for the fifteen categories detailed above exceeds what would otherwise be available remedies if the Settlement is not approved. For example, under the terms of the Settlement, Class Members may recover for the cost of credit monitoring, up to $80 and purchased anytime between February 1, 2016 and the Claims Deadline. Similarly, in addition to time spent dealing with the Security Incident, Class Members can receive an additional $15 payment for each credit or debit card that incurred fraudulent charges that were reimbursed. Without a Settlement, these remedies would not likely be available to Class Members. Given the size of the Class and the amount of monetary relief available to the Class, Plaintiff does not anticipate concerns about the allocation of the settlement fund among Class Members. See N.D. Cal. Procedural Guidance for Class Action Settlements, 1(e).

### 2. Injunctive Relief

Class benefits from this Settlement Agreement are not merely monetary; they also include robust injunctive relief designed to minimize the risk of future data breaches and protect consumer data going forward.  As part of the Settlement Agreement, Kimpton will adopt and implement, at a minimum, the following data security measures for three years from the

execution of the Settlement Agreement:

1)   Information Security Position.  Kimpton will designate a position that is specifically responsible for overseeing information security compliance at Kimpton Hotel & Restaurant Group, LLC.

2)   Annual PCI DSS Audits & Penetration Testing.  Kimpton will hire a third-party Qualified Security Assessor to conduct an annual assessment of Kimpton's compliance with PCI DSS and hire a penetration testing company to conduct an annual penetration test of Kimpton Hotel & Restaurant Group, LLC's cardholder data environment.  Qualified Security Assessor means an independent security organization that has been qualified by the PCI Security Standards Council to assess an entity's adherence to PCI DSS.  Penetration test means a manual process that complies with the standards set forth by PCI DSS for penetration testing.

3)   Annual Security Awareness Program.  Kimpton will provide annual security awareness training for its employees, which will include education and training regarding payment card data security and payment card data security best practices.

4)   Payment Card Acceptance Technology.  With respect to all consumer card present payment transactions where a physical payment card is used at a Kimpton hotel front desk or restaurant, Kimpton will: (1) implement a solution that encrypts payment card data when it is read by the card acceptance device and routes the authorization message out to the payment card networks without the authorization message data being unencrypted on devices owned and managed by Kimpton ("Encryption Solution"); and (2) install card acceptance devices and payment applications that support acceptance of EMV enabled payment cards (the "EMV Solution").  Kimpton will implement the Encryption Solution and EMV Solution by June 31, 2019 for card present transactions that occur at the front desk of its hotels.  Kimpton will implement the Encryption Solution and EMV Solution for card present transaction that occur in its restaurants by January 2020.

5)   Senior Leadership reporting.  Kimpton will report to its executive team about its cybersecurity efforts.

SA, Ex. 1 ¶¶ 3.1-3.5.

The injunctive relief provisions included in the Settlement Agreement materially enhance the value of this Settlement and represent significant improvements by Kimpton to its data security.  For example, though the parties disputed whether Kimpton had been PCI-compliant (that is, compliant with the Payment Card Industry Data Security Standards [PCI-DSS]), this settlement includes regular PCI-DSS compliance auditing.  In addition, the improvements to Kimpton's payment card acceptance technology represent a significant financial investment by

1   Kimpton and further add to the relief Class Members would receive as because of this

2   Settlement.

3          Thus, the meaningful benefit to Class Members through this settlement is not merely

4   monetary. By including these security enhancements in addition to monetary relief, the

5   Settlement Agreement provides renewed confidence that Kimpton systems will prospectively

6   protect consumer data.

7          **G.     The reasonableness of the Plaintiff's requested fee award is confirmed by**
           **recent case law.**

8

9          The reasonableness of the fee award requested by Plaintiff's Counsel (which, as noted

10  above, includes a 0.44 negative multiplier) is confirmed by the recent decision on *Warren v. Kia*

11  *Motors America, Inc.*, 30 Cal. App. 5th 24, 37-41 (2018).  In Warren, a jury awarded the plaintiff

12  $17,455.57 in damages pursuant to the Song-Beverly Consumer Warranty Act.  *Id.* at 31.  In the

13  trial court, Warren had requested $526,582.89 in attorney fees ($351,055.26 in lodestar fees,

14  times a multiplier of 1.5) and $40,151.11 in costs and expenses.  *Id.* at 31.  The court applied a

15  negative multiplier of 33 percent (33%) to the lodestar figure of $351,055.26 justifying the

16  reduction on the basis of the actual recovery to plaintiff. *Id.* at 34 – 35.  The court of appeal held

17  that the trial court abused its discretion in applying a negative multiplier based simply on the

18  damages amount.  *Id.* at 37.

19         [I]t is <u>inappropriate</u> and an abuse of a trial court's discretion <u>to tie an attorney fee</u>
           <u>award to the amount of the prevailing buyer/plaintiff's damages or recovery</u> in a

20         Song-Beverly Act action, <u>or pursuant to another consumer protection statute with</u>
           <u>a mandatory fee-shifting provision</u>.  *Graciano* [*v. Robinson Ford Sales, Inc.*, 144

21         Cal. App. 4th 140, 164 (2006).] Thus, when a trial court applies a substantial
           negative multiplier to a presumptively accurate lodestar attorney fee amount, the

22         court must clearly explain its case-specific reasons for the percentage reduction.
           Kerkeles [v. City of San Jose 243 Cal. App. 4th 88, 102—4 (2015).]  <u>If, as</u>

23         <u>occurred here, the reasons for the reduction include tying the fee award to some</u>
           <u>proportion of the buyer's damages recovery, the court abuses its discretion</u>.

24

25  *Id.* (emphasis added)(citations omitted).

26         The case of *Graciano v. Robinson Ford Sales, Inc.* also discusses the application of a

27  proportionality rule, which is the practice of tying an attorney fee award to the damages or

PLAINTIFF'S MOTION FOR ATTORNEY'S FEES,                    Case No. 3:16-cv-05387-VC
COSTS AND EXPENSES

settlement recovery.  144 Cal. App. 4th at 145.  The plaintiff, Graciano, was awarded

substantially reduced attorney fees under two consumer protection statutes with mandatory fee-

shifting clauses—the Automobile Sales Finance Act (ASFA, § 2981 *et seq.*) and the Consumers

Legal Remedies Act (CLRA,§ 1750 *et seq.*).  *Id.* at 145.  Graciano appealed, arguing that the trial

court erroneously "cap[ped]" her attorney fee award to a percentage of her settlement recovery,

and the *Graciano* court agreed.  *Id*. at 145, 161–64.

A jury found that the defendant had violated both ASFA and CLRA, awarding Graciano

$11,191.40 and finding the defendant violated the CLRA by engaging in conduct with malice,

oppression, and fraud for purposes of punitive damages. *Id.* at 147. However, the parties settled

the case before the jury began deliberating the punitive damages claim for an agreed payment of

$45,000 to Graciano and an agreement that she would seek attorneys' fee and costs by motion.

*Id.*  Graciano then sought $249,365.36 in attorney fees and costs based on lodestar fees of

$109,468.50, times a multiplier of 2.0 due to the contingent nature of her attorneys'

representation, the delay in paying her attorneys, the results achieved, and the complexity of the

issues.  *Id.*  The trial court reduced the hourly rates of Graciano's three attorneys to a blended rate

of $250, less than their requested hourly rates. *Id.* at 148.   Next, the trial court applied several

multipliers, positive and negative, which resulted in the final application of a 0.3 multiplier.  *Id.*

at 162. The trial court found that the resulting $27,570 fee award was "within the market place

range of fees" noting that the settlement was for $45,000 plus any attorney fees the court might

award, and contingency fee agreements commonly required the plaintiff to pay approximately 40

percent of the recovery. *Id.*  Thus, if $45,000 represented Graciano's 60 percent portion of the

total settlement, then 40 percent of the settlement would be $30,000 ($75,000 times 0.40 equals

$30,000; $75,000 times 0.60 equals $45,000) and the fee award was reasonable.  *Id.*

The *Graciano* court found two problems with the trial court's fee. First, the trial court's

reduction of the attorneys' requested hourly rates to $250 was an abuse of the trial court's

discretion because the requested hourly rates were well within the range of the relevant

geographic and practice area.  *Id.* at 154. Second, the *Graciano* court found that the application

1    of the 0.30 negative multiplier to the adjusted lodestar fees of $91,900 was improper, because the

2    trial court's goal was not achieve a 40 percent contingency fee of Graciano's settlement recovery.

3    *Id.* at 148, 161–64. The court explained that, "because this matter involve[d] an individual

4    plaintiff suing under consumer protection statutes involving mandatory fee-shifting provisions,

5    the legislative policies are in favor of Graciano's recovery of all attorney fees reasonably

6    expended, without limiting the fees to a proportion of her actual recovery." *Id.* at 164.

7         In its September 13 Order, the Court cited two Ninth Circuit cases to suggest that the

8    Plaintiffs' anticipated $800,000 request was unjustified on the current record given the low

9    expected participation rate in the settlement and the $600,000 fund for claims. Ord. 2 (citing *In

10   re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947-49 (9th Cir. 2011); *Staton v. Boeing

11   Co.*, 327 F.3d 938, 964 (9th Cir. 2003)).  Both *In re Bluetooth* and *Staton*, however, involved

12   appeals following the final approval of settlement agreements where the appellate courts were

13   concerned about the factual findings the district court had made in connection with finally

14   approving the fee awards.  *In re Bluetooth*, 654 F.3d at 943 (stating that the district court "made

15   (1) no explicit calculation of a reasonable lodestar amount; (2) no comparison between the

16   settlement's attorneys' fees award and the benefit to the class or degree of success in the

17   litigation; and (3) no comparison between the lodestar amount and a reasonable percentage

18   award"); *Staton*, 327 F.3d at 966 ("no lodestar-based scrutiny of the fees awarded class counsel

19   in the settlement agreement ever took place").

20        Here, however, while at this point here the claims rate and total payout are unknown,

21   particularly in light of the other changes the parties have made to the agreement in response to

22   the Court's concerns, the value of the injunctive relief as well as the significant public benefit

23   and important public interest of enforcing the unfair competition law and motivating other

24   companies to safeguard customers' data support the requested attorney fee award. To date, Epiq

25   has reported receiving a total of 753 claims, only one opt-out, and almost 215,000 hits on the

26   settlement web page.  With the claim filing deadline not until August 22, 2019, plaintiff's

27   counsel is hopeful that many more claims will be received.  However, even if the claims rate for

the data breach case ends up being lower than claims for other types of class action settlement, the class as well as other future Kimpton customers receive the benefit from the robust injunctive relief obtained by plaintiff through settlement of this action.  Because plaintiff sought to enforce important an important right affecting the general public – that of protecting consumers' private information, and a significant benefit —both monetary and injunctive—was conferred on a large class of persons, the rationale in both *Warren* and *Graciano*  apply here.  Accordingly, the Court should award Class Counsel attorneys' fees as requested herein.

### H.   The Requested Expenses and Costs Are Fully Documented, Necessarily Incurred and Reasonable.

Federal Rule of Civil Procedure 54(d) "creates a presumption in favor of awarding costs to prevailing parties, and it is incumbent upon the losing party to demonstrate why the costs should not be awarded." *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1079 (9th Cir. 1999) (citing *National Info. Servs., Inc. v. TRW, Inc.*, 51 F.3d 1470, 1471-72 (9th Cir. 1995)). Moreover, Federal law permits recovery for out-of-pocket litigation expenses that are normally billed to a client. *Grove v. Wells Fargo Fin., Inc.*, 606 F.3d 577, 580 (9th Cir. 2010) (reviewing cases upholding as part of fee awards reimbursement for non-taxable costs such as computerized legal research, travel, copying, courier); *accord Thalheimer v. City of San Diego*, 2012 U.S. Dist. LEXIS 59315, 26 (S.D. Cal. 2012) (allowing reimbursement for out-of-pocket "and otherwise non-taxable expenses such as telephone charges, copies, filing fees, courier and mailing fees, []internet research," and "necessary travel expenses" as part of fee award).

The amount of costs sought here $138,417.76 is eminently reasonable for the services provided and the result obtained. Moreover, these are charges that California lawyers commonly bill to their clients. Because the costs are reasonable, fully documented, and were necessarily incurred, as the declarations of Class Counsel set forth, an award of these costs should be approved within the $800,000 maximum amount of attorney fees and expenses sought by Class Counsel as described in the class settlement notice for reasonable attorneys' fees and litigation expenses.

Case No. 3:16-cv-05387-VC

# I.     Service Award

The Settlement allows Class Counsel to request and for Kimpton to pay a service award to Andrew Parsons, Plaintiff and the proposed Class Representative, in an amount not to exceed $5,000.00 as approved and ordered by the Court upon final approval of the Class Settlement. Again, the service award is to be paid separately by Kimpton and will not affect the monetary benefits to be received by the Class.  The Class Representative's agreement to the Settlement is not conditioned in any manner on the award of a service award or its amount. Declaration of Andrew Parsons, Attached as Exhibit 3 ¶ 10.

The Class Representative has given his time and accepted his responsibilities admirably, participating actively in this litigation as required and in a manner beneficial to the Class generally.  Yanchunis Decl., Ex. 2 ¶ 41.  The Class Representative worked diligently with counsel to prepare and file pleadings, produce documents related to the breach, respond to written discovery, and otherwise assist in the prosecution of this litigation. *Id*. The Class Representative was advised on his obligations in serving as a class representative to select adequate and skilled counsel, to cooperate with counsel, and to place the interests of the class on a level equal to or above her own interests. The Class Representative has met and continue to meet these obligations, cooperating fully with counsel to fulfill his fiduciary duties to the class. *Id*.

The proposed service award is presumptively reasonable. *In re Yahoo Mail Litig.*, No. 13-CV-4980, 2016 WL 4474612, at *11 (N.D. Cal. Aug. 25, 2016) ("The Ninth Circuit has established $5,000.00 as a reasonable benchmark [for service awards]."). It is particularly warranted given Mr. Parsons' extensive participation in the litigation, including being deposed on personal financial matters. See, e.g., *Garner v. State Farm Mut. Auto. Ins. Co., No.* CV 08 1365, 2010 WL 1687832, at *17 (N.D. Cal. Apr. 22, 2010).  Here, there are no conditions placed on the service award nor does the amount of the award undermine the adequacy of the class representative.  See N.D. Cal. Procedural Guidance for Class Action Settlements, §7 (citing *see, e.g., Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157 (9th Cir. 2013)).

PLAINTIFF'S MOTION FOR ATTORNEY'S FEES,
COSTS AND EXPENSES

Case No. 3:16-cv-05387-VC

1   \\\

2   \\\

3   \\\

4   \\\

5   \\\

6   **IV.     CONCLUSION**

7           For the foregoing reasons, the Court should grant the motion for attorneys' fees and

8   expenses.

9

10  Dated: May 8, 2019

                                              By:   */s/ Michael F. Ram*
11                                                  Michael F. Ram, SBN# 104805
12                                                  mram@robinskaplan.com
                                                    ROBINS KAPLAN LLP
13                                                  2440 W El Camino Real, Suite 100
                                                    Mountain View, CA 94040
14                                                  Telephone: (650) 784-4040
                                                    Facsimile: (650) 784-4041
15

16                                                  John A. Yanchunis *(pro hac vice)*
                                                    jyanchunis@forthepeople.com
17                                                  MORGAN & MORGAN COMPLEX
                                                    LITIGATION GROUP
18                                                  201 N. Franklin Street, 7th Floor
19                                                  Tampa, Florida 33602
                                                    Telephone: (813) 223-5505
20                                                  Facsimile: (813) 223-5402

21

22

23

24

25

26

27

PLAINTIFF'S MOTION FOR ATTORNEY'S FEES,                          Case No. 3:16-cv-05387-VC
COSTS AND EXPENSES