1  ROBINS KAPLAN LLP
   Michael F. Ram, SBN #104805
2  mram@robinskaplan.com
   Marie N. Appel, SBN #187483
3  mappel@robinskaplan.com
   2440 West El Camino Real, Suite 100
4  Mountain View, California 94040
   Telephone:  (650) 784-4040
5  Facsimile:  (650) 784-4041

6  MORGAN & MORGAN
   COMPLEX LITIGATION GROUP
7  John A. Yanchunis (admitted *pro hac vice*)
   jyanchunis@ForThePeople.com
8  201 N. Franklin Street, 7th Floor
   Tampa, Florida 33602
9  Telephone: (813) 223-5505
   Facsimile: (813) 223-5402

10

11 *Attorneys for Plaintiff and Proposed Class*

12           UNITED STATES DISTRICT COURT

13        FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15 ANDREW PARSONS, individually and on        Case No. 3:16-cv-05387-VC
   behalf of all others similarly situated,
16                                            **PLAINTIFF'S MEMORANDUM OF**
                   Plaintiff,                 **POINTS AND AUTHORITIES IN**
17                                            **SUPPORT OF UNOPPOSED MOTION**
   v.                                         **FOR FINAL APPROVAL**
18
   KIMPTON HOTEL & RESTAURANT
19 GROUP, LLC

20                 Defendant.

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ............................................................................................. 1

II.   SUMMARY OF THE LITIGATION ............................................................... 1

III.   THE SETTLEMENT NEGOTIATIONS WERE AT ARM'S LENGTH ........................... 3

IV.   SETTLEMENT TERMS, IMPLEMENTATION, AND RESPONSE ................................ 3

    A.   The Settlement Class ......................................................................... 3

    B.   The Settlement Benefits .................................................................... 4

        1.   Monetary Remedies .................................................................... 4

        2.   Injunctive Relief ........................................................................ 7

    C.   Implementation of the Notice Plan .................................................. 8

    D.   Class Member Response .................................................................. 11

    E.   Attorneys' Fees, Costs, and Expenses, and Service Award ............. 12

    F.   Release of Claims ........................................................................... 12

V.   ARGUMENT .............................................................................................. 12

    A.   The Settlement Class Should Be Finally Certified .......................... 12

        1.   The Class Meets the Requirements of Rule 23(a) ........................... 13

        2.   The Class Meets the Requirements of Rule 23(b)(3) ....................... 13

    B.   The Court Should Grant Final Approval ......................................... 17

        1.   The Standard for Final Approval: Amended Rule 23(e) .................... 17

            a.   Adequacy of Represnetation and Arm's Length Negotiation ................. 17

            b.   Adequacy of Relief ........................................................... 18

        2.   The Standard for Final Approval:  Historic Factors ......................... 20

            a.   The Strength of Plaintiff's Case ......................................... 20

            b.   The Amount Offered in Settlement ..................................... 21

            c.   The Extent of Discovery Completed and the Stage of the Proceedings .. 22

            d.   The Experience and Views of Counsel ................................. 23

            e.   The Presence of a Governmental Participant ......................... 23

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

f.      The Reaction of Class Members to the Proposed Settlement .................. 23

C.      The Court Should Find the Notice Plan Met the Requirements of Due Process ........ 23

D.      The Court Should Finally Appoint Plaintiff's Counsel as Class Counsel .................. 24

VI.    CONCLUSION ............................................................................................................ 25

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**TABLE OF AUTHORITIES**

**Cases**

*Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997) ..................................................... 13, 16, 17

*American Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ......................................................... 15

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ................................................... 23

*Dugas v. Starwood Hotels & Resorts Woldwide, Inc.*, 3:16-cv-00014-GPC-BLM (S.D. Cal.)..... 21

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)................................. 13, 14, 15, 16

*Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) .......................................................... 12

*In re Bluetooth Headset Products Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011) ...................... 20

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig*., 2010 WL 3931096 (N.D. Cal.
   Oct. 6, 2010)............................................................................................................................... 15

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2009 WL 5184352, at *6–7
   (W.D. Ky. Dec. 22, 2009) ........................................................................................................... 17

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *6 (W.D.
   Ky. Aug. 23, 2010)...................................................................................................................... 18

*In re Hyundai & Kia Fuel Econ. Litig.,* 881 F.3d 679, 707 (9th Cir. 2018) .................................. 14

*In re Linkedin User Privacy Litig.,* 309 F.R.D. 573, 585 (N.D. Cal. 2015)................................... 17

*In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522-PAM, ECF No. 358-1
   (March 18, 2015) (Settlement Agreement); *id.*, 2017 WL 2178306, at *2 (D. Minn. May 17,
   2017) (order approving settlement on remand from the 8th Circuit), *appeal pending* Case No.
   15-3912 (8th Cir.) .................................................................................................................. 22, 23

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *2 (N.D.
   Ga. Aug. 23, 2016)...................................................................................................................... 17

*In re the Home Depot, Inc., Customer Data Sec. Breach Litig.,* No. 1:14-MD-02583-TWT, ECF

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

No. 181-2 (March 7, 2016) (Settlement Agreement); *id.*, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) ................................................................................................................ 21, 23

*Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ......................................... 13, 15, 16

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) ................................ 18, 22

*Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589-90 (9th Cir. 2012) ...................................... 15

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ................................ 24

*Remijas v. The Neiman Marcus Group, LLC*, No. 14-cv-1735, ECF No. 145 (March 17, 2017) . 22

*Smith v. Triad of Alabama, LLC,* 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017).............. 19

*Staton v. Boeing Co.,* 327 F.3d 938, 957 (9th Cir. 2003)................................................................ 13

*Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).......................................... 14, 16

*Vaquero v. Ashley Furn.*, 824 F.3d 1150, 1155 (9th Cir. 2016) ................................................... 16

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ......................................................... 13

*Whalen v. Michaels Stores, Inc.*, 689 F. App'x 89 (2d Cir. 2017) ............................................... 21

**Statutes**
Class Action Fairness Act, 28 U.S.C. § 1715 ......................................................................... 16, 23

**Other Authorities**
*Manual for Complex Litigation,* Fourth, § 21.61 (2004) ............................................................. 21

*Manual for Complex Litigation*, Fourth, § 21.632 (2004) ........................................................... 16

N.D. Cal. Procedural Guidance for Class Action Settlements, §2........................................... 11

N.D. Cal. Procedural Guidance for Class Action Settlements, §6........................................... 15

**Rules**
Fed. R. Civ. P. 23(a)...................................................................................................................... 16

Fed. R. Civ. P. 23(a)(1).................................................................................................................. 16

Fed. R. Civ. P. 23(b)(1).................................................................................................................. 17

Fed. R. Civ. P. 23(e) .................................................................................................... 21

Fed. R. Civ. P. 23(g)(1)(A)(i-iv) ................................................................................. 28

Fed. R. Civ. P. 23(g)(1)(B) ......................................................................................... 28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

This matter was hard-fought during active litigation and preliminary approval of its resolution was similarly forged in the crucible of this Court's careful consideration. Plaintiff moved for preliminary approval on three occasions, addressing the Court's watchful critiques in each iteration (ECF Nos. 89, 98, 106), resulting, ultimately, in an approval Order being entered on January 9, 2019, (ECF No. 111).  Following in the wake of that approval and the associated robust notice and administration plan, Plaintiff now moves for final approval of the settlement.

The response from the Settlement Class[1] has been positive: only five Class Members opted-out of the settlement, and zero objections were received; yet, more than 900 claims have been submitted. *See* Declaration of Cameron Azari at ¶¶ 29–31, attached as **Exhibit 1**.[2]  If finally approved, Class Members will be eligible to receive reimbursement for out-of-pocket expenses resulting from the Security Incident—including for overdraft fees, late fees, unreimbursed charges, and up to five hours of lost time at the rate of $25.00 per hour. SA ¶ 2.1. In addition, significant injunctive relief required by the Settlement ensures Class Member's information is protected going forward. SA ¶¶ 3.1-3.5.

Accordingly, Plaintiff respectfully requests that the Court enter an order (1) finally approving the Settlement; (2) finally certifying the Settlement Class; (3) finally appointing Andrew Parsons as Class Representative; (4) finally appointing John Yanchunis as Lead Class Counsel, and Michael Ram as Class Counsel; (5) finally approving the Notice Program as implemented; (6) finally appointing Epiq Systems, Inc. to serve as the Claims Administrator; and (7) finally appointing Bruce A. Friedman as the Claims Referee.

## II.    SUMMARY OF THE LITIGATION

This class action case was filed against Kimpton in September 2016 following a malware incident potentially affecting payment card transactions at 61 Kimpton hotels and restaurants

---

[1] Unless otherwise defined, capitalized terms have the same meaning attributed to them in the Settlement Agreement ("SA"), previously filed at ECF No. 106-1.

[2] The deadline for opting-out and objecting was June 8, 2019. (ECF No. 111 at 12).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

between February and July 2016.  ECF No. 1 ¶ 2.  Plaintiff Lee Walters asserted five claims in his original complaint: negligence, breach of implied contract, and three claims under California's Unfair Competition Law (unfair conduct, unlawful conduct, and fraudulent conduct).  *Id.* ¶¶ 57-95. Mr. Walters filed an amended complaint in January 2017 asserting the same claims.  ECF No. 34. Following Kimpton's motion to dismiss, the Court dismissed the UCL fraud prong claim and allowed the other four claims to go forward.  ECF No. 44.

The Court bifurcated pre-trial proceedings into individual liability and damages and class certification phases and ordered the parties to proceed first with discovery and summary judgment on liability and damages as to the named plaintiff only.  ECF No. 47.  Early in discovery, Andrew Parsons was added as a plaintiff.  ECF No. 61.  Mr. Parsons alleges that he used his payment card at a Kimpton hotel in Washington, D.C. during the at-risk window for the malware incident.  *Id.* ¶¶ 13-18.  In January 2018, the original plaintiff, Mr. Walters, was voluntarily dismissed.  ECF No. 74.

The parties completed fact discovery on February 16, 2018, (ECF No. 67), having engaged in voluminous document and ESI discovery and exchanged substantial written discovery, including interrogatories and requests for admission. Kimpton deposed Mr. Parsons and Plaintiff took the depositions of Kimpton's Rule 30(b)(6) representative, Kimpton's four data security witnesses, and Kimpton's Director of Communications. *See* Declaration of John Yanchunis in Support of Final Approval at ¶ 16, attached hereto as **Exhibit 2**.

The parties also engaged in substantial third-party discovery. Plaintiff issued subpoenas to the Better Business Bureau, Mandiant (forensics firm), SecureWorks (forensics firm), Sunera (computer security firm), Rapid7 (computer security firm), and certain employees of Kimpton's parent company, IHG. In connection with these subpoenas, Plaintiff has taken the depositions of Mandiant, Sunera, and two IHG witnesses. Yanchunis Decl. ¶17.

Plaintiff's counsel also retained a cybersecurity expert to assist with identifying the cause of the breach and to determine the preventive measures necessary to protect information of consumers in the future. This expert telephonically attended several of the depositions and reviewed documents produced by Kimpton.  Plaintiff's counsel also retained a damages expert to assist in

determining the type and nature of the damages that could be sustained by Class Members. *Id*. ¶ 18.

## III.   THE SETTLEMENT NEGOTIATIONS WERE AT ARM'S LENGTH

The negotiations that resulted in the Settlement were, at all times, hard-fought and conducted at arm's length. While engaging in discovery, the parties also began a discussion of the potential resolution of the litigation. Specifically, on November 9, 2017, Plaintiff sent Kimpton a letter outlining the material terms of a proposed settlement. On February 5, 2018, Kimpton responded to Plaintiff's proposal and outlined its position on the basic parameters of a settlement. Yanchunis Decl. ¶ 19. In February 2018, the parties retained Bruce A. Friedman, a highly experienced mediator, to assist the parties in continuing the negotiations. For the primary benefit of the mediator, the parties briefed their respective positions on the facts, claims, defenses and assessments of the risk of litigation. The parties also submitted a draft settlement term sheet that was prepared by Plaintiff and that was then used at the mediation. *Id*. ¶ 20.

On March 12, 2018, the parties had a full-day mediation session with Mr. Friedman at JAMS in San Francisco. The negotiations were hard-fought throughout and the settlement process was conducted at arm's length. Through the negotiations, Mr. Friedman was able to assist the parties in reaching an agreement on the substantive terms of the Settlement. *Id*. ¶ 21. The parties executed a term sheet the same day. The subject of attorneys' fees and expenses, subject to Court approval, was negotiated only after the substantive terms of the Settlement were agreed upon by the parties. *Id*.

## IV.   SETTLEMENT TERMS, IMPLEMENTATION, AND RESPONSE

### A.  The Settlement Class

The proposed Settlement Class is defined as:

> All residents of the United States whose Personal Information was compromised as a result of the malware attack publicly announced by Kimpton on August 31, 2016.

SA ¶ 1.26.  A litigation class has not yet been certified.  See N.D. Cal. Procedural Guidance for Class Action Settlements, Preliminary Approval 1(a).  The class definition is consistent with the class definition in Plaintiff's Second Amended Class Action Complaint ("[a]ll persons residing in the United States whose personal and/or financial information was disclosed in the Data Breach

affecting Kimpton in 2015") (ECF No. 61, Second Amended Class Action Complaint ¶ 54.).  The class definition was revised to accurately include the date of the public announcement of the Data Breach based on information learned in discovery.

Through discovery Plaintiff confirmed that Kimpton has name and contact information for approximately 149,200 Settlement Class Members, to whom Kimpton provided direct notice of the security incident.  The size of the remaining class is difficult to estimate with precision.  Because of the nature of payment card acceptance, Kimpton does not have an ability to match contact information to most of the payment cards potentially affected by the incident.  Visa reported it considered 297,576 unique accounts to be at-risk, MasterCard identified 146,243 unique at-risk accounts (24,259 of which had been identified as at-risk due to other earlier reported incidents), and American Express identified 169,335 unique at-risk accounts (54,812 of which had been identified as at-risk due to other earlier reported incidents).  These account number totals, however, are not necessarily equivalent to unique individuals because one person could have used a Visa account at the front desk and a Mastercard in a restaurant.  Thus, based on these numbers, Kimpton estimates that in total approximately 600,000 unique individuals were potentially affected by the incident, many of whom used cards that were previously identified as at-risk by other security incidents reported to the payment card networks other than the Kimpton incident.

**B.      The Settlement Benefits**

**1.      Monetary Remedies**

Under the Settlement, subject to its terms and conditions and subject to Court approval, Settlement Class Members are eligible to receive reimbursement of up to $250 (in total) for the following categories of out-pocket expenses resulting from the Security Incident:

> (i) unreimbursed bank fees;
> (ii) unreimbursed card reissuance fees;
> (iii) unreimbursed overdraft fees;
> (iv) unreimbursed charges related to unavailability of funds;
> (v) unreimbursed late fees;
> (vi) unreimbursed over-limit fees;
> (vii) long distance telephone charges;

(viii) cell minutes (if charged by minute), Internet usage charges (if charged by the minute or by the amount of data usage and incurred solely as a result of the Security Incident), and text messages (if charged by the message and incurred solely as a result of the Security Incident);

(ix) unreimbursed charges from banks or credit card companies;

(x) postage;

(xi) interest on payday loans due to card cancelation or due to over-limit situation;

(xii) up to five hours of lost time spent dealing with replacement card issues or in reversing fraudulent charges or otherwise dealing with the Security Incident (calculated at the rate of $25.00 per hour), but only if at least one full hour was spent;

(xiii) an additional $15 payment for each credit or debit card on which document fraudulent charges were incurred that were later reimbursed, to compensate the claimant for lost time associated with seeking reimbursement for the fraud, but no documentation will be required for this benefit;

(xiv) costs of credit report(s) purchased by Settlement Class Members between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident); and

(xv) costs of credit monitoring and identity theft protection (not to exceed $80.00) purchased by Settlement Class Members between February 1, 2016 and the Claims Deadline (with an affirmative statement by the Settlement Class Member that it was purchased primarily because of the Security Incident and not for other purposes, and with proof of purchase).

SA ¶ 2.1.

Class Members who had other extraordinary unreimbursed out-of-pocket monetary losses as a result of the Security Incident, including alleged unreimbursed fraudulent charges, are eligible to make a claim for reimbursement of up to $10,000.00.  SA ¶ 2.2.  Settlement Class Members

shall also be eligible to be reimbursed for monetary out-of-pocket losses that are claimed by the Settlement Class Member to have occurred more likely than not as a result of the Security Incident, in an amount not to exceed $10,000.00 per Settlement Class Member, subject to the following conditions: (a) it is an actual, documented, and unreimbursed monetary loss; (b) was more likely than not caused by the Security Incident; (c) occurred during the time period from February 1, 2016 through and including the end of the applicable claims period (*see* ¶ 2.2.2, *infra*); (d) is not already covered by one or more of the categories in ¶ 2.1, and (e) the claimant made reasonable efforts to avoid or seek reimbursement for the loss including but not limited to exhaustion of all available credit monitoring insurance and identity theft insurance as required under ¶ 2.2.1. Settlement Class Members with claims under this paragraph may also

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

submit claims for benefits under ¶ 2.1.

SA ¶ 2.2.

The aggregate amount of claims reimbursement for which Kimpton shall be responsible to pay is capped at $600,000—approximately $1.00 per card involved, which compares favorably to other payment card data breach cases where the average per card amount was significantly below $1.00 per card.  If the total valid claims exceed the $600,000 cap, each individual amount shall be reduced pro rata so that the aggregate claims reimbursement is exactly $600,000.  SA ¶ 2.4.[3] Unused funds, however, will not redistributed to class members who claim their share nor do unused funds go to *cy pres*.  *See* Standing Order for Civil Cases Before Judge Vince Chhabria, §32; *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 8.  This is because the goal of this settlement is to provide Settlement Class Members with unreimbursed out-of-pocket expenses and documented lost time that resulted from the Security Incident without knowing how the breach could have affected the class as a whole.  Plaintiff believes that the Settlement will accomplish this goal and therefore Plaintiff did not seek additional monetary relief beyond what Settlement Class Members can recover through the claims process.

The monetary relief provided under the terms of the Settlement most likely exceeds the potential recovery if Plaintiff were to prevail on each of his claims.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(d).  Reimbursement for out-of-pocket losses for the fifteen categories detailed above exceeds what would otherwise be available remedies if the Settlement is not approved.  For example, under the terms of the Settlement, Class Members may recover for the cost of credit monitoring, up to $80 and purchased anytime between February 1, 2016 and the Claims Deadline.  Similarly, in addition to time spent dealing with the Security Incident, Class Members can receive an additional $15 payment for each credit or debit card that

---

[3] The Claims Deadline is August 22, 2019.  S.A. §§ 1.5, 2.1; Azari Decl. ¶ 32.

incurred fraudulent charges that were reimbursed.  Without a Settlement, these remedies would not likely be available to Class Members.  Given the size of the Class and the amount of monetary relief available to the Class—and the claims received to date—Plaintiff does not anticipate concerns about the allocation of the settlement fund among Class Members. *See* N.D. Cal. Procedural Guidance for Class Action Settlements, 1(e).

### 2.   Injunctive Relief

Class benefits from this Settlement Agreement are not merely monetary; they also include injunctive relief designed to ensure the protection of class members' information which remains in the possession of Kimpton, and to minimize the risk of future data breaches and protect consumer data going forward.  As part of the Settlement Agreement, Kimpton will adopt and implement, at a minimum, the following data security measures for three years from the execution of the Settlement Agreement:

1) Information Security Position.  Kimpton will designate a position that is specifically responsible for overseeing information security compliance at Kimpton Hotel & Restaurant Group, LLC.

2) Annual PCI DSS Audits & Penetration Testing.  Kimpton will hire a third-party Qualified Security Assessor to conduct an annual assessment of Kimpton's compliance with PCI DSS and hire a penetration testing company to conduct an annual penetration test of Kimpton Hotel & Restaurant Group, LLC's cardholder data environment.  Qualified Security Assessor means an independent security organization that has been qualified by the PCI Security Standards Council to assess an entity's adherence to PCI DSS.  Penetration test means a manual process that complies with the standards set forth by PCI DSS for penetration testing.

3) Annual Security Awareness Program.  Kimpton will provide annual security awareness training for its employees, which will include education and training regarding payment card data security and payment card data security best practices.

4) Payment Card Acceptance Technology.  With respect to all consumer card present payment transactions where a physical payment card is used at a Kimpton hotel front desk or restaurant, Kimpton will: (1) implement a solution that encrypts payment card data when it is read by the card acceptance device and routes the authorization message out to the payment card networks without the authorization message data being unencrypted on devices owned and managed by Kimpton ("Encryption Solution"); and (2) install card acceptance devices and payment applications that support acceptance of EMV enabled payment cards (the "EMV Solution").  Kimpton will implement the Encryption Solution and EMV Solution by June 31, 2019 for card present transactions that occur at the front desk of its hotels.  Kimpton will implement the Encryption Solution

and EMV Solution for card present transaction that occur in its restaurants by January 2020.

<u>5) Senior Leadership reporting</u>.  Kimpton will report to its executive team about its cybersecurity efforts.

SA ¶¶ 3.1-3.5.

The injunctive relief provisions included in the Settlement Agreement materially enhance the value of this Settlement and represent significant improvements by Kimpton to its data security. For example, though the parties disputed whether Kimpton had been PCI-compliant, this settlement includes regular PCI-DSS compliance auditing.  And the improvements to Kimpton's payment card acceptance technology represent a significant financial investment by Kimpton and further adds to the relief Class Members would receive as a result of this Settlement.

Thus, the meaningful benefits to Class Members through the Settlement is not merely monetary.  By including these security enhancements in addition to monetary relief, the Settlement Agreement provides renewed confidence that Kimpton systems will prospectively protect consumer data.

### C.    Implementation of the Notice Plan

Pursuant to the Preliminary Approval Order, Settlement Administrator Epiq Systems implemented the Notice Program—at Kimpton's sole and separate expense. SA ¶ 4.2.  Settlement administration and notice has thus far cost approximately $351,000.00, with additional expenses expected between final approval and disbursement.  *See* N.D. Cal. Procedural Guidance for Class Action Settlements, §2.  Since Kimpton is paying these costs in addition to the monetary relief provided to Class Members, this also materially enhances the value of the Settlement.

With respect to notice, there are two groups of Settlement Class Members:  those for whom Kimpton has email addresses and/or physical addresses, and those for whom Kimpton does not. As anticipated by the Notice Plan, Epiq identified 269,469 records of potential Class members, resulting in 199,759 records for the initial email effort and 69,710 records for the initial postcard mailing, with the individual notice effort reaching approximately 84.5% of the identified Settlement Class.  Azari Decl. ¶ 10.

Specifically, on February 8, 2019, Epiq disseminated a total of 199,759 Summary Email

Notices to all potential Settlement Class Members for whom a facially valid email address was available.  Each Summary Email Notice was transmitted with a unique message identifier.  If the receiving e-mail server could not deliver the message, a "bounce code" was returned along with the unique message identifier.  For any Summary Email Notice for which a bounce code was received indicating that the message was undeliverable, at least two additional attempts were made to deliver the Notice by email.  At the end of the initial Email Notice effort, 15,300 emails remained undeliverable.  *Id*. ¶ 11. The Summary Email Notice included an embedded link to the Settlement Website.  By clicking the link, recipients are able to easily access the Long Form Notice and Settlement Agreement, other information about the Settlement, and easily file an online Claim Form.  *Id*. ¶ 12.

On February 22, 2019, Epiq mailed 69,710 Summary Postcard Notices via USPS first class mail to known or potential Settlement Class Members with no associated email address.  *Id*. ¶ 14. Prior to the initial Postcard Notice mailing, all mailing addresses were checked against the National Change of Address ("NCOA") database maintained by the United States Postal Service ("USPS"), any invalid addresses were updated through a third-party address search service, and addresses were certified via the Coding Accuracy Support System ("CASS") and verified through Delivery Point Validation ("DPV") to verify the accuracy of the addresses.  *Id*. ¶ 13.  Detailed Notices and paper Claim Forms were mailed via USPS first class mail to any persons who requested.  *Id*. ¶ 15. On February 28, 2019, 8,188 Summary Postcard Notices were mailed to Class Members for whom an Email Notice was undeliverable and an associated physical mailing address was available.  The same address verification process outlined above was used.  *Id*. ¶ 16. For Summary Postcard Notices returned as undeliverable, Epiq undertook additional public record research, using a third-party lookup service, resulting in—as of June 25, 2019—the re-mailing of 5,519 Summary Postcard Notices.  *Id*. ¶ 17.

The Summary Postcard Notice and the Summary Email Notice are estimated to have reached approximately 227,828 unique Settlement Class Members, or 84.5% of the identified Settlement Class.  *Id*. ¶ 18.

For the remaining Settlement Class Members, notice was provided by publication.  First,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

on March 1, 2019, a 1/3 page advertisement was placed in *People Magazine*.  *People* is the number one celebrity and entertainment brand and has the largest audience of any magazine in the United States.  *People's* circulation is approximately 3.4 million and its readership is over 38.2 million readers per week and an average number of 11.2 readers-per-copy nationwide.  *Id*. ¶ 19.

Second, Internet Banner Notices were placed online across the Google Display Network and the Yahoo! Ad Network.  In addition, banners were placed on a Google Display Network's Custom Intent Audience targeted to consumers who are actively researching or planning "Hotel Accommodations," "Hotels and Resorts," and "Online Hotel Booking" related topics.  Banner Notices were also placed on Facebook, including Banners targeted to Facebook users who have identified an interest in Kimpton Hotels and Restaurants.  The Digital Banner Notice effort as implemented is as follows:

| Network/Property | Banner Size | # of Days | A18+ Impressions |
|---|---|---|---|
| Google Display Network | 300x250; 728x90 | 31 | 90,084,229 |
| Google Display Network: Custom Intent Audience | 300x250; 728x90 | 31 | 950,403 |
| Facebook | 254x133 | 31 | 148,359,961 |
| Facebook: Kimpton Hotels Interest | 254x133 | 31 | 22,885,717 |
| Yahoo Ad Network | 300x250; 728x90 | 31 | 35,000,144 |
| **TOTAL** | | | **297,280,454** |

Combined, approximately 297 million adult impressions were generated by the Banner Notice, which ran for a 31-day period, from February 8, 2019 to March 10, 2019.  Clicking on the banner linked the reader to the case website where they can obtain detailed information about the Settlement and file an online claim.  Azari Decl. ¶¶ 20–21.

On February 8, 2019, a neutral, informational, Settlement Website (www.KimptonSettlement.com) was established so that members of the Settlement Class can file claims, and obtain additional information and case documents, including the Complaint, Long Form Notice, Settlement Agreement, Order Granting Preliminary Approval, paper Claim Form, and Answers to Frequently Asked Questions. As of June 26, 2019, there have been 147,755 unique visitors to the Settlement Website and 219,275 website page views presented.  *Id*. ¶¶ 24–26. To facilitate locating the Settlement Website, sponsored search listings were acquired on the three most

highly-visited internet search engines: Google, Yahoo! and Bing.  When search-engine visitors search on common keyword combinations—including "Kimpton Hotel Settlement," "Kimpton Data Breach Litigation," and "Kimpton Security Settlement"—the sponsored search listing generally is displayed at the top of the page, above the search results, or in the upper right-hand column of the web-browser screen. As of June 8, 2019, the sponsored listings have been displayed 1,369 times, resulting in 480 clicks that displayed the case website. *Id.* ¶¶ 22–23. Also on February 8, 2019, a toll-free number (1-855-789-0900) was established to allow Class Members to call and get information about the Settlement in the form of recorded answers to Frequently Asked Questions.  Callers can also request that a Long Form Notice and Claim Form be sent by mail.  This automated phone system is available 24 hours per day, 7 days per week.  As of June 26, 2019, the toll-free number has handled 188 calls representing 879 minutes of use. *Id.* ¶ 27.

Using standard advertising media industry methodologies to calculate the overlap inherent in exposures to the direct mail and email, measured publication and internet banner ads we arrive at a combined measurable reach of approximately 80%.  Reach was enhanced further by the sponsored internet search listings and the case website. *Id.* ¶ 38.

The Notices themselves were designed to be "noticed," reviewed, and—by presenting the information in plain language—understood by Class Members.  The design of the Notices follows the principles embodied in the Federal Judicial Center's illustrative "model" notices posted at www.fjc.gov. *Id.* ¶ 33; Standing Order for Civil Cases Before Judge Vince Chhabria, at 12.  The Notices are clearly worded with an emphasis on simple, plain language to encourage readership and comprehension.  Azari Decl. ¶ 34.

### D.    Class Member Response

The Class's response to the Settlement has been positive.  N.D. Cal. Procedural Guidance for Class Action Settlements, Final Approval § 1. While the deadline to request exclusion from, or object to, the Settlement was June 8, 2019, as of June 25, 2019, Epiq has received only five requests for exclusion from the Settlement Class and no objections.  Azari Decl. ¶ 29.  This represents a miniscule opt-out rate of 0.00083%; further supporting approval. *See, e.g.*, *In re Anthem, Inc. Data*

*Breach Litig.*, 327 F.R.D. 299, 320–21 (N.D. Cal. 2018) ("[O]nly 406 Settlement Class Members have opted out of the Settlement (about 0.0005% of the Class). Such low rates of objections and opt-outs are 'indicia of the approval of the class.'") (citations omitted) (quoting *Hughes v. Microsoft Corp.*, No. 98-CV-01646, 2001 WL 34089697, at *1, *8 (W.D. Wash. Mar. 26, 2001)).

Moreover, as of June 26, 2019, Epiq has received 948 claims (898 online and 50 paper), of which 189 included supporting documentation. Azari Decl. ¶ 30.  With an August 22, 2019 filing deadline, these numbers are preliminary and will be updated. As to the claims received thus far, the initial review, which removes likely duplicate claims and adjusts claimed amounts to caps, results in $143,302.68 claimed to date for Ordinary Expenses, $16,005.00 claimed to date for Reimbursed Fraudulent Charges and $487,721.91 claimed thus far for Extraordinary Expenses. *Id.* ¶ 30.

**E.    Attorneys' Fees, Costs, and Expenses, and Service Award**

Plaintiff separately moved for Attorney's Fees, Costs, and Expenses, as well as a service award for Plaintiff, (ECF No. 113), and thus those matters are not further addressed here.  N.D. Cal. Procedural Guidance for Class Action Settlements, Final Approval §§ 2–3; Standing Order for Civil Cases Before Judge Vince Chhabria, at 13.

**F.    Release of Claims**

Under the Settlement, each member of the Class will be deemed to have released any and all claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, suspected or unsuspected, asserted or that might have been asserted, by the Plaintiff or any Settlement Class Member, against Kimpton arising out of or related to the facts giving rise to the subject matter of the Complaint in this case. SA ¶ 7.1.  Class Members are only releasing claims based on the identical factual predicate, as required under Ninth Circuit precedent. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010); *see also* Standing Order for Civil Cases Before Judge Vince Chhabria, ¶45, p.11.

**V.    ARGUMENT**

**A.    The Settlement Class Should Be Finally Certified**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

**1.**     **The Class Meets the Requirements of Rule 23(a)**

Before assessing the parties' settlement, the Court should first confirm that the underlying settlement class meets the requirements of Rule 23. *See Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *Manual for Complex Litigation*, Fourth, § 21.632 (2004). The prerequisites for class certification under Rule 23(a) are numerosity, commonality, typicality, and adequacy—each of which is satisfied here. Fed. R. Civ. P. 23(a). The proposed settlement class includes, at minimum, more than 150,000 people, and so readily satisfies the numerosity requirement. *See* Fed. R. Civ. P. 23(a)(1); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

The proposed class also satisfies the commonality requirement of Rule 23(a), which requires that class members' claims "depend upon a common contention," of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The central question behind every claim in this litigation is whether Kimpton adequately secured its consumers' payment card information.  The answer to that question depends on common evidence that does not vary from class member to class member, and so can be fairly resolved—whether through litigation or settlement—for all class members at once.

The final requirements of Rule 23(a)—typicality and adequacy—are likewise satisfied here. The proposed Class Representative used a payment card for a stay at an affected Kimpton property during the breach period, and so he was affected by the same inadequate data security that Plaintiff alleges harmed the rest of the class. *See Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017) ("[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class"). The proposed Class Representative also has no conflict with the class; has participated actively in the case, including by sitting for a deposition; and is represented by experienced attorneys. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (adequacy satisfied if plaintiffs and their counsel lack conflicts of interest and are willing to prosecute the action vigorously on behalf of the class).

**2.**     **The Class Meets the Requirements of Rule 23(b)(3)**

- 13 -

"In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed. R. Civ. P. 23(b)(1), (2) or (3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Circ. 1997).  Here, the proposed class is maintainable under Rule 23(b)(3), as common questions predominate over any questions affecting only individual members and class resolution is superior to other available methods for a fair resolution of the controversy.  *Id.*  Plaintiff's liability case depends, first and foremost, on whether Kimpton used reasonable data security to protect payment card data.  That question can be resolved using the same evidence for all class members, and thus is the precise type of predominant question that makes a class-wide adjudication worthwhile.  *See Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) . . . .'").  This case involves a single cybersecurity incident that impacted *all* Class members whose data was stolen in connection with using a payment card at Kimpton properties, giving rise to claims under state law that *all* share the same common nucleus of facts and law pertaining to the duty of care and whether Kimpton violated it.

Predominance is satisfied in this case and the common legal and factual issues here outweigh any "questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Familiar Ninth Circuit standards going back at least 20 years, to *Hanlon*, govern the predominance inquiry:[4] here, as in in *Hanlon*, "a common nucleus of facts and potential legal remedies dominate this litigation." 150 F.3d at 1022.  Thus, any variations in state law do not outweigh the predominance of factual and legal issues with respect to the constellation of claims in this case in the settlement context.  *Id.* at 1022–23 (holding that "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims"); *see also In re Hyundai & Kia Fuel Econ. Litig.*, 15-56014, 2019 WL 2376831, at *10–11 (9th Cir. June 6, 2019) ("The prospect of having to apply the separate laws of dozens of jurisdictions presented a significant

---

[4] *In re Hyundai & Kia Fuel Econ. Litig.*, 881 F.3d 679, 707 (9th Cir. 2018) is no longer precedential authority in light of *In re Hyundai & Kia Fuel Econ. Litig.*, 15-56014, 2019 WL 2376831 (9th Cir. June 6, 2019).

issue for trial manageability, weighing against a predominance finding. In settlement cases, such as the one at hand, the district court need not consider trial manageability issues.") (internal citations omitted).

 "Variations in state law do not necessarily preclude a 23(b)(3) action.'" *Hanlon*, 150 F.3d at 1022.  Here, there are no material differences as to Plaintiff's common-law negligence or breach of implied contract claims.  *Hanlon*, 150 F.3d at 1022; *Just Film*, 847 F.3d at 1122. The basic elements of contract law, as they apply to our facts, are the same across states. *See In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Mktg. Litig*., 2010 WL 3931096 (N.D. Cal. Oct. 6, 2010); *cf. American Airlines v. Wolens*, 513 U.S. 219, 233 n.8 (1995) ("Because contract law is not at its core 'diverse, nonuniform, and confusing,' we see no large risk of nonuniform adjudication . . . .") (citations omitted).  The breach of implied contract claim focuses on issues of Kimpton's privacy policy and the alleged breach of that policy, both of which are subject to common proof.  There are no material differences in state law with respect to interpretation or breach that would require *individualized* adjudication of the facts here at issue.  *Just Film*, 847 F.3d at 1123.

Similarly, the commonalities with respect to the key facts and legal issues relevant to Plaintiff's negligence claim outweigh any individualized differences.  The core elements of negligence – duty, breach, causation, damages – do not substantively vary from state-to-state (except as to contributory/comparative negligence principles not at play in this single-defendant case).  *See* ECF No. 98-13.  In sum, these claims are so similar across states that they do not defeat predominance.

True, this case includes an unfair competition claim under California Business & Professions Code section 17200, the precise kind of consumer protection statute that would result in application of multiple state laws under, e.g., *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589-90 (9th Cir. 2012).  Yet, even assuming that the consumer protection laws of multiple states apply, this still does not defeat predominance.

Here, as in in *Hanlon*, "a common nucleus of facts and potential legal remedies dominate this litigation." 150 F.3d at 1022.  Class members here do not occupy different factual positions that might create conflicts in the legal viability of their claims.  Much like *Hanlon's* class members

who all had "the same problem – an allegedly defective rear latchgate . . . ." (*Hanlon*, 150 F.3d at 1021), the class members here all suffered the same loss of personal information from the same single cybersecurity incident which compromised payment-card data.  That theft gives rise to claims under state law that *all* share the same common nucleus of facts and law pertaining to the duty of care and whether Kimpton violated it.  It is the same injury, from the same origin, based on the same facts. Any variations in state law do not outweigh the predominance of common factual and legal issues in this case.  *See Hanlon*, 150 F.3d at 1022–23 (holding that "idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over the shared claims").

In light of the common factual evidence, this Court can conclude that "common, aggregation-enabling, issues in the case are more prevalent or important," (*Tyson Foods*, 136 S. Ct. at 1045) even if there are variations between the state statutory claims, particularly where much of that variation applies statewide rather than individually.  For all of these claims, variations in state law that apply statewide, or to other large sub-groups of the class, do not pose individualized issues at all, and raise only questions of manageability irrelevant to settlement under governing law. *Amchem Prods*, 521 U.S. at 623. Likewise, there is a long-standing rule that individualized damages issues do not defeat predominance.  *Tyson Foods*, 136 S.Ct. at 1045; *Vaquero v. Ashley Furn.*, 824 F.3d 1150, 1155 (9th Cir. 2016).

Finally, since "the proposal is that there be no trial," manageability considerations have no impact on whether the proposed settlement class should be certified.  *Amchem*, 521 U.S. at 620. There is only the predominant issue of whether Kimpton properly secured the payment card data of its consumers, such that Kimpton's security should be improved and class members affected by the data breach provided with a remedy. As a practical matter, that issue cannot be resolved through individual trials or settlement negotiations: the amount at stake for individual class members is too small, the technical issues involved too complex, and the required expert testimony and document review too costly.  *See Just Film*, 847 F.3d at 1123.[5]

_____

[5] A class action is not only the superior method of adjudicating consumer claims arising from this

1  In sum, because of the common experience of every individual in this Class with respect to

2  the single event of the Kimpton data breach, the common evidence pertaining to data security and

3  the breach, and the common legal issues across the common law and statutory claims, the proposed

4  class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S.

5  at 623.

6  **B.     The Court Should Grant Final Approval**

7  **1.     The Standard for Final Approval: Amended Rule 23(e)**

8  Federal Rule of Civil Procedure 23(e) provides that a class action cannot be settled or

9  compromised without approval by the court.  Fed. R. Civ. P. 23(e).  Judicial approval is required

10  regardless of whether the action is certified for trial and later settled or is certified for purposes of

11  settlement. *Manual for Complex Litigation,* Fourth, § 21.61 (2004).  Recent revisions to Rule

12  23(e)—effective on December 1, 2018—standardize the factors governing final approval, stating

13  that approval is proper upon a finding that the settlement is "fair, reasonable, and adequate" after

14  considering whether:

15  > (A) the class representatives and class counsel have adequately represented the class;

16  > (B) the proposal was negotiated at arm's length;

17  > (C) the relief provided for the class is adequate, taking into account:

18  > > (i) the costs, risks, and delay of trial and appeal;

19  > > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

20  > > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

21  > > (iv) any agreement required to be identified under Rule 23(e)(3); and

22  > (D) the proposal treats class members equitably relative to each other.

23  Fed. R. Civ. P. 23(e).

24  **a. Adequacy of Representation and Arm's Length Negotiation**

25

26  data breach, it is the *only* method practicable—just as in other data breach cases where a class wide

27  settlement has been approved.  *See, e.g., In re Linkedin User Privacy Litig.,* 309 F.R.D. 573, 585 (N.D. Cal. 2015); *In re re Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 6902351, at *2 (N.D. Ga. Aug. 23, 2016); *In re Countrywide Fin. Corp. Customer Data Sec. Breach*

28  *Litig.*, 2009 WL 5184352, at *6–7 (W.D. Ky. Dec. 22, 2009).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

- 17 -

As explained above, the Class Representative has adequately represented the Class throughout this case as has Class Counsel. Class Counsel are well-versed in class litigation, including class privacy and data breach litigation such as this, and have steadfastly represented the Class throughout this matter, and the Class Representative is equally committed and unconflicted. *See, e.g.* ECF No. 106-8 at ¶¶ 1–3; ECF No. 98-8 at ¶¶ 1–19; ECF Nos. 98-9 – 98-12.

Further, the Settlement was at all times negotiated at arm's-length. Class Counsel undertook significant factual and legal investigation of the issues prior to filing the case and during the hard-fought litigation. The parties engaged in extensive discovery about both the facts and law at issue. Finally, Mediator Bruce Friedman presided over the parties' formal, arm's length and adversarial mediation. The Settlement clearly emerges from a formal, arms-length negotiation process between the Parties. ECF No. 106-8 ¶ 38; Yanchunis Decl. ¶ 44.

### b. Adequacy of Relief

The relief offered by the Settlement is adequate considering the risks of continued litigation. Although Plaintiff is confident in the merits of his claims, the risks involved in prosecuting a class action through trial cannot be disregarded. While most of Plaintiff's claims survived a motion to dismiss, Plaintiff would still need to prevail on cross-motions for summary judgment and then prevail on a motion for class certification. Almost all class actions involve a high level of risk, expense, and complexity, which is one reason that judicial policy so strongly favors resolving class actions through settlement. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998). This is not only a complex case, but it is in an especially risky field of litigation. *See, e.g.*, *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 WL 3341200, at *6 (W.D. Ky. Aug. 23, 2010) (approving data breach settlement, in part, because "proceeding through the litigation process in this case is unlikely to produce the plaintiffs' desired results"). Data breach cases continue to be among the most risky and uncertain of all class action litigation and certification is rare. Even if the Court had certified a class, Kimpton would have sought appellate review. The Court may recall that Kimpton sought an interlocutory review of this Court's order on the motion to dismiss. Through the Settlement, Plaintiff and Class members gain significant benefits without having to face further risk.

While Plaintiff believes he would prevail on a motion for summary judgment and then also prevail on class certification, there is little directly analogous precedent to rely upon. Class certification has been denied in other consumer data breach cases and it was only recently that the first litigation class was certified in a consumer data breach case. *See Smith v. Triad of Alabama, LLC,* 2017 WL 1044692, at *6 (M.D. Ala. Mar. 17, 2017). The lack of direct precedent creates an additional risk in achieving and maintaining class action status throughout trial and even appeal. While Plaintiff feels that he would be able to obtain certification outside of a settlement context and maintain certification through trial, this is not certainty. Additionally, any potential certification would be subject to later appeal and potential reversal. Also, the cost of trial and any appeals would be significant and would delay the resolution of this litigation without the guarantee of any relief.

The Settlement relief will be distributed via a straight-forward claims process utilizing easy to understand and use claim forms. SA § 2.3. The Claims Process includes procedures for Claim Supplementation, acceptance or rejection of payment offers made by the Claim Administrator, and, if necessary, referral to the Claims Referee where disputes persist. SA § 2.3.1–2.3.5. Checks for approved claims will then be mailed and postmarked within 60 days of the Effective Date, or within 30 days of the date that the claim is approved, whichever is latest. SA § 9.2.

Attorneys' fees, costs, and expenses were negotiated only after reaching agreement on the Class relief. ECF No. 106-8 at ¶ 13; SA § 8.1. Kimpton has agreed to pay up to $800,000.00 for attorneys' fees, costs, and expenses, however the awarded amount remains wholly in the Court's discretion and no order of the Court, or modification or reversal or appeal of any order of the Court, concerning the amount(s) of any attorneys' fees, costs, expenses, and/or service award ordered by the Court will affect whether the Judgment is Final or constitute grounds for cancellation or termination of this Settlement Agreement. SA §§ 8.2, 8.5. Attorneys' fees, costs, and expenses, in whatever amount set by the Court, will be paid within fifteen days of the Effective Date. SA § 8.4. And, as explained in Plaintiff's Motion for Attorneys' Fees, an award of the full $800,000.00 requested will still be less than Counsels' lodestar amount. ECF No. 113 at 13–14 (noting lodestar of more than $1.5 million and costs in excess of $138,000.00).

1    Finally, there are no Rule 23(e)(3) agreements in place here, and the Settlement treats all

2    Class Members equitably relative to each other as all who have been damaged are eligible to receive

3    reimbursement for their losses, whether in the form of time, out-of-pocket costs, or both.

4              **2.  The Standard for Final Approval:  Historic Factors**

5         The Advisory Committee also noted, however, that "[t]he goal of this amendment is not to

6    displace any factor" previously considered in any given Circuit.  *See also, e.g.*, 4 Newberg on Class

7    Actions  § 13:58  (5th  ed.)  ("[V]arious  pre-existing  legal  factors  not  captured

8    by amended Rule 23(e)(2)'s list of factors may prove relevant in particular cases.").  Those historic

9    final approval factors include: (1) the strength of the plaintiff's case; (2) the risk, expense,

10   complexity, and likely duration of further litigation; (3) the risk of maintaining class action status

11   throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and

12   the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a

13   governmental participant; (8) the reaction of the class members to the proposed settlement; and (9)

14   whether the settlement is a product of collusion among the parties. *In re Bluetooth Headset*

15   *Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). To the extent not already addressed above,

16   these factors are addressed below.

17              **a.      The Strength of Plaintiff's Case**

18        Plaintiff believes he has a good case for liability and damages.  Pursuant to the scheduling

19   order in this case, at the time the parties negotiated the Settlement, Plaintiff had developed a solid

20   factual record to move this case forward, and was preparing his motion for summary judgment on

21   his individual claims and damages.  Plaintiff was prepared to submit evidence supporting his

22   assertion that Kimpton had failed to take a number of industry-standard measures to secure its

23   consumers' payment card data; ignored warnings of vulnerabilities in its data security; and that

24   Kimpton missed opportunities to detect and stop the data breach while it was underway.  Plaintiff

25   also believes he would be able to show that he suffered damages as a result of the Kimpton data

26   breach.  However, throughout the litigation, Kimpton has continually disputed the sufficiency of

27   Plaintiff's allegations, and Kimpton believes that discovery against Plaintiff Parsons has allowed

28   Kimpton to develop a factual record to support many of the same basic arguments Kimpton raised

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

on its motion to dismiss. Although Plaintiff feels that he would be able to obtain a favorable ruling on his motion for summary judgment, this is not a certainty.  Moreover, as discussed above, the proposed settlement provides for monetary benefits that likely exceeds what class members would likely be able to recover if Plaintiff were to establish class-wide liability.  And, the level of effort that each class member must undertake to claim those settlement benefits is likely significantly less than if he or she were forced to prove and claim causation and damages in a contested proceeding.

### b.    The Amount Offered in Settlement

Through arm's-length negotiations between sophisticated counsel experienced in litigating complex cases and through the assistance of an experienced mediator, the parties were able to reach an agreement that compares very favorably to settlements in payment card data breach class actions that have been approved by other courts.  As discussed above, payment card data breach class action cases are particularly risky and challenging and the outcome of this settlement should be considered not only as favorable compared to other payment card data breach class action settlements, but as particularly favorable given that multiple other payment card data breach cases against hotel or restaurant chains have resulted in no recovery for the plaintiff or Class Members.  *See, e.g.*, *Dugas v. Starwood Hotels & Resorts Woldwide, Inc.*, 3:16-cv-00014-GPC-BLM (S.D. Cal.), Doc. 56 (order dismissing payment card data breach case) (July 11, 2017); *Whalen v. Michaels Stores, Inc.*, 689 Fed. App'x 89 (2d Cir. 2017) (order affirming dismissal of payment card data breach case).

- The Home Depot data breach, which involved the theft of approximately 92 million consumers, consisting of 40 million consumers' payment data and 53 million consumers' email addresses settled creating a $13 million fund for consumers, paying an additional $6.5 million for internet and dark web monitoring services (which was eligible to be repaid from the fund), and $7.5 million in attorney fees. For the 40 million payment cards at issue, the settlement equates to approximately .33 cents per card.  *See In re the Home Depot, Inc., Customer Data Sec. Breach Litig.,* No. 1:14-MD-02583-TWT, ECF No. 181-2 (March 7, 2016) (Settlement Agreement); *id.*, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (order approving settlement).

- The Target data breach, which compromised the personal information of nearly 110 million consumers, resolved with Target establishing a settlement fund of $10 million and separately paying $6.75 million in attorney fees. This amounts to

approximately .09 cents per card. *See In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522-PAM, ECF No. 358-1 (March 18, 2015) (Settlement Agreement); *id.*, 2017 WL 2178306, at *2 (D. Minn. May 17, 2017) (order approving settlement on remand from the 8th Circuit), *appeal pending* Case No. 15-3912 (8th Cir.).

- The Neiman Marcus data breach, which compromised the personal information of approximately 2,187,773 individuals who held different payment card accounts with Neiman Marcus establishing a settlement fund of $1,600,000, $400,000 of which went to costs for the Claims Administrator and $530,000 for attorneys' fees, costs and expenses. This equates to approximately .31 cents per card. *See Remijas v. The Neiman Marcus Group, LLC*, No. 14-cv-1735, ECF No. 145 (March 17, 2017) (Memorandum in Support of Preliminary Approval).

Here, the $1.00 per card recovery compares well against other payment card data breach settlements. The Settlement will also reduce the risk that the payment card data that consumers continue to entrust to Kimpton will be compromised by future attacks. Kimpton will adopt several significant data security measures negotiated with the assistance of a cyber security expert and Lead Counsel's experience in other data breach cases, including those referenced above. These measures include designating an information security position, performing annual PCI DSS audits and penetration testing, implementing an annual security awareness program, and improving payment card acceptance technology.

### c.   The Extent of Discovery Completed and the Stage of the Proceedings

Before entering into settlement discussions on behalf of class members, counsel should have "sufficient information to make an informed decision." *Linney*, 151 F.3d at 1239. Here, the parties completed fact discovery, which included: eleven depositions; tens of thousands of produced documents; and, multiple subpoenas for documents and depositions to non-parties. ECF No. 106-8 at ¶ 36; Yanchunis Decl. ¶ 42. Expert discovery was also well underway when the parties reached the Settlement. Plaintiff retained a cybersecurity expert and a damages expert. Both experts reviewed information developed during discovery and had numerous conference calls with Plaintiff. Plaintiff's cybersecurity expert also attended several of the depositions in this case. *Id.* Plaintiff knows the strengths and weaknesses of the Class's claims and has worked with experts to value those claims and to understand the business practice changes necessary to protect Class members' payment card data in the future. From the information Plaintiff obtained in discovery,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   he was well-prepared to negotiate a settlement on behalf of the Class. *Id.*

2               **d.      The Experience and Views of Counsel**

3               As set forth in the previously provided resumes and declaration, Plaintiff's counsel have

4   considerable experience in class actions and specifically data breach litigation, and have litigated

5   to resolution some of the largest data breach and privacy cases filed to date. *See* ECF No. 106-8 at

6   ¶¶ 1–3; ECF No. 98-8 at ¶¶ 1–19; ECF Nos. 98-9 – 98-11; Yanchunis Decl. ¶ 43. Class Counsel

7   are confident, based on their extensive experience as class action litigators and with other similar

8   class actions, *e.g. In re: The Home Depot, Inc., Customer Data Security Breach Litigation.,* Case

9   No. 14-md-02583-TWT (N.D. Ga. 2016), *In re: Target Corporation Customer Data Security*

10  *Breach Litigation*, Case No. 14-md-02522 (D. Minn. 2015), that they have a full understanding of

11  the facts at issue, and the strengths and weaknesses of the legal allegations in the complaint. Thus,

12  Plaintiff's counsel is well qualified to evaluate the class claims, value of the settlement versus

13  moving for certification and going to trial, and the viability of possible affirmative defenses. *See*

14  *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979) ("The recommendations of plaintiffs'

15  counsel should be given a presumption of reasonableness."). Plaintiff's counsel believes that the

16  settlement is fair and reasonable in light of the complexities of the case, the uncertainties of class

17  certification and litigation, and the secured benefit to the class. ECF No. 106-8 at ¶ 37; Yanchunis

18  Decl. ¶ 43.

19              **e.      The Presence of a Governmental Participant**

20              No governmental agency is involved in this litigation, but the Attorney General of the

21  United States and Attorneys General of each of the States have been notified of the proposed

22  settlement pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, and given an opportunity

23  to raise any objections or concerns they may have, and none have raised any concerns.

24              **f.      The Reaction of Class Members to the Proposed Settlement**

25              Only five Class Members have excluded themselves from the Settlement and no objections

26  have been lodged, yet, hundreds of claims have been filed. This positive reaction of the Class

27  strongly supports finally approving the Settlement.

28              **C.      The Court Should Find the Notice Plan Met the Requirements of Due Process**

*Left margin:* ROBINS KAPLAN LLP   ATTORNEYS AT LAW   MINNEAPOLIS

In any proceeding that is to be accorded finality, due process requires that interested parties be provided with notice reasonably calculated, under the circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). That means the settlement notices must fairly apprise the class members of the terms of the proposed compromise and give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. *Id*. Additionally, the notice must be designed so as to have a reasonable chance of reaching a substantial percentage of the class members. *Id.* at 318 (explaining notice must be reasonably calculated to reach interested parties).

Here, as explained above, the Notice Plan was implemented as anticipated, reaching 84.5% of the identified Settlement Class and approximately 80% of the Class as a whole. Azari Decl. ¶¶ 18, 38. Accordingly, the Court should find the Notice Plan was reasonably calculated to give actual notice to Settlement Class Members of the right to receive benefits from the Settlement, and to be excluded from or object to the Settlement and that the Notice Plan met the requirements of Rule 23 and due process.

### D.    The Court Should Finally Appoint Plaintiff's Counsel as Class Counsel

Under Rule 23, "a court that certifies a class must appoint class counsel . . . [who] must fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). In making this determination, courts generally consider the following attributes: (1) the proposed class counsel's work in identifying or investigating potential claims, (2) the proposed class counsel's experience in handling class actions or other complex litigation, and the types of claims asserted in the case, (3) the proposed class counsel's knowledge of the applicable law, and (4) the proposed class counsel's resources committed to representing the class. Fed. R. Civ. P. 23(g)(1)(A)(i-iv).

Here, proposed Class Counsel have extensive experience prosecuting class action cases, and specifically data breach cases. *See* ECF No. 106-8 at ¶¶ 1–3; ECF No. 98-8 at ¶¶ 1–19; ECF Nos. 98-9 – 98-11; Yanchunis Decl. ¶¶ 5-9. Accordingly, the Court should appoint John Yanchunis of Morgan & Morgan Complex Litigation Group as Lead Class Counsel, and Michael Ram of Robins Kaplan LLP as Class Counsel.

**VI.   CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this motion for final approval; find the Settlement fair, reasonable, and adequate under Rule 23(e), finally certify the Settlement Class; finally appoint Andrew Parsons as Class Representative; finally appoint John Yanchunis as Lead Class Counsel, and Michael Ram as Class Counsel; finally appoint Epiq Systems, Inc. to serve as the Claims Administrator, and find that the Notice Program satisfied Rule 23 and due process.

Dated:  June 27, 2019

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**

By:  /s/ *John A. Yanchunis*
John A. Yanchunis *(pro hac vice)*
Florida Bar No. 324681
jyanchunis@ForThePeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
Facsimile: (813) 223-5402

Michael F. Ram, SBN #104805
Email:  mram@RobinsKaplan.com
Marie N. Appel, SBN #187483
Email:mappel@RobinsKaplan.com
ROBINS KAPLAN, LLP
2440 W. El Camino Real, Suite 100
Mountain View, California 94040
Telephone:  (650) 784-4040
Facsimile:  (650) 784-4041

1

## CERTIFICATE OF SERVICE

2

      I hereby certify that June 27, 2019, I authorized the electronic filing of the foregoing with

3

the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4

e-mail addresses denoted on the attached Electronic Mail Notice List.

5

      I certify under penalty of perjury under the laws of the United States of America that the

6

foregoing is true and correct. Executed June 27, 2019.

7

                                /s/ *John A. Yanchunis*

8

                                John A. Yanchunis
MORGAN & MORGAN COMPLEX LITIGATION
GROUP

9

201 N. Franklin Street,
7th Floor Tampa, FL 33602

10

Telephone:  813/223-5505
813/223-5402 (fax)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

- 26 -